## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **MITCHELL J. MAGEE, M.D.** and **TODD M. DEWEY, M.D.** | § § § § | Civil Action No. _____ |
| **Relators,** | § § | |
| **BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA** | § § § § | |
| **C/O Hon. John M. Bales** **United States Attorney** **Northern District of Texas** **101 East Park Boulevard, Suite 500** **Plano, Texas 75704** | § § § § § | **QUI TAM COMPLAINT** *JURY TRIAL DEMANDED* |
| **Plaintiff,** | § § | |
| **vs.** | § § | **FILED** *IN CAMERA* **UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **TEXAS HEART HOSPITAL OF THE SOUTHWEST, L.L.P. d/b/a THE HEART HOSPITAL – BAYLOR PLANO, BAYLOR, SCOTT & WHITE MEDICAL CENTER – PLANO, THE BAYLOR HEALTH CARE SYSTEM, and BAYLOR SCOTT & WHITE HEALTH** | § § § § § § § § § | |
| **Defendants.** | § § | |

### QUI TAM COMPLAINT

Relators Mitchell J. Magee, M.D. ("Dr. Magee") and Todd M. Dewey, M.D. ("Dr. Dewey") (together, "Relators") bring this action on behalf of the United States against The Texas Heart Hospital of the Southwest, L.L.P. d/b/a The Heart Hospital Baylor – Plano ("Heart Hospital"), Baylor, Scott & White Medical Center – Plano ("BMCP") (formerly known as

Baylor Regional Medical Center at Plano ("BRMCP"), The Baylor Health Care System ("BHCS"), and Baylor Scott & White Health ("BSWH") (together "Defendants") for treble damages and civil penalties arising from the defendants' false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. (the "FCA") and the Medicare and Medicaid Protection Act of 1987 (a.k.a. the "Anti-Kickback Statute" or "AKS"), 42 U.S.C. 1320a-7b, and alleges as follows:

## I.   PRELIMINARY STATEMENT

1.   As far back as 1994, the Office of Inspector General ("OIG") of the United States Department of Human Services ("HHS") issued a Special Fraud Alert warning of the risk that physician-owned specialty hospitals would violate AKS if they serve to "lock up a stream of referrals from the physician investors and to compensate them indirectly for those referrals." Since that time, studies have repeatedly confirmed that physician self-referral arrangements lead to overutilization of health care services, especially of federally-funded health care programs.

2.   The Heart Hospital, as it turns out, presents the epitome of the concerns expressed by such warnings.  Opening as a free-standing facility in 2007, the physician-owned specialty cardiac hospital – which primarily serves Medicare patients – has seen exponential growth in the number of procedures and other services performed at the facility.  According to its website, it is now the sixth largest cardiac surgery center in the United States, and is the number one heart surgery center in Dallas-Fort Worth area.

3.   Much of that growth has been as a result of Defendants' illegal scheme to ensure referrals to the Heart Hospital from its physician investors by conditioning the ability of those physicians to retain their limited partnership interests, and the lucrative returns from those interests, on having an excessive number of "patient contacts" at the hospital per year –

from six (6) when the hospital was founded to an astronomical, unparalleled forty-eight (48) by 2012 – and changing the definition of such contacts to only those patient encounters that generate revenue. A significant percentage of the patients undergoing services at the Heart Hospital are there as a result of referrals from physician investors in the facility. In fact, ownership in the Heart Hospital was based on the ability to generate referrals. The term "patient contact" is, therefore, really nothing more than a code word for "patient referrals."

4.     Defendants have thus violated the AKS and harmed the United States by improperly providing direct and/or indirect remuneration to physician investors for the purpose of inducing them to refer beneficiaries of federally-funded healthcare programs, including Medicare, to the Heart Hospital in order to receive services paid by such programs. Moreover, having received reimbursement from federally-funded health care programs with respect to referrals that resulted from breaches of the AKS, Defendants have also violated the Federal False Claims Act ("FCA"). As a result of these improper actions the United States has likely paid hundreds of millions of dollars in wrongful Medicare, Medicaid, and/or TRICARE reimbursements to the Heart Hospital.

## II.     **PARTIES**

5.     Relator Dr. Magee is a resident Dallas, Texas and a citizen of the United States. Dr. Magee has direct and independent knowledge of the information on which the allegations in this Complaint are based.

6.     Relator Dr. Dewey is a resident Dallas, Texas and a citizen of the United States. Dr. Dewey has direct and independent knowledge of the information on which the allegations in this Complaint are based.

7. The real party in interest to the claims set forth in this Complaint is the United States of America.

8. Defendant the Heart Hospital is Texas limited liability partnership whose principal place of business is located at 1100 Allied Drive, Plano, Texas 75093.

9. Defendant BMCP is Texas nonprofit corporation whose principal place of business is located at 4700 Alliance Boulevard, Plano, Texas 75093. It is the majority owner of the Heart Hospital.

10. Defendant the BHCS is a Texas nonprofit health care corporation comprising a network of hospitals, primary care and specialty care centers, rehabilitation clinics, senior care centers, and affiliated ambulatory surgery centers throughout Texas. It is the owner of BMCP. Its principal place of business is 2001 Bryan Street, Suite 2300, Dallas, Texas 75201.

11. Defendant BSWH is the largest nonprofit health care corporation in Texas, is the owner of BHCS, and its principal place of business is located at 2001 Bryan Street, Dallas, Texas 75201.

### III.    JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, as well as 31 U.S.C. § 3730(b).

13. This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants can be found, and transact business, in this judicial district and have committed acts within this judicial district that are proscribed by 31 U.S.C. § 3729.

14. Venue is proper in this Court under 28 U.S.C. 1391 (a)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in, and transact business, in this judicial district and have committed acts within this judicial district that are proscribed by 31 U.S.C. § 3729.

15.   The facts and circumstances of Defendants' violations of the FCA and the AKS have not been publicly disclosed in criminal, civil or administrative proceeding; or in any legislative, administrative, or inspector general report, hearing, audit, or investigation, or in the media.

16.   Relators are the original source of the information upon which this Complaint is based, as that phrase is used in the FCA at 31 U.S.C.A. § 3730(e)(4)(B), and, prior to filing the Complaint, have served voluntary written disclosures to the United States of substantially all material evidence and information possessed by them.   Moreover, the allegations made in the Complaint have not been publicly disclosed in a: (i) Federal criminal, civil or administrative hearing in which the United States, or its agent, is a party; (ii) congressional, Government Accountability Office or other Federal report, hearing, audit, or investigation; or (iii) from the news media.

## IV.

## RELATORS:  AMONG THE DALLAS AREA'S PREEMINENT SURGEONS

### A.    Mitchell J. Magee, M.D.

17.   Dr. Magee currently serves as the Director of Thoracic Surgical Oncology for HCA North Texas Division, as well as Director of the Minimally Invasive Surgery Institute for Lung and Esophagus at Medical City Dallas Hospital ("Medical City").  He has been practicing medicine since August 1985, and is recognized as one of the Dallas area's preeminent thoracic surgeons.   He has been recertified twice since original certification in June 1995 as a cardiothoracic surgeon by American Board of Thoracic Surgery, and further specializes in thoracic oncology and heart and lung transplants.  He is also certified by the United Network of Organ Sharing as a qualified Surgical Director in both Heart Transplantation and Lung Transplantation.

18.   Graduating from the University of Texas Medical School at Houston ("UT Medical, Houston") in 1984, after serving as a Research Fellow at the M.D. Anderson Cancer Center, he began an internship in General Surgery at the University of Southern California Medical Center ("USC Medical Center") in Los Angeles.  That was followed by a residency in General Surgery at that same hospital.  In 1986 he began a two-year research fellowship in Heart Transplantation and Mechanical Circulatory Support at the Texas Heart Institute in Houston, and simultaneously completed a Masters of Science degree with thesis in tumor and transplant immunology from the University of Texas Graduate School of Biomedical Sciences and M.D. Anderson Cancer Center, after which he returned to the USC Medical Center as Chief Resident in General Surgery.

19.   In 1991, Dr. Magee moved to the University of Pittsburgh Medical Center ("UP Medical Center"), where he completed three years of fellowship training in cardiac and thoracic surgery and heart and lung transplantation to become Chief Resident in Cardiothoracic Surgery. Subsequently, in 1994, he took a position as Assistant Professor of Cardiothoracic Surgery at the Southern Illinois University School of Medicine ("Southern Illinois Medical").  During that same period, he also served as the first Surgical Director of the Heart Transplant Program at St. John's Hospital in Springfield, Illinois.

20.   In 1998 Dr. Magee moved to Dallas, Texas, where he became a partner in Cardiothoracic Surgery Associates of North Texas, P.A.  In mid-2007, Dr. Magee completed additional fellowship training at UP Medical Center in Minimally Invasive General Thoracic Surgery.   He then re-focused his practice on non-cardiac thoracic surgery, specializing in thoracic oncology and minimally invasive surgery of the esophagus, lung, and mediastinum.

21.  Dr. Magee has held an active unrestricted license to practice medicine in Texas since 1985 and was formerly licensed in California, Pennsylvania, and Illinois. In addition, Dr. Magee is a current member of a nearly a dozen medical societies and associations, including: (i) the American College of Surgeons, where is a Fellow; (ii) the American College of Cardiology, where is he also a Fellow; (iii) the Society of Thoracic Surgeons; (iv) the European Society of Thoracic Surgeons; (v) the American Association of Thoracic Surgery; and (vi) the International Society of Heart and Lung Transplantation.

22.  Dr. Magee has held a number of positions on national medical committees and boards. These include serving as: (i) Surgical Director of Research at the Cardiopulmonary Research Science and Technology Institute; (ii) Scientific Advisory Board Member at both Percardia and Novadaq Corporation; (iii) Member of the Workforce On National Databases, the Taskforce on Quality Measurement, and the Taskforce on General Thoracic Surgery Database at the Society of Thoracic Surgeons; (iv) Chair of the General Thoracic Database Audit Committee; and (v) Co-Chair of the Post-Graduate Program Committee of the Southern Thoracic Surgical Association. Dr. Magee also serves as Associate Editor on the Editorial Board of the Annals of Thoracic Surgery, and as a reviewer for the Journal of Heart and Lung Transplantation and the Journal of Cardiothoracic and Cardiovascular Surgery.

23.  Dr. Magee has also received numerous awards and honors during his career. These include: (i) a membership in the Alpha Omega Alpha Medical Honor Society at the UT Medical School, Houston; (ii) the Excellence in Teaching Award at Southern Illinois Medical; and (iii) being named a Thoracic Surgery Research Foundation Fellow and the recipient of the Alley Sheridan Scholarship by the Thoracic Surgery Foundation for Research and Education. In addition, he has been named 14 times as one of the "Best Doctors in Dallas" by D Magazine, and

designated a "Texas Super Doctor" by Texas Monthly ten times. Finally, Dr. Magee is the author, or co-author, of nearly 90 articles published in a variety of national and international medical journals and publications – including the New England Journal of Medicine, the Annals of Thoracic Surgery, and Oncology – as well as 10 chapters in well-known medical textbooks and treatises, such as *Glenn's Thoracic and Cardiovascular Surgery* and *Difficult Decisions in Thoracic Surgery: An Evidence-Based Approach*. He has also made nearly 60 presentations at various meetings of medical professionals, including those held by the American Surgical Association, the American College of Chest Physicians, and the American Heart Association.

24. Between 1998 and 2009, Dr., Magee served as both Chief of the Section of Cardiothoracic Surgery and Associate Director of Heart and Lung Transplantation at Medical City Dallas Hospital ("Medical City") and served as Chief of the Department of Cardiothoracic Surgery from 2010 through 2016. He was also on the founding Board of Directors at BRMC between 2004 and 2007, and from 2003-2005 he was the Surgical Director of Cardiovascular and Thoracic Services at that facility.

25. In June 2004 Dr. Magee became, with other physicians, a founding partner in the Heart Hospital, which is majority-owned by BRMC. Indeed, he performed the first cardiac surgical procedure – a coronary artery bypass – conducted at the Heart Hospital while operating at BRMC, and for the first two years in operation at that facility performed the majority of the cardiothoracic surgeries done on the campus of BRMC. He also established the initial medical order sets and protocols for surgery patients and those admitted to the Intensive Care Unit at the Heart Hospital.

**B.    Todd M. Dewey, M.D.**

26. Dr. Dewey currently serves as Surgical Director of Heart Transplant & Medical Assist Device Technologies and Director of Structural Heart disease at Medical City as well as

the National Medical Director for Cardiovascular Surgery for the Hospital Corporation of America ("HCA"). He has been practicing medicine since May 1990, and is acknowledged as one the Dallas area's best cardiothoracic surgeons. He is certified as a cardiothoracic surgeon by the American Board of Thoracic Surgery, and has recertified once.

27.  Graduating from the Texas Tech University Health Sciences Center School of Medicine in 1990, he was a resident in General Surgery at the University of Texas Southwestern Medical Center in Dallas, Texas until June 1995, serving as Chief Resident from 1994 to 1995. He was then Chief Resident for Cardiothoracic Surgery at The New York Hospital/Cornell Medical Center from July 1995 to June 1997. During that time, he was also Thoracic Surgery Fellow at Memorial Sloan-Kettering Cancer Center in New York. From there, he served a Fellow and Attending Staff for Cardiac Transplantation & Ventricular Assist Devices at Columbia-Presbyterian Medical Center until mid-1998, when he moved to Dallas, Texas to become a partner in COR Specialty Associates of North Texas, P.A.

28.  Dr. Dewey holds an active license to practice medicine in Texas. In addition, he is a current member of the Society of Thoracic Surgeons, the American Association for Thoracic Surgery, the Southern Thoracic Surgical Association, and the Parkland Surgical Society

29.  Dr. Dewey has held a number of academic appointments since 1994. He was a Clinical Instructor in Surgery at: (i) the University of Texas Southwestern Medical School/Parkland Memorial Hospital; (ii) The New York Hospital/Cornell Medical Center; and (iii) Columbia-Presbyterian Medical Center. He has also served as an Adjunct Assistant Clinical Professor at the University of Texas at Arlington School of Nursing.

30.  Dr. Dewey has held a number of positions on national medical committees and boards. From 2008 to 2010 he Membership and Professional Standards Committee for the

United Network for Organ Sharing. From 2011 to 2012, was the Chairman of the Society of Thoracic Surgeons Workforce on Annual Meeting, and continues to serve as a member of the Task Force on End Stage Heart Disease. He is currently a member of the Society of Thoracic Surgeons/American Association of Thoracic Surgery Joint Task Force on Thoracic Surgical Education.

31.   Dr. Dewey has received numerous awards and honors during his career.  These include: (i) a membership in the Alpha Omega Alpha Medical Honor Society at the Texas Tech University Health Sciences Center School of Medicine; (ii) being named Outstanding Student in Internal Medicine; and (iii) receiving the Francis C. Jackson Award for Excellence in Surgery while at Texas Tech.  In addition, he has been named 12 times as one of the "Best Doctors in Dallas" by D Magazine, and designated a "Texas Super Doctor" by Texas Monthly nine times.

32.   Dr. Dewey is the author, or co-author, of over 75 articles published in a variety of national and international medical journals and publications – including the New England Journal of Medicine, the Journal of Thoracic Cardiovascular Surgery, the Annals of Thoracic Surgery, and the European Journal of Cardiothoracic Surgery1  – as well as three chapters in well-known medical textbooks and treatises, such as *Cardiac Surgery in the Adult, Third Edition* and *Transcatheter Aortic Valve Implantation: Tips and Tricks to Avoid Failure*.  He has also made nearly 160 presentations at various meetings of medical professionals, including those held by the Society of Thoracic Surgeons, International Society for Minimally Invasive Cardiac Surgery, American College of Cardiology, and Society for Heart Valve Disease.  He also presented over 30 abstracts, and been the Principal or Sub-Investigator for 30 studies, on various topics related to cardiothoracic devices and surgeries.

33. In 2004 Dr. Dewey, along with Dr. Magee and other physicians, became a founding partner in the Heart Hospital.

## V. APPLICABLE STATUTES AND REGULATIONS

### A. The Medicare Program – Title XVII of Social Security Act – 42 U.S.C.S §§ 1395-95ccc

34. The Medicare Program was enacted in 1965 by Congress to pay for the costs of certain health services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. Title XVIII of the Social Security Act; 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including the Heart Hospital, derive a substantial portion of their revenue from the Medicare Program.

35. Under the Medicare program, the Centers for Medicare and Medicaid Services ("CMS") makes payments after the services are rendered to hospitals for inpatient and outpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program.

36. As detailed below, the Heart Hospital from its inception in 2004 and through today has knowingly submitted, or caused to be submitted, claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

37. The Heart Hospital, since its inception in 2004 and through the present has participated Medicare Part A. To that end, has since 2004 and through the present knowingly and periodically signed an application for participation in the Medicare program, known as CMS Form 855A, and submit it to the United States. Included in the CMS Form 855A is a "Certification Statement" that contains, *inter alia,* the following language:

**I agree to abide by the Medicare laws, regulations and program instructions that apply to this provide . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law) and o the provider's compliance with all applicable conditions of participation in Medicare.**

38.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

39.     Following the discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. These hospitals submit patient-specific claims for interim payments on a CMS Form UB-04 (formerly UB-92).

40.     As a prior condition to payment by Medicare, CMS requires hospitals to submit on an annual basis a form CMS-2552, more commonly known as the "Hospital Cost Report." These reports are the final claim that a provider submits to the fiscal intermediary for items and services provided to Medicare beneficiaries.   After the conclusion of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.180(b)(l). Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(t)(l).

41.   The Heart Hospital was, required to submit Hospital Cost Reports to its fiscal intermediaries, and has knowingly done so from the time of its opening in 2004 through the present.

42.   Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit the hospital cost reports and financial representations made by the Defendants to ensure their accuracy and to preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.

43.   Each Hospital Cost Report contains an express certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

44.   The Hospital Cost Report Certification is a preface to the cost report's certification, the following warning appears:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

This advisory is followed by the actual certification language itself:

> **CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)**
>
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of

**facility, ID number of facility) for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations (emphasis added). (This is followed by: signature of facility's officer, title and date).**

45.     Defendants are required to be familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports. Thus, the Heart Hospital, BMCP, BHCS, and Baylor Scott & White Health are required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports, stating, *inter alia*:

> **Whoever  . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . .be guilty of a felony.**

46.     The Heart Hospital, since its inception in 2004 and through the present, has knowingly submitted Health Cost Reports that were signed by the Heart Hospital's employees, usually a hospital official, who attested, among other things, to the certification quoted above. To assist in the administration of Medicare Part B, CMS contracts with "carriers." Carriers, typically insurance companies, are responsible for

processing and paying claims.   Doctors or other providers submit Medicare Part B claims to the carrier for payment.

47.   Under Part B, Medicare will generally pay eighty percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 13951 (a)(l), 1395y(a)(l). For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality.  42 C.F.R. §§ 405.502-504.

**B.**   **The TRICARE/CHAMPUS Program – 10 U.S.C.A. § 1071-1106**

48.   In 1967 the Department of Defense established the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), a federal medical program funded by Congress.  10 U.S.C. § 1071.  CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel.

49.   In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this program.

50.   The TRICARE managed healthcare programs are created through contracts with managed care contractors in three geographic regions: North, South, and West. The Defendants serve patients in the West TRICARE region.  Health services providers, such as

the Heart Hospital, who are Medicare-certified providers are also considered TRICARE-authorized providers.

51.     The Heart Hospital is a TRICARE "Network Provider," which means it has entered into the West region's managed care contractor to provide services for an agreed reimbursement rate. 32 C.F.R. § 199.14(a). It has, therefore, since its inception in 2004 and through the present, knowingly sought and obtained reimbursement from the TRICARE program for services it has provided to military retirees, and/or their eligible dependents, and/or active duty members of the armed forces.

52.     In addition to individual patient costs, TRICARE reimburses hospitals for two types of costs based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.6. A facility seeking reimbursement from TRICARE for these costs is required to submit a Request for Reimbursement form, in which the provider sets forth its number of TRICARE patient days and financial information which relates to these two cost areas all of which is derived from the Medicare cost report for that facility.

53.     This Request for Reimbursement form requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report." Upon receipt of a hospital's Request for Reimbursement and its financial data, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the facility.

54.    The Heart Hospital since its inception in 2004 and through the present has knowingly submitted Requests for Reimbursement to TRICARE that were based on its Medicare cost reports.

## VI.    APPLICABLE FEDERAL STATUTES

### A.    The Federal Anti-Kickback Statute, 42 U.S.C.A § 1320a-7b

55.    The AKS prohibits a party from receiving "any remuneration," in any form, whether direct or indirect, in return for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C.A. § 1320a-7(b)(1)(A). It also prohibits any party from paying such remuneration.   42 U.S.C.A.   § 1320a-7(b)(2)(A).

56.    The term "any remuneration" encompasses any kickback, bribe, payment, benefit or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. 31320a-7b(b)(l). It includes both sums for which no actual service was performed, and sums for which some service was performed.   The statute has been interpreted to cover any arrangement where even one purpose of the remuneration was to obtain money for the referral of services or induce further referrals.

57.    Under the AKS both criminal and civil penalties apply, including civil monetary penalties, and the sanction of exclusion from federal health benefit programs. The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization, poor medical judgment, and restrict competition, ultimately resulting in poor quality of care being delivered to patients.

58. In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Medicare any claim for referrals that are induced by kickbacks. Importantly, the Patient Protection and Affordable Care Act of 2010 ("ACA") amended the AKS to provide that a claim submitted for reimbursement to a federally-funded health care program for items or services provided as the result of a referral violating the AKS is deemed to be "false" under the FCA. 42 U.S.C. § 1320a-7b(g).

59. The ACA also amended the AKS to expressly state that neither actual knowledge of the AKS nor a specific intent to violate it is an element of a violation of the statute. 42 U.S.C. § 1320a-7b(h). Prior to the passage that amendment, the United States Court of Appeals for the Fifth Circuit had stated that a violation of the AKS was knowing and willful when the defendant had knowledge that the conduct in question was unlawful and was committed with the specific intent to do something the law forbids, but the defendant need not have had knowledge of the particular law allegedly violated. *United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998).

60. Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the AKA *must* be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(l). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the AKS, the Secretary may exclude that provider from the Federal health care programs for a discretionary period, and may impose administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

61.    HHS has published safe harbor regulations that define practices that are not subject to the AKS because such practices would unlikely result in fraud or abuse.  42 C.F.R. §1001.952. Such safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor, and with regard to referrals from investors to a practice or entity such as the Heart Hospital, no more than 40% of the entity's gross revenue can come from such referrals, and the terms offered to investors must have no relation to expected volume of referrals or require than an investor make referrals to the entity.  Indeed, in a Special Fraud Alert issued by the OIG in 1994, HHS warned that joint ventures such as the Heart Hospital would violate the AKS if they serve to "lock up a stream of referrals from the physician investors and to compensate the them indirectly for those referrals."  OIG Special Fraud Alert on Joint Venture Arrangements, 59 Fed. Reg. 65373-74 (Dec. 19, 1994).  The Alert specifically noted that one of the red flags marking such an entity as suspect under the AKS would include the joint venture choosing investors because they are in a position to make referrals.  *Id.*

**B.    The Federal False Claims Act, 31 U.S.C.A. §§ 3729(a) *et seq.***

62.    The FCA, at 31 U.S.C.A. 3729(a), provides, *inter* alia, that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to committee a violation of subparagraph (A), (B) . . . or (G) . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government  for a civil penalty of  not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person

63.   The FCA, at 31 U.S.C.A. 3729(b), further provides, *inter alia,* that:

For purposes of this section – (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) no proof of specific intent to defraud is required.

## VII.   DEFENDANTS' WRONGFUL SCHEME

**A.**   **The Heart Hospital Baylor Plano – Focused From The Start On Generating Increasing Revenue From Federally-Funded Health Programs.**

64.   In mid-2004 eighty-six physicians, including Relators, partnered with BRMC to form the Texas Heart Hospital of the Southwest, LLP, which does business as the Heart Hospital. The purpose of the limited partnership – of which BMCP has a majority ownership slightly exceeding 50% – was to create a specialty hospital focusing on cardiac care. Initially, there were 1000 "Class P" units for physician investors at $25,000 per unit, with an equal number of "Class H" units for BMCP (then BRMCP). As of September 2013, after an 8th subscription offering to physicians, the total number of outstanding Class P units was 4,822, and the value of those units was significantly more than the original offering.

65.   The Heart Hospital began operation in the BRMC, but in 2007 it moved into a newly-built facility adjacent to the current BMCP campus.

66.   Lawmakers, scholars, and health care experts have identified several problems with physician self-referral arrangements, such as is found at the Heart Hospital, primarily the concern that it leads to overutilization of services.   Indeed, studies have consistently shown that when self-referrals occur the amount of services increases substantially. *See, e.g.,* U.S. Gov't Accountability Office, GAO-12-966, GAO Report: Medicare (2012).  Overutilization,

especially of federally-funded health care programs, from self-referral is a natural temptation of the arrangement because the return on investment depends on the number of patients that receive services at the facility, which in turn is most often determined by the number of patients referred by the investing physician. *See* Theodore N. McDowell, *Physician Self Referral Arrangements: Legitimate Business or Unethical "Entrepreneurialism,"* 15 Am. J.L. & Med. 61, 65 (1989).  Indeed, a 2006 report focusing on physician-owned specialty hospitals found that rates of coronary artery bypass graft surgery for Medicare beneficiaries grew faster in areas that gained a physician-owned cardiac hospital, such as the Heart Hospital.  *See* Medicare Payment Advisory Commission, August 2006, *Report to the Congress: Physician-Owned Specialty Hospitals Revisited.*  Two other studies in that same year reported similar growth in utilization in areas after specialty cardiac hospitals opened compared to cardiac programs in general hospitals.  *See* B. Nallamothus, M. Rogers, M. Chernew, et al., Opening of Specialty Cardiac Hospitals and Use of Coronary Revascularization in Medicare Beneficiaries, *Journal of the American Medical Association* 297(9):962-8 (March 7, 2007); J. Stensland and A. Winter, Do Physician-Owned Cardiac Hospitals Increase Utilization?, *Health Affairs* 25(1): 2252-9 (Jan-Feb 2006).

67.      From its inception, the Heart Hospital's leaders were keenly aware of these concerns, and by the increased scrutiny of physician-owned hospitals by the United States Government and Congress that had resulted.  In fact, a *D Magazine* article on the Heart Hospital noted that Dr. David Brown, co-founder of the Heart Hospital and the Chairman of the Medical Staff, "wanted to partner with a health system. Congress was considering killing Medicare and Medicaid reimbursements to physician-owned hospitals because of the risk of fraud involving conflicts of interest. If the heart hospital launched without a partner health

system, it would have been dead on arrival." M. Goodman, Why Plano has one of the Country's Best Heart Hospitals, *D Magazine*, April 2015. The article also noted that, perhaps unsurprisingly given the studies noted above, in 2013 the Heart Hospital "became the seventh-largest vascular program in the country (out of about 1,700). It had the seventh-largest valve surgery program. It did more open heart surgeries than all but seven other programs. One of every five heart surgeries performed in North Texas last year happened here."

**B.      The Heart Hospital's Response To Government Restrictions On Its Expansion – Artificially Increase The Required Number Of "Patient Contacts" For Physician Investors And Narrow The Definition Of A Contact To Revenue-Generating Referrals.**

68.      Dr. Brown proved to be prescient.  In light of the evidence that physician-owned specialty hospitals had led to overutilization of federally-funded health programs at those facilities, Section 6001 of the ACA effectively bans new physician-owned hospitals and generally keeps existing ones, such as the Heart Hospital, from expanding.  Faced with this government-mandated limitation on the Heart Hospital's ability to generate additional revenue by adding beds, Defendants turned to another solution.  To ensure an increasing stream of revenue from physician investor referrals, and under the false guise of ensuring "quality of care" peer review, the Heart Hospital: (i) artificially inflated the number of "patient contacts" required by a physician to retain their limited partnership units; while, at the same time, (ii) limiting the definition of "patient contacts" to those encounters that generated revenue to the hospital.

**1.      Patient contact requirements at the Heart Hospital are directly linked to both the remuneration received by the physician investors and the hospital's revenue stream from those physician's referrals.**

69.     Like most hospitals, the medical staff by-laws of the Heart Hospital (the "By-Laws") has a provision wherein, in order to maintain membership on the Active-Clinical Medical Staff, a physician is required to have a minimum number of patient contacts during the period of his or her appointment.  Such requirements are imposed to permit a medical facility's credentialing authorities to more accurately assess a physician's competency during the relevant period and to determine whether reappointment to the active staff is appropriate. The number of such required contacts, however, must be rationally related to the goal of maintaining patient care, patient welfare and the objective of the institution.  The required number of patient contacts should thus only be the minimum necessary to determine competency rather than a mere pretense.

70.     The need for rationality in setting the required number of patient contacts to retain active staff privileges is especially important at the Heart Hospital because maintaining such privileges is prerequisite to physician investors retaining their Physician Partner Units in the Heart Hospital.  Pursuant to Section 4.2 of the Limited Partnership Agreement, the limited partnership has a right and option to immediately redeem a physician investor's units once the physician's Active-Clinical Medical Staff status lapses, and at a price equal to the physician's adjusted capital account.  In other words, if a physician investor fails to maintain active privileges, he or she may lose not only their limited partnership units, but also the lucrative income stream associated with those units.  As of 2014, physician investors were receiving payments of approximately $12,000 to $15,000 per Class P Unit on a semi-annual basis.  In short, the number of "patient contacts" required to maintain Active-Clinical Medical Staff privileges is directly related to the remuneration received by the physician investor from the Heart Hospital.

71.   "Patient contacts" – *i.e.* patient referrals – are equally, if not more, important to the Heart Hospital.  A significant percentage of the facility's revenue comes from services to patients referred by physician investors.  Accordingly, especially after the ACA has prohibited it from expanding, the hospital needed to ensure that this source of revenue continued to increase.

2.   **The ever-expanding number of "patient contacts" required of Heart Hospital's physician investors and the ever-changing definition of those contacts.**

72.   When the Heart Hospital first began operations at BRMC in 2004, the number of patient contacts required to maintain Active-Clinical Medical Staff privileges was six (6) per year.  In the ensuing years, the number of contacts continued to be randomly increased by the hospital's Medical Executive Committee and Board of Managers.  By May 2012 reappointment to the Active-Clinical Medical Staff required twenty-four (24) patient contacts per year.  In July 2012, however, the Heart Hospital's Medical Executive Committee and Board of Managers doubled that number to forty-eight (48) patient contacts per year, or at least eighty-four (84) over a two-year appointment period.  Thus, since 2004, the number of required patient contacts had gone up by eight-fold.

73.   Also changing was the definition of the type of "patient contacts" that were needed to fulfill the requirement.  Initially, a "patient contact" included any and all face-to-face encounters with a patient, whether it be surgery, an in-hospital  history and physical examination, a consult, or encounter during required rounds at the hospital.  As of December 2012, however, the definition had changed to ensure that all "patient contacts" would be revenue generating for the Heart Hospital.  According to Section 14.1 of the Heart Hospital's Medical Staff Rules and Regulations, "patient contacts" were: (i) admissions, as long as the

history and physical examination is performed *at the hospital*; (ii) inpatient and outpatient procedures performed *at the hospital*; (iii) surgeries performed *at the hospital*; (iii) or consultations that occur *at the hospital*. Contacts during rounds are no longer counted. Most significantly, no patient admission can result in more than one "patient contact," even if multiple consults are performed during the stay, additional procedures are performed as needed, or there are more than one "meaningful face to face encounter" with that patient.

3. **The changes to the number and definition of "patient contacts" had a disproportionately negative impact on physician investors that did not contract directly with BHCS or BSWH.**

74.    These changes have a disparate and negative impact on physician investors that are employed by BHCS or BSWH versus those that have contracts with other hospital systems.   Opportunities for in-house consultations became more critical as the definition of "patient contacts" narrowed.   Such consultations, however, are controlled by Baylor-contracted physician investors and their Baylor colleagues.   In addition, patients that are brought into the Heart Hospital through the emergency department or outpatient clinics operated by BHCS/BWSH are preferentially referred to surgeons are contracted to Baylor, further limiting access to "patient contacts" those physician investors that are not contracted to BHCS/BWSH.

75.    The impact is especially disproportionate on physician investors that are surgeons, but were not contracted with BHCS or BWSH.   That is because the new "one contact per admission" rule effectively means that a "contact" is more often than not a surgery. Thus, in order to keep their limited partnership units in the Heart Hospital as of mid-2012, a non-Baylor surgeon essentially has to perform 48 surgical procedures per year solely at the Heart Hospital, and would not allow any surrogate lists of patient care from any other

hospital within or outside the Baylor healthcare system.  This policy is uniquely restrictive to the Heart Hospital as compared to any hospitals within or outside the Baylor Healthcare system, where a list demonstrating competency at another hospital in the community is acceptable, with the exception of one other physician-owned Baylor Hospital that may be similarly structured to the Heart Hospital.

76.     The leadership of the Heart Hospital uses this fact to pressure high-performing surgeons to contract with BHCS or BSWH.  For example, in early 2014 Mark Valentine ("Valentine"), the Heart Hospital's President, and Dr. Brown met with Relator Dr. Dewey and asked to him to break his contract with HCA and come to work for the Heart Hospital.  In doing so, they specifically mentioned that Dr. Dewey's "patient contacts" were below the 48 per year that he needed to be appointed to the hospital's Active-Clinical Medical Staff.  They emphasized that if he did not do so, they would have to take his limited partnership units away, but working for BHCS would probably resolve the issue.  Dr. Dewey declined the invitation.  Subsequently, he was not reappointed to Active-Clinical Medical Staff and his shares were involuntarily redeemed.

77.     The focus on revenue generation from self-referrals also dictates the type of physicians that are offered the opportunity to purchase limited partnership units.  Only cardiologists, cardiac surgeons, thoracic surgeons, or vascular surgeons – *i.e.* specialists whom could make referrals to the hospital – have received partnership subscription offers. Anesthesiologists, on the other hand, although critical to the operation of the cardio-surgical specialties, have not been allowed to be partners because they would not be a source of patient referrals.

**C.   The Purpose Of The Changes To "Patient Contacts" Requirements Is To Reward Physician Investors For Referring Revenue-Generating Patients To The Heart Hospital.**

78.   Defendants claim that increased numbers of required "patient contacts," and the narrowing of the scope of such contacts, were necessary to "monitor the quality of care provided by the physicians" working at the Heart Hospital.   As explained below, that assertion is blatantly false.   In fact, Defendants seek to induce referrals to the Heart Hospital by conditioning a physician investor's ability to retain his or her limited partnership units in the Heart Hospital, and thus to receive revenue from those units, upon that physician's maintaining an excessive number of "patient contacts" – which are actually nothing more than revenue-generating referrals to the Heart Hospital.   In other words, Defendants are knowingly rewarding physician investors in return for referrals by those physicians to the Heart Hospital of patients that receive services and items paid for by federally-funded health care programs, including Medicare.

**1.   Defendants' contention that increased "patient contacts" are needed to monitor a physician's quality of care is a sham.**

79.   In its letters warning physicians that that they are not on track to meet the required number patient contacts to be reappointed to the Active-Clinical Medical Staff, the Heart Hospital claims that the required contacts are necessary to have "a sufficiently representative body of clinical work on which to conduct meaningful peer review of the quality of care furnished by members of the Medical Staff." That assertion is a sham and nothing more than a pretense.

80.   There is no rational basis for requiring such a large number of patient contacts as part of a physician's professional competency evaluation.   The American Medical

Association expressly states that clinical hospital privileges "should not be based on numbers of patients admitted to the facility." AMA Opinion 4.07 -- Staff Privileges (June, 1994). The Joint Commission, founded in 1951, evaluates and credits nearly 21,000 health care organizations and programs in the United States.   It is the nation's oldest and largest standards-setting and accrediting body in health care, and BSWH touts the accreditations its hospitals obtain from the Joint Commission on its website.     Indeed, in reappointing physicians to the Active-Clinical Medical Staff the Heart Hospital cites to Joint Commission Standard MS.08.01.01, which deals with the need for professional practice evaluations ("PPE") to determine whether to maintain a physician's privileges.  In discussing ongoing evaluation ("OPPE"), however, the Joint Commission specifically notes the ability of a hospital to use other measures of performance than patient contacts at a specific facility. These include peer recommendations, quality profiles for the physician from other hospitals, and the physicians private practice records.

81.    The Heart Hospital has set up different classes of staff privileges based upon the amount of activity in the hospital, such as: consulting privileges, courtesy privileges, and active privileges. These are common designations across all hospital systems, and generally do not limit the physician in what the physician may do in a hospital. At the Heart Hospital a physician can maintain courtesy privileges with no restrictions to admitting privileges or procedures performed in the hospital. As few as two "patient contacts" per year were required to maintain courtesy privileges, The Heart Hospital requires 48 "patient contacts" to maintain active privileges, and the only advantage to maintaining active status is the ability to own stock in the Heart Hospital.

82. The Heart Hospital also touts its participation in – and the awards it has received – from the Society of Thoracic Surgeons National Database, which bills itself as the "gold standard for specialty outcomes databases." The database collects and reports performance and quality of care data on individual members' activities from *all* facilities that they practice at, not just the Heart Hospital. Both Relators are participants in the STS National Database.

83. Notably, Relators have been unable to identify any other hospital, or hospital system, in the United States that requires a physician to have anywhere close to 48 patient contacts per year, or 84 patient contacts per two-year appointment period limited solely to that facility, in order to maintain active staff privileges, with the exception of one other physician-owned Baylor Hospital that may be similarly structured to the Heart Hospital. The following are some examples of the minimum number of patient contacts that are mandated by other hospitals and hospital systems in the United States to maintain active clinical privileges:

    a. <u>Stanford Health Care, California</u>:  Eleven (11) patient contacts per year, or otherwise regularly involved in Medical Staff functions.

    b. <u>HCA Medical City Dallas Hospital, Texas</u>:  Six (6) patient contacts per year.

    c. <u>Banner Heart Hospital, Arizona</u>:  Twenty-five (25) patient contacts per two-year appointment period.

    d. <u>Vanderbilt University Medical Center, Tennessee</u>:  No designated minimum number of patient contacts.

    e. <u>Emory Johns Creek Hospital, Georgia</u>:  Twenty-four (24) patient contacts per two-year appointment period.

    f. <u>Medical Center of Lewisville, Texas</u>:  Twenty-four (24) patient contacts per two-year appointment period.

g. <u>Spectrum Health Hospitals, Michigan</u>:  No minimum number of patient contacts.   Active privileges extended to those who "regularly admit patients to the Hospital and/or are regularly involved in the care and treatment of patients in the Hospital."

h. <u>Broward Health, Florida</u>:  Eighteen (18) patient contacts per two-year reappointment period.

i. <u>Baylor University Medical Center</u>:  Twelve (12) patient contacts per year for active staff privileges.

j. <u>Texas HealthHeart and Vascular Hospital Arlington</u>:  Twelve (12) patient contacts per year for active staff privileges.

k. <u>Baylor Jack and Jane Hamilton Heart and Vascular Hospital</u>:  Forty Eight (48) patient contacts per year.

l. <u>Baylor Scott and White Hospital- Round Rock</u>:  Twenty-Four (24) patient contacts per two-year reappointment period.

84.    Relators are also unaware of any other hospital or hospital system in the United States that has as narrow a definition of "patient contacts" as that of the Heart Hospital, with the exception of one other physician-owned Baylor Hospital that may be similarly structured to the Heart Hospital.  For example, Spectrum Hospitals defines patient contacts more broadly as "any admission, consultation, procedure, response to emergency call, evaluation, treatment, or service performed in any facility operated by the Hospital or affiliate, including outpatient facilities."  Similarly, Broward Health broadly defines patient contacts as "[a]ny combination of admissions, emergency room encounters, rendering of inpatient or outpatient care as a designated attending, consultant, or surgeon or cross-covering physician, ambulatory or outpatient surgery cases, invasive procedures, evaluation for any such procedure which includes but is not limited to a written H&P or consultation."  The

Heart Hospital's narrow definition of "patient contacts" is thus exposed for what it really is – code words for "patient referrals" to the hospital.

> **2.** **The Heart Hospital's decisions to remove a physician investor from the Active-Clinical Medical Staff for lacking the required "patient contacts" are based on the physician's potential to refer patients and not on quality of care considerations.**

85.     The Heart Hospital's imposition of excessive patient contacts requirements on physician investors in order for them to maintain Active-Clinical Medical Staff privileges is actually based on purely economic factors, rather than on a concern for quality of care.

86.     Defendants assiduously track the number of "patient contacts," and thus the number of referrals, of the Heart Hospital's physician investors as well as how much money those physicians generate with such referrals.  Approximately every six months, physicians receive a Physician Activity Summary issued by the Baylor Healthcare Enterprise Systems. The report lists total patient visits for the physician in their roles as "Attending," "Consulting," or "Surgeon."  It also tracks the total days that the physician's patients were at the Heart Hospital, as well as the average length of stay for patients.   The summary is sometimes accompanied by a Physician by Procedure report, also issued by the Baylor Healthcare Enterprise System.  It lists – by a physician's role as Attending, Consulting or Surgeon – all of the procedures done by the physician for the time period of the report, the total number of patients seen, the total days those patients stayed at the hospital, the patients' average length of stay, and the total charges billed to those patients.  Notably, while the definition of "patient contacts" in the Bylaws of the Medical Staff ostensibly includes "[m]eaningful face to face contacts," neither the Physician Activity Summary nor the

Physician by Procedure report includes such a category.  Indeed, the only patient contacts that are tracked individually are revenue-generating "procedures."

87.    Those physicians that appear not to be on track to meet the minimum patient contacts were sent letters from Dr. Brown and Valentine.  The letters detail the status of the physician's current appointment to Active-Clinical Medical Staff, the physician's current "patient contacts" activity, the number of patient contacts that the physician is "pacing" to have for the entire appointment period, and how many additional patient contacts are required.

88.    Dr. Dewey, for example, received such a letter on November 28, 2012, signed by Valentine and Dr. Brown.  It noted that "in an effort have a sufficiently representative body of work on which to conduct meaningful peer review of the quality of care furnished by members of the Medical Staff, **physicians on the Active-Clinical Medical staff must undertake . . . forty-eight (48) patient contacts per year**" after their initial appointment. (emphasis in original).  It then notes that, "**According to hospital records, your current appointment to the Medical Staff began on 6.01/2012 and will end on 6/01/2013. According to hospital records, your "contacts" activity for this period is 9, and you are therefore "pacing" to have approximately 17 contacts during the current appointment period.**  Please see your personal Physician Activity Report attached to this letter . . . Assuming your report is correct, you need to undertake at least 25 additional patient contacts prior to the end of your current appointment period." (emphasis in original).  The letter ends by declaring that, if Dr. Dewey failed in this endeavor, he would "**most likely be moved to Courtesy Staff.**" (emphasis in original).

89. No such effort and attention to detail is given to metrics that would actually prove useful in measuring and evaluating a physician investor's quality of patient care. While BHCS periodically sends out a "report card" which contains quality of care metrics for physicians, nothing in this report discusses or links the raw number of patient contacts with its evaluation of the physician's professional competency. It should be noted that Relators never received a "report card" indicating any deficiency in quality of care. Relators are unaware of any surgeon investor who had their privileges restricted or revoked for "true" quality metrics.

90. Moreover, in terms of the medical activities that are permitted to be performed by a physician at the Heart Hospital, there is no practical distinction between a member of the Active-Clinical Medical Staff and Courtesy Staff. A member of the Courtesy Staff can perform *any* surgery, test, consultation, or other activity that a member of the Active-Clinical Medical Staff can perform. In addition, like physicians with active privileges, a Courtesy Staff member is required to rounds at the Heart Hospital. Thus, the only real difference between the two is that a Courtesy Staff member is unable to own limited partnership units in the Heart Hospital. This "difference" begs the question – if the Heart Hospital has concerns about being able to assess a physician's quality, then why does the sole difference between active and courtesy (ability to be an equity owner) have absolutely nothing to do with quality? Put another way, the threat to remove a physician investor from the Active-Clinical Medical Staff for failure to maintain an excessively high number of minimum patient contacts has nothing to do with quality of care, and everything to do with the Heart Hospital incentivizing that physician to keep referring revenue-generating patients to the hospital so that they will not lose their partnership-related income.

91. That is exactly the situation that was faced by Relators, who at the time their active clinical privileges were revoked were contracted with HCA and not Baylor. Tellingly, before they were removed from the Active-Clinical Medical Staff, and then had their limited partnership units in the Heart Hospital involuntarily redeemed, neither Dr. Magee nor Dr. Dewey ever had a discussion with anyone at the hospital about their quality of care or competency, only their number of "patient contacts." That is understandable, because both Relators' quality of care metrics were and are outstanding, Neither ever suffered a patient mortality while serving at the Heart Hospital. Dr. Magee is now the Director of Thoracic Surgical Oncology for HCA North Texas Division, as well as Director of the Minimally Invasive Surgery Institute for Lung and Esophagus at Medical City. Dr. Dewey is the Surgical Director of Heart Transplant & Medical Assist Device Technologies at Medical City, as well as the National Medical Director for Cardiovascular Surgery for HCA. Both participate in the STS National Database, which the Heart Hospital subscribes to, further Dr. Magee is a member of the STS Quality Measurements Taskforce that determines the quality metrics for the participants in the STS Nations database.

92. The notion that the removal of Relators as limited partners in the Heart Hospital was due to the inability of the hospital to conduct a "meaningful peer review of the quality of care" they furnished patients is thus absurd. The real reason for their removal was that Heart Hospital's leadership thought that they were not referring sufficient numbers of revenue-generating patients to the hospital.

93. Relators are unaware of *any* physician investor at the Heart Hospital whose privileges were revoked because of actual quality of care concerns, as opposed to failure to maintain the required number of "patient contacts." Indeed, several physicians that have

relatively high rates of mortalities and complications have nevertheless been retained on the Active-Clinical Medical Staff, or otherwise permitted to retain their partnership units in the Heart Hospital, because they make large numbers of patient referrals to the hospital and constantly satisfy their required contacts.

94.     Moreover, physician investors that have little or no "patient contacts" at the Heart Hospital, but either provide substantial patient referrals to the hospital or are friends of Dr. Brown, are also permitted to retain their partnership units.   At Medical Executive Committee meetings, where a physician investor's patient contacts and practice profile would be discussed, Dr. Brown would dictate to Valentine which physicians would be permitted to stay on the active staff – *i.e.* retain their partnership status – and which would not. He did this irrespective of "quality of care" concerns.  Dr. Brown has a "you're either for me or against me" attitude."  Thus, "Friends of David" are treated preferentially, while those who are not on his good side are often sent packing.

95.     For example, Dr. Waenard Miller is the co-founder of the Legacy Heart Center, which offers comprehensive cardiologic diagnostic testing and treatment services in North Texas.  He was an initial investor in the Heart Hospital, but has never treated or admitted a patient at the facility.  Because he is the source of a large number of referrals, however, he has been allowed to retain his shares despite not meeting the qualifications for Active-Clinical Medical Staff at the hospital.  Prior to his passing, Dr. Ron Underwood had no "patient contacts" at the Heart Hospital, but was permitted to retain his limited partnership units because he was a good source of patient referrals.  Dr. Tea Acuff has repeatedly failed to have the required minimum number of patient contacts, but has never even got a letter

raising a concern about that fact from the Medical Executive Committee, much less threatened with redemption of his limited partnership units.

3. **The Heart Hospital knows that its excessive patient contacts requirements for Active-Clinical Medical Staff is illegal "economic credentialing."**

96.     At different times, various physician investors have objected to the Heart's Hospital excessive and ever-increasing "patient contacts" requirements for Active-Clinical Medical Staff and demanded an explanation for their necessity.  These concerns of these individuals have been ignored or dismissed, often with the statement that required number of contacts have been vetted and approved by the Heart Hospital's attorney, R. Terry Heath.

97.     For example, at a meeting of the physician investors Dr. Eichhorn publicly asked Dr. Brown and Valentine to justify increasing the "patient contacts" requirement to forty-eight (48), noting that no other medical institution in the United States required such a high number of contacts.  He commented that the only plausible explanation was that the hospital was seeking to "make money off the backs of physicians."  His queries were shouted down and his loyalties to the Heart Hospital questioned.

98.     Dr. Brad Leonard was a physician investor at the Heart Hospital.  For several years he served as its Chief Medical Officer ("CMO") and Vice President of Medical Affairs.  He also chaired the hospital's Cardiovascular Quality Committee.  One of his responsibilities as CMO and committee chairman was to oversee the quality of care provided to patients by physicians working at the hospital, and help evaluate those physicians' medical competency.

99.     While serving as CMO on multiple occasions Dr. Leonard approached Dr. Brown and/or Valentine to raise concerns about using the number of "patient contacts" as a quality of care measure, rather than more appropriate metrics.  In particular, he noted that the

Heart Hospital was putting too much focus on the raw number of patient contacts, which is an arbitrary measure of quality of care and professional competency. He urged that the hospital instead look at the type and quality of a physician's contacts. Dr. Brown and Valentine ignored these concerns and suggestions.

100.   When the Medical Executive Committee raised the number of required "patient contacts" for Active-Clinical Medical Staff to forty-eight (48), Dr. Leonard went to fellow physician investor Dr. Trent Pettijohn and told him that the move was unjustifiable and "illegal." He noted that no other hospital required that number of contacts to maintain active privileges, and that the requirement amounted to improper "economic credentialing." The Heart Hospital's response was to tell Dr. Leonard to keep quiet, and that the requirements had been vetted by the hospital's outside attorneys.   Shortly thereafter Dr. Leonard was shown the door and replaced as CMO by Dr. Pettijohn. Dr. Leonard is now the Chief Operating Officer at Advanced Heart Care, and the Chairman, Cardiovascular Services, at Wise Health System.

101.   Thus, the Heart Hospital is well aware that its excessive "patient contacts" requirement is nothing more than a deliberate scheme to reward physician investors for referring patients to the hospital by directly linking such referrals to the ability of those physicians to received lucrative partnership income from the Heart Hospital.   The Heart Hospital also knows that the majority of the referred patients from this scheme have been provided services for which the hospital sought and received payment from federally-funded programs, such as Medicare, and that its actions are, therefore, a violation of both the AKS and FCA.  Moreover, the Heart Hospital has implemented its illegal remuneration scheme

with the full knowledge and consent of its executive leadership, its Board of Managers, its majority owner BMCP, BMCP's owner BHCS, and BHCS's owner BSWH.

## VIII.   CLAIMS

**COUNT I:**   **Violations Of The Federal False Claims Act, 31 U.S.C.A. §§ 3729(a) (1)(A)-(B) For Violations of the AKS.**

102.   Relators repeat and re-allege every allegation made above, and incorporate them herein by reference.

103.   Beginning at least April 2010 and continuing through today, the Heart Hospital has knowingly imposed an illegal scheme to remunerate physician investors in the Heart Hospital in order to induce, or in return for, the referrals to the Heart Hospital of services to beneficiaries of federally-funded health care programs in violation of the AKS, which enriched all Defendants.   Moreover, the Heart Hospital has implemented its illegal remuneration scheme with the full knowledge and consent of its executive leadership, its Board of Managers, its majority owner BMCP, BMCP's owner BHCS, and BHCS's owner BSWH.

104.   Defendants conduct described herein constitutes a violation of the Federal Anti-Kickback Statute, 42 U.S.C.A. § 1320a-7(b) *et seq.*

105.   In particular, beginning at least in April 2010 and continuing through the present, Defendants have knowingly imposed a wrongful scheme, under the false guise of monitoring quality of care, whereby a physician investor's ability to retain his or her limited partnership units in the Heart Hospital, and to receive revenue from those units, is conditioned upon that physician investor maintaining an excessive number of "patient

contacts" – *i.e.* revenue-generating referrals to the Heart Hospital.   Put another way, Defendants are rewarding physician investors in the Heart Hospital in return for referrals by those physicians to the hospital of patients that receive services and items paid for by federally-funded health care programs, including Medicare.

106.   Defendants' illegal scheme has induced improper referrals by investor physicians of the Heart Hospital of services and items provided to beneficiaries of federally-funded healthcare programs.  In essence, since at least April 2010 and continuing through the present, only physician investors that provide unduly large numbers of referrals to the Heart Hospital are permitted to retain their limited partnership units Heart Hospital and receive lucrative income from those units.

107.   Defendants' deliberate and knowing scheme to require unduly large and ever increasing numbers of revenue-generating "patient contacts" as a condition of maintaining a lucrative investment interest in the Heart Hospital is not protected by any "safe harbors" regulations governing the AKS.

108.   The Heart Hospital knowingly implemented as of at least April 2010, and continues to implement, its illegal remuneration scheme with the full knowledge and consent of its executive leadership, its Board of Managers, its majority owner BMCP, BMCP's owner BHCS, and BHCS's owner BSWH.

109.   Defendants' knowing violations of the AKS, in and of themselves, give rise to liability under the Federal False Claims Act pursuant to 42 U.S.C. § 1320a-7b(g), which states that "a claim that includes items or services resulting from a violation" of the AKS "constitutes a false or fraudulent claim for purposes" of the FCA.

110.   In any event, as a prerequisite to participating in federally-funded health care programs, the Heart Hospital -- with the full knowledge and consent of its executive leadership, its Board of Managers, its majority owner BMCP, BMCP's owner BHCS, and BHCS's owner BSWH – knowingly and expressly certified (or, through their participation in such programs, impliedly certified) their compliance with the AKS.  Defendants thus also violated the FCA by, between at least April 2010 and through the present, knowingly submitting, or causing to be submitted, claims for reimbursement from federal health care programs, including Medicare, knowing that they were ineligible to receive the payments demanded due to AKS violations associated with their illegal "patient contacts" remuneration scheme.

111.   Each claim submitted by Defendants to a federally-funded health care program, including Medicare, for a service provided to a patient referred by a physician who received remuneration pursuant to Defendants' wrongful scheme is false because it is tainted by that illegal scheme.

112.   In addition, whenever the Heart Hospital's Medicare cost reports contained false data or certifications from which the Heart Hospital derived its Requests for Reimbursement that it knowingly – with the full knowledge and consent of its executive leadership, its Board of Managers, its majority owner BMCP, BMCP's owner BHCS, and BHCS's owner BSWH – submitted to TRICARE, those Requests for Reimbursement were also false.  Specifically, on each occasion where the Heart Hospital's Requests for Reimbursement were knowingly false due to falsity in its Medicare cost reports, the Heart Hospital falsely certified that the information contained in its Requests for

Reimbursement was "accurate and based upon the hospital's Medicare cost report," and knew that such information was false.

113. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. §§ 3729(a)(1)(a), 3729 (a)(1)(B), and 42 U.S.C. § 1320a-7b(g).

114. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(1)(b), presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(b) and 42 U.S.C. § 1320a-7b(g).

115. By virtue of the false records or false statements knowingly caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

**COUNT II:** **Federal False Claims Act Violations for Fraudulent Enrollment of Hospice Care Patients (31 U.S.C. §3729).**

116. Relators re-allege and incorporate the allegations in all previous paragraphs as if fully set forth herein.

117. The Heart Hospital knowingly made or caused to be made or used false statements, certifications and records in order to get false or fraudulent claims paid or approved by the Government from April 2010 to the present, and such conduct is ongoing.

118.   The Heart Hospital also knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States. The United States of America, unaware of the falsity of the statements, certifications, and records made thereupon, was damaged in an as of yet undetermined amount by The Heart Hospital's use of false and/or fraudulent statements and/or certifications in order to get claims paid or approved by the government.

119.   By virtue of all the acts described above, the Heart Hospital knowingly made, used or caused to be made or used false or fraudulent records and statements, and omitted material facts, to induce the Government to approve and pay such false or fraudulent claims.

120.   Each submission to the Government by the Heart Hospital for payment represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

121.   The Federal Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, has paid and continues to pay the claims that would not be paid if not for Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trail.

122.   Since at least April 2010, and continuing through the present, the Heart Hospital intentionally acted to defraud the United States by seeking and/or obtaining reimbursements from Medicare by engaging in and /or knowingly permitting the above fraudulent acts and billing.

123.   Furthermore, the Heart Hospital filed a Form 855 and Cost Reports acknowledging compliance with, *inter alia,* the AKS.  The Heart Hospital made similar representations when submitting claims for payment.

124.   The Heart Hospital's course of conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009).

**Count III.**   **False Claims – Violation of the Affordable Care Act's 60-Day Repayment Provision (Reverse False Claims).**

125.   Relators reallege and incorporate by reference the above paragraphs as though fully set forth herein.

126.   By failing to report the instances in which Medicare had been billed when it should have been billed, due to the improper certifications and remuneration described above, and by failing to repay the money Medicare paid to Defendants in reliance on such improper billing, the Heart Hospital violated the Affordable Care Act's 60-day repayment provision, which required providers to return Medicare overpayments within 60 days of identifying them.  In doing so, Defendants made and used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

127.   Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C. § 3729(a)(1).  The ACA specifies that the failure to make a timely refund to Medicare can serve as the basis for False Claims Act Liability.  42 U.S.C. § 1320-7k(d)(3).

## PRAYER FOR RELIEF

**WHEREFORE,** the United States requests that judgment be entered in its favor and against Defendants as follows:

a.  Treble the United States' damages, in an amount to be determine at trial, plus an $11,000 penalty for each overpayment retained in violation of the FCA;

b.  an award of costs pursuant to 31 U.S.C. § 3729(a)(3); and

c.  such further relief as is proper.

**WHEREFORE,** Relators pray for judgment against Defendants as follows

a.  That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.,

b.  That this Court enter judgment against Defendants in an amount equal to three times the damages the United States has sustained because of the Defendants action, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.  That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

d.  That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

e.  That Relators recover such other relief as the Court deems just and proper.

## IX.

## PRAYER FOR JURY TRIAL

1.  Relators pray for a jury trial in this action.

Respectfully submitted,

EVAN LANE (VAN) SHAW
Bar Card No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115
Email -van@shawlaw.net

ATTORNEY FOR RELATORS