UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MITCHELL J. MAGEE, M.D. and TODD M. DEWEY, M.D. | § § § § | |
| Plaintiffs, | § § | CASE NO. 4:16-CV-00717-ALM |
| v. | § § § | |
| TEXAS HEART HOSPITAL OF THE SOUTHWEST, L.L.P. d/b/a HEART HOSPITAL BAYLOR PLANO and HEART HOSPITAL BAYLOR DENTON, BAYLOR HEART AND VASCULAR CENTER, L.L.P. d/b/a BAYLOR JACK AND JANE HAMILTON HEART AND VASCULAR HOSPITAL, BAYLOR, SCOTT & WHITE MEDICAL CENTER AT PLANO, BAYLOR UNIVERSITY MEDICAL CENTER, BAYLOR SCOTT & WHITE ALL SAINTS MEDICAL CENTER, THE BAYLOR HEALTH CARE SYSTEM, BAYLOR SCOTT & WHITE HEALTH, AND BSW HEALTH | § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## AMENDED QUI TAM COMPLAINT

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.   PARTIES ............................................................................................................... 6

III.   JURISDICTION AND VENUE ............................................................................. 9

IV.   RELATORS ARE PREEMINENT CARDIO-THORACIC SURGEONS ....................... 10

   A.  Mitchell J. Magee, M.D. ................................................................................ 10

   B.  Todd M. Dewey, M.D. .................................................................................. 14

V.   APPLICABLE STATUTES AND REGULATIONS ................................................. 17

   A.  The Medicare Program – Title XVII of Social Security Act .............................. 17

   B.  The Medicaid Program – Title XVIII of the Social Security Act ...................... 21

   C.  The TRICARE/CHAMPUS Program – 10 U.S.C. § 1071-1106 ...................... 22

VI.   APPLICABLE FEDERAL STATUTES ................................................................ 24

   A.  The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b............................... 24

   B.  The Stark Statute, 42 U.S.C. § 1395nn .......................................................... 27

   C.  The Federal False Claims Act, 31 U.S.C. §§ 3729(a) *et seq.* ........................... 31

VII.   DEFENDANTS CONSPIRED TO CREATE AND IMPLEMENT A MINIMUM CONTACTS REQUIREMENT INTENDED TO INDUCE REFERRALS IN VIOLATION OF AKS AND THE STARK STATUTE ........................................................................ 33

   A.  The Patient Contacts Requirement Is Intended to Induce Referrals ................... 33

      1.  Heart Hospital and Jack & Jane Hospital Increase the Required Number of "Patient Contacts" and Narrow the Definition to Maximize Referrals ............... 41

      2.  Defendants' Implementation of the "Patient Contacts" Requirement Demonstrate It Is Intended to Induce Referrals, Not to Control Quality ......................... 48

      3.  Defendants Use the "Patient Contacts" Requirement to Pressure High Performers to Join Baylor and Dominate the Market.................................................... 53

      4.  Heart Hospital and Jack & Jane Hospital Have Grown Dramatically Because the Unlawful "Patient Contacts" Requirement has Successfully Induced Patient Referrals....... 54

   B.  Defendants Know the "Patient Contacts" Requirement Is an Illegal Attempt to Induce Patient Referrals .............................................................................................. 56

   C.  Defendants Coordinated to Expand the Unlawful Scheme................................. 58

      1.  Baylor Plano Furthered the Scheme ........................................................ 62

      2.  University Furthered the Scheme .............................................................. 62

      3.  All Saints Furthered the Scheme .............................................................. 63

      4.  BHCS Furthered the Scheme ................................................................... 63

      5.  BSWH Furthered the Scheme .................................................................. 64

  6. BSW Furthered the Scheme ........................................................................... 64

 D. Defendants' Actions Violate the AKS and Stark Statute.................................... 65

  1. Defendants Have Violated the AKS............................................................ 65

  2. Defendants Have Violated the Stark Statute ............................................... 67

VIII. CLAIMS ................................................................................................................ 69

IX. PRAYER FOR RELIEF ....................................................................................... 74

X. PRAYER FOR JURY TRIAL................................................................................ 75

Relators Mitchell J. Magee, M.D. ("Dr. Magee") and Todd M. Dewey, M.D. ("Dr. Dewey") (together, "Relators") bring this action on behalf of the United States against The Texas Heart Hospital of the Southwest, L.L.P. d/b/a Heart Hospital Baylor Plano and Heart Hospital Baylor Denton ("Heart Hospital"), the Baylor Heart and Vascular Center, L.L.P. d/b/a the Baylor Jack and Jane Hamilton Heart and Vascular Hospital ("Jack & Jane Hospital"), Baylor Regional Medical Center at Plano ("Baylor Plano"), Baylor University Medical Center ("University"), Baylor Scott & White All Saints Medical Center ("All Saints"), The Baylor Health Care System ("BHCS"), Baylor Scott & White Health LLC ("BSWH"), and BSW Health ("BSW"), as well as their predecessors and successors in interest (collectively "Defendants"), for treble damages and civil penalties arising from the defendants' material false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), the Medicare and Medicaid Protection Act of 1987 (a.k.a. the "Anti-Kickback Statute" or "AKS"), 42 U.S.C. § 1320a-7b, and the Physician Self-Referral Law (the "Stark Statute"), 42 U.S.C § 1395nn, and allege as follows:

## I.     PRELIMINARY STATEMENT

1.     Since at least 2009 and continuing to the present day, Defendants have defrauded Medicare, Medicaid, and TRICARE by unlawfully inducing physicians to refer patients through their operation of physician-owned hospitals that condition physician-ownership on satisfying a minimum "patient contacts" requirement.  Under the guise of ensuring quality of care, Defendants have effectively remunerated physicians for funneling countless patients to Defendants' hospitals in violation of the AKS and Stark Statute.

2.     In 1994, the Office of Inspector General ("OIG") of the United States Department of Human Services ("HHS") issued a Special Fraud Alert warning of the risk that physician-owned specialty hospitals would violate AKS if they serve to "lock up a stream of referrals from the

physician-investors and to compensate them indirectly for those referrals" (similar warnings would follow in subsequent years).  In an effort to thwart similar misconduct, Congress passed the Stark Statute to restrict physician-owned hospitals, recognizing that financial relationships between physicians and their referring entities can compromise their professional judgment and lead to overutilization of health care services.  Since then, studies have repeatedly confirmed that physician self-referral arrangements lead to overutilization of health care services, especially in federally-funded health care programs.[1]

3.      Heart Hospital and Jack & Jane Hospital[2] epitomize the concerns that led to the aforementioned Congressional and OIG actions.  Both physician-owned specialty cardiac hospitals – which primarily serve Medicare patients – have seen exponential growth in the number of procedures and other services performed at their facilities since implementing their fraudulent referral scheme, even during a time of relatively stable demand.  Notably, Heart Hospital is now, according to its website, the sixth largest cardiac surgery center in the United States and the number one heart surgery center in Dallas-Fort Worth area.

4.      The explosive growth by Heart Hospital and Jack & Jane Hospital is attributable to Defendants' illegal scheme to ensure referrals from physician-owners of Heart Hospital and Jack & Jane Hospital by conditioning the ability of those physicians to retain their limited partnership

---

[1] *See e.g.*, U.S. Gov't Accountability Office, GA0-12-966, GAO Report: Medicare (2012); Medicare Payment Advisory Commission, August 2006, *Report to the Congress: Physician-Owned Specialty Hospitals Revisited* (2006) (finding rates of certain cardiology surgeries grew faster in areas with physician-owned cardiac hospitals); B. Nallamothus, M. Rogers, M. Chemew, *et al.*, Opening of Specialty Cardiac Hospitals and Use of Coronary Revascularization in Medicare Beneficiaries, *Journal of the American Medical Association* 297(9):962-8 (March 7, 2007) (same); J. Stensland and A. Winter, Do Physician-Owned Cardiac Hospitals Increase Utilization?, *Health Affairs* 25(1): 2252-9 (Jan-Feb 2006) (same).

[2] Heart Hospital and Jack & Jane Hospital are physician-owned hospitals that are majority owned by Baylor Plano and University, and controlled by their shared domestic ultimate parents, BSWH and BSW.  While Baylor Plano, University, All Saints, BHCS, BSWH, and BSW are not physician-owned hospitals, they control the physician-owned Heart Hospital and Jack & Jane Hospital through shared leadership and oversight authority.

interests, and the lucrative returns from those interests,[3] on having an excessive number of minimum "patient contacts" each year.

5.      In general, hospitals use minimum patient contact requirements to ensure that they have an adequate opportunity to observe the competency of the physicians practicing (or admitting patients) at their facilities, and so that they can inform patients of the same.  While this requirement is legitimate for many hospitals, Heart Hospital and Jack & Jane Hospital's policies deviates from industry standards in two key respects.  First, while the industry standard for comparable hospitals is six (or in some cases up to twelve) patients per year (or perhaps twice that every two years), Defendants require an astronomical forty-eight (48) contacts per year, four to eight times the industry standards.  Second, hospitals accept a broad array of activities that exhibit the physician's competency, such as any "consultation, procedure, response to emergency call, evaluation, treatment, or service performed" for any patient.  Furthermore, most hospitals accept activity or case logs from other hospitals in the community when assessing quality or competency.   In contrast, Defendants do not accept any activity or procedures performed in any hospital other than the Heart Hospital or Jack and Jane Hospital as a contact.  Additionally, Defendants define "patient contacts" to track only patient admissions, i.e. only one patient contact is allowed per admission, a policy only explained by a desire to increase the number of referrals for admission per physician and connect the "patient contacts" with expensive procedures.

6.      Both Heart Hospital and Jack & Jane Hospital have increased the required number of minimum "patient contacts" over time, from the original six (6) in the early 2000s to an unparalleled forty-eight (48) by 2012.  They have also narrowed the standard definition of "patient contacts" to count only patient admissions, in direct contravention of industry warnings that

---

[3] Note that ownership can be very lucrative.   As of 2014, physician-investors were receiving payments of approximately $12,000 to $15,000 per interest unit on a semi-annual basis.

physician privilege decisions should not be based on patient admissions, such as the American Medical Association's Ethics Opinion 9.5.2.  The term "patient contact" has, therefore, become the equivalent of a "patient referral," and Heart Hospital and Jack & Jane Hospital base ownership on a physician's ability to generate these referrals.  Further, their ad hoc and inconsistent implementation of this requirement further illuminates its true intent.  More tellingly, they allow "courtesy" staff the same hospital admitting and procedure privileges, but do not apply the minimum patient contact requirement to them.  The only difference between the two classes of physicians is whether they generate enough revenue to justify ownership.  Perhaps most tellingly, there is simply no justification for applying these standards under the auspices of quality only to physician-owners, rather than to all physicians with admitting privileges.  Accordingly, Heart Hospital and Jack & Jane Hospital have knowingly induced physicians to refer patients through their ownership-incentive structures.  As a result of this scheme, a significant majority of the patients undergoing services at Heart Hospital and Jack & Jane Hospital were unlawfully referred by physician-investors in the facilities.

7.     The ownership-incentive structure at Heart Hospital and Jack & Jane Hospital also has an anticompetitive impact.  Other area hospitals struggle to compete with Heart Hospital and Jack & Jane Hospital for their target patients because area physicians, including many who have the right to practice at multiple other hospitals, are incentivized to send their patients only to Baylor Scott & White hospitals in order to meet their quotas.  This has a detrimental impact not only on area hospitals, but on the patients who are often forced to travel further for their treatment.  Fundamentally, patients would be receiving treatment at different facilities absent the inducements at Heart Hospital and Jack & Jane Hospital.  In addition to the inherent danger of overutilization resulting from the incentives caused by self-referrals, in many cases the patients would otherwise

4

receive treatment at hospitals more convenient for the patients and their loved ones that are providing care and support during these often serious procedures.

8.     Defendants coordinated to plan and implement the scheme to pressure physician-owners to refer patients, including by having Heart Hospital and Jack & Jane Hospital increase the minimum "patient contacts" required for ownership.  Through committees composed of leaders of entities affiliated with Baylor Scott & White, Defendants have conspired to expand and refine the illegal scheme to mutually benefit all Defendants.

9.     Defendants have submitted and continue to submit false and fraudulent claims based on these referrals to the United States to obtain millions of dollars in illegal Medicare, Medicaid, and TRICARE reimbursement.   Under the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A)-(C) (2009) and 31 U.S.C. §§ 3729(a)(1)-(3) (1986), such claims are false and/or fraudulent because the Defendants have no entitlement to payment for such unlawfully obtained referrals and are the result of false information provided to the United States.  The illegal self-referral/kickback scheme was in place by at least 2009 and continues to the present day.

10.    Defendants have thus harmed the United States and violated the AKS and Stark Statute by improperly providing direct and/or indirect remuneration to physician-investors for the purpose of inducing them to refer beneficiaries of federally-funded health care programs, including Medicare, Medicaid, and TRICARE, to Heart Hospital and Jack & Jane Hospital.  Defendants have also harmed the United States by submitting false certifications of their compliance with federal law, which they have submitted each year that the scheme was in place.  Moreover, having submitted or caused the submissions of requests for reimbursement from federally-funded health care programs (and by making false statements in connection with the same) with respect to referrals that resulted from violations of the AKS and Stark Statute, Defendants have also violated

the FCA.  As a result of these improper actions, the United States has paid hundreds of millions of

dollars in wrongful Medicare, Medicaid, and/or TRICARE reimbursements to Heart Hospital and

to Jack & Jane Hospital.  Had the federal programs been aware of the fraudulent scheme, they

would not have made the resulting payments to Defendants, which were illegally requested.   Thus,

the aforementioned false statements and claims were material and had a natural tendency to

influence, or were capable of influencing, the payment of the reimbursements, within the meaning

of the FCA.

## II.   **PARTIES**

11.     Relator Dr. Magee is a resident of Dallas, Texas and a citizen of the United States.

Dr. Magee has direct and independent knowledge of the information on which the allegations in

this Complaint are based.

12.     Relator Dr. Dewey is a resident of Dallas, Texas and a citizen of the United States.

Dr. Dewey has direct and independent knowledge of the information on which the allegations in

this Complaint are based.

13.     The real party in interest to the claims set forth in this Complaint is the United

States of America.

14.     Defendant Heart Hospital is a Texas limited liability partnership its registered agent

located at 2001 Bryan Street, Suite 2200, Dallas Texas 75201-3024.  Heart Hospital operates a

hospital located at 1100 Allied Drive, Plano, Texas, 75093.  Heart Hospital does business under

multiple names, including Heart Hospital Baylor Plano and Heart Hospital Baylor Denton.

Defendant Baylor Plano owns 50.1% of Heart Hospital.  Heart Hospital operated a hospital facility

in Plano adjacent to Baylor Plano, and a hospital facility in Denton.

15.     Defendant Jack & Jane Hospital is a Texas limited liability partnership whose

principal place of business is located at 621 N. Hall Street, Dallas, Texas 75226-1339.  Jack & Jane Hospital does business under multiple names, including the Baylor Jack and Jane Hamilton Heart and Vascular Hospital.  Defendant University owns 50.1% of Jack & Jane Hospital.  Jack & Jane Hospital operates a hospital facility in Dallas adjacent to University, and a hospital facility in Fort Worth adjacent to All Saints.

16.     Defendant Baylor Plano is a Texas nonprofit corporation with its registered agent, C T Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  Baylor Plano owns and operates a hospital located at 4700 Alliance Blvd., Plano, Texas, 75093 and adjacent to, and affiliated with, a hospital owned and operated by Heart Hospital in Plano.  Baylor Plano is also the parent company and 51% owner of Heart Hospital.  Baylor Plano is a subsidiary of Defendant BHCS, which is the sole controlling member of Baylor Plano.

17.     Defendant University is a Texas nonprofit corporation with its registered agent, C T Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  University owns and operates a hospital adjacent to, and affiliated with, a hospital owned and operated by Jack & Jane Hospital in Dallas.  University is also the parent company and 50.1% owner of Jack & Jane Hospital.  University is a subsidiary of Defendant BSWH, which is the sole controlling member of University.

18.     Defendant All Saints is a Texas nonprofit corporation with its registered agent, C T Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  All Saints owns and operates a hospital adjacent to, and affiliated with, a hospital owned and operated by Jack & Jane Hospital in Fort Worth.  All Saints is a subsidiary of Defendant BHCS, which is the sole controlling member of All Saints.

19.     Defendant BHCS is a Texas healthcare corporation comprising a network of

hospitals, primary care and specialty care centers, rehabilitation clinics, senior care centers, and affiliated ambulatory surgery centers throughout Texas.  BHCS is a Texas nonprofit corporation with its registered agent, C T Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  BHCS is the parent company and sole controlling member of Defendants Baylor Plano and All Saints.  BHCS is a subsidiary of Defendant BSWH, which is the sole controlling member of BHCS.

20.     BSWH was formed in 2013 through a merger of BHCS and Scott & White Healthcare, and is therefore the successor of BHCS.  BSWH is the parent company and sole controlling member of Defendants BHCS and University.  BSWH is a Texas limited liability company with its registered agent, C T Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

21.     In 2014, BSWH merged with, and moved forward as, the nonprofit corporation BSW Health, which shares a registered agent, C T Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  BSW Health, as the go-forward entity of BSWH, is the successor of BSWH and BHCS, as well as the current domestic ultimate of each of the other Defendants.

22.     Below is a chart demonstrating Relators' understanding regarding the corporate structure among Defendants:



\* "Adjacent to:" indicates each entity operates a hospital that is geographically adjacent to a hospital operated by the other, and that the adjacent hospitals provide supporting services to each other.

### III.   JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, as well as 31 U.S.C. § 3730(b).

24.     This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because Defendants can be found, and transact business, in this judicial district and have committed acts within this judicial district that are proscribed by 31 U.S.C. § 3729.

25.     Venue is proper in this Court under 28 U.S.C. 1391 (a)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in, and transact business, in this judicial district and have committed acts within this judicial district that are proscribed by 31 U.S.C. § 3729.

26.     Before the filing of this case, the facts and circumstances of Defendants' violations of the FCA, the AKS, and Stark Statute had not been publicly disclosed in criminal, civil or

administrative proceeding; or in any legislative, administrative, or inspector general report, hearing, audit, or investigation, or in the media.

27.     While no longer a jurisdictional issue under the 2010 amendments to the FCA, to Relators' knowledge, there has been no qualifying public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e).  Additionally, Relators are the original source of the information upon which this Complaint is based, as that phrase is used in the FCA in 31 U.S.C. § 3730(e)(4)(B), and, prior to filing the Complaint, have served voluntary written disclosures to the United States of the information on which the allegations or transactions in this action are based.  The allegations made in the Complaint have not been publicly disclosed in a: (i) Federal criminal, civil or administrative hearing in which the United States, or its agent, is a party; (ii) congressional, Government Accountability Office or other Federal report, hearing, audit, or investigation; or (iii) from the news media.  Moreover, Relators have knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without their knowledge.

28.     Relators filed the Original Complaint on September 16, 2016.  The Court lifted the seal in November 2017.

### IV.     RELATORS ARE PREEMINENT CARDIO-THORACIC SURGEONS

### A.     Mitchell J. Magee, M.D.

29.     Dr. Magee currently serves as the Director of Thoracic Surgical Oncology for HCA North Texas Division, as well as Director of the Minimally Invasive Surgery Institute for Lung and Esophagus at Medical City Dallas Hospital.  He has been practicing medicine since August 1985, and is recognized as one of the Dallas area's preeminent thoracic surgeons.  He has been

recertified twice since original certification in June 1995 as a cardiothoracic surgeon by the American Board of Thoracic Surgery, and further specializes in thoracic oncology and heart and lung transplants.  He is also certified by the United Network of Organ Sharing as a qualified Surgical Director in both Heart Transplantation and Lung Transplantation.

30.     Graduating from the University of Texas Medical School at Houston ("UT Medical, Houston") in 1984, after serving as a Research Fellow at the M.D. Anderson Cancer Center, Dr. Magee began an internship in General Surgery at the University of Southern California Medical Center ("USC Medical Center") in Los Angeles.  That was followed by a residency in General Surgery at that same hospital.  In 1986, he began a two-year research fellowship in Heart Transplantation and Mechanical Circulatory Support at the Texas Heart Institute in Houston, and simultaneously completed a Masters of Science degree with thesis in tumor and transplant immunology from the University of Texas Graduate School of Biomedical Sciences and M.D. Anderson Cancer Center, after which he returned to the USC Medical Center as Chief Resident in General Surgery.

31.     In 1991, Dr. Magee moved to the University of Pittsburgh Medical Center ("UP Medical Center"), where he completed three years of fellowship training in cardiac and thoracic surgery and heart and lung transplantation to become Chief Resident in Cardiothoracic Surgery. Subsequently, in 1994, he took a position as Assistant Professor of Cardiothoracic Surgery at the Southern Illinois University School of Medicine ("Southern Illinois Medical").  During that same period, he also served as the first Surgical Director of the Heart Transplant Program at St. John's Hospital in Springfield, Illinois.

32.     In 1998, Dr. Magee moved to Dallas, Texas, where he became a partner in Cardiothoracic Surgery Associates of North Texas, P.A.  In mid-2007, Dr. Magee completed

additional fellowship training at UP Medical Center in Minimally Invasive General Thoracic Surgery.  He then refocused his practice on non-cardiac thoracic surgery, specializing in thoracic oncology and minimally invasive surgery of the esophagus, lung, and mediastinum.

33.     Dr. Magee has held an active unrestricted license to practice medicine in Texas since 1985 and was formerly licensed in California, Pennsylvania, and Illinois.  In addition, Dr. Magee is a current member of nearly a dozen medical societies and associations, including: (i) the American College of Surgeons, where he is a Fellow; (ii) the American College of Cardiology, where he is also a Fellow; (iii) the Society of Thoracic Surgeons; (iv) the European Society of Thoracic Surgeons; (v) the American Association of Thoracic Surgery; and (vi) the International Society of Heart and Lung Transplantation.

34.     Dr. Magee has held a number of positions on national medical committees and boards.  These include serving as: (i) Surgical Director of Research at the Cardiopulmonary Research Science and Technology Institute; (ii) Scientific Advisory Board Member at both Percardia and Novadaq Corporation; (iii) Member of the Workforce On National Databases, the Taskforce on Quality Measurement, and the Taskforce on General Thoracic Surgery Database at the Society of Thoracic Surgeons; (iv) Chair of the General Thoracic Database Audit Committee; and (v) Co-Chair of the Post-Graduate Program Committee of the Southern Thoracic Surgical Association.  Dr. Magee also serves as Associate Editor on the Editorial Board of the Annals of Thoracic Surgery, and as a reviewer for the Journal of Heart and Lung Transplantation and the Journal of Cardiothoracic and Cardiovascular Surgery.

35.     Dr. Magee has also received numerous awards and honors during his career.  These include: (i) a membership in the Alpha Omega Alpha Medical Honor Society at the UT Medical School, Houston; (ii) the Excellence in Teaching Award at Southern Illinois Medical; and (iii)

being named a Thoracic Surgery Research Foundation Fellow and the recipient of the Alley Sheridan Scholarship by the Thoracic Surgery Foundation for Research and Education.  In addition, he has been named 14 times as one of the "Best Doctors in Dallas" by D Magazine, and designated a "Texas Super Doctor" by Texas Monthly ten times.  Finally, Dr. Magee is the author, or co-author, of nearly 90 articles published in a variety of national and international medical journals and publications - including the New England Journal of Medicine, the Annals of Thoracic Surgery, and Oncology - as well as 10 chapters in well-known medical textbooks and treatises, such as *Glenn's Thoracic and Cardiovascular Surgery* and *Difficult Decisions in Thoracic Surgery: An Evidence-Based Approach*.  He has also made nearly 60 presentations at various meetings of medical professionals, including those held by the American Surgical Association, the American College of Chest Physicians, and the American Heart Association.

36.     Between 1998 and 2009, Dr. Magee served as both Chief of the Section of Cardiothoracic Surgery and Associate Director of Heart and Lung Transplantation at Medical City Dallas Hospital, and served as Chief of the Department of Cardiothoracic Surgery from 2010 through 2016.  He was also on the founding Board of Directors at Baylor Plano between 2004 and 2007, and from 2003-2005, he was the Surgical Director of Cardiovascular and Thoracic Services at that facility.

37.     In June 2004 Dr. Magee became, with other physicians, a founding partner in Heart Hospital, which is majority-owned by BHCS.  Indeed, he performed the first cardiac surgical procedure – a coronary artery bypass – conducted at Heart Hospital while operating at Baylor Plano, and for the first two years in operation at that facility, performed the majority of the cardiothoracic surgeries done on the campus of Baylor Plano.  He also established the initial medical order sets and protocols for surgery patients and those admitted to the Intensive Care Unit

at Heart Hospital.

38.     Dr. Magee has also been on the Board of Trustees of Defendant Baylor Plano. Through his board membership and relations with physician-owners of Jack & Jane Hospital, Dr. Magee has knowledge of Jack & Jane Hospital's partnership agreement and bylaws.

39.     In September 2013, Dr. Magee had his ownership interests involuntarily redeemed at the option of Heart Hospital on an adjusted capital basis, as a result of Dr. Magee's failure to satisfy the ever-increasing number of required "patient contacts" at Heart Hospital.

40.     Through his experience as a founding physician-owner of Heart Hospital, member of the Board of Trustees of Baylor Plano, and active clinical staff member of Heart Hospital, Baylor Plano, and University, Dr. Magee has direct and independent knowledge of Defendants' practices for coordinating and enforcing policies between entities affiliated with Baylor Scott & White.  He also has knowledge of Defendants' use of policies to induce patient referrals.

41.     During the relevant time period, Dr. Magee discussed with Dr. Dewey his respective and collective knowledge regarding efforts by Defendants to induce patient referrals, all of which resulted in false billings to government healthcare programs and private insurers for patients referred to Defendants.

**B.     Todd M. Dewey, M.D.**

42.     Dr. Dewey currently serves as Surgical Director of Heart Transplant & Medical Assist Device Technologies and Director of Structural Heart Disease at Medical City, as well as the National Medical Director for Cardiovascular Surgery for the Hospital Corporation of America ("HCA").  He has been practicing medicine since May 1990, and is acknowledged as one of the Dallas area's best cardiothoracic surgeons.  He is certified as a cardiothoracic surgeon by the American Board of Thoracic Surgery, and has recertified once.

14

43.     Graduating from the Texas Tech University Health Sciences Center School of Medicine in 1990, Dr. Dewey was a resident in General Surgery at the University of Texas Southwestern Medical Center in Dallas, Texas until June 1995, serving as Chief Resident from 1994 to 1995.  He was then Chief Resident for Cardiothoracic Surgery at The New York Hospital/Cornell Medical Center from July 1995 to June 1997.  During that time, he was also a Thoracic Surgery Fellow at Memorial Sloan-Kettering Cancer Center in New York.  From there, he served as Fellow and Attending Staff for Cardiac Transplantation & Ventricular Assist Devices at Columbia-Presbyterian Medical Center until mid-1998, when he moved to Dallas, Texas to become a partner in COR Specialty Associates of North Texas, P.A.

44.     Dr. Dewey holds an active license to practice medicine in Texas.  In addition, he is a current member of the Society of Thoracic Surgeons, the American Association for Thoracic Surgery, the Southern Thoracic Surgical Association, and the Parkland Surgical Society.

45.     Dr. Dewey has held a number of academic appointments since 1994.  He was a Clinical Instructor in Surgery at: (i) the University of Texas Southwestern Medical School/Parkland Memorial Hospital; (ii) The New York Hospital/Cornell Medical Center; and (iii) Columbia-Presbyterian Medical Center.  He has also served as an Adjunct Assistant Clinical Professor at the University of Texas at Arlington School of Nursing.

46.     Dr. Dewey has held a number of positions on national medical committees and boards.  From 2008 to 2010, he was part of the Membership and Professional Standards Committee for the United Network for Organ Sharing.  From 2011 to 2012, he was the Chairman of the Society of Thoracic Surgeons Workforce on Annual Meeting, and continues to serve as a member of the Task Force on End Stage Heart Disease.  He is currently a member of the Society of Thoracic Surgeons/American Association of Thoracic Surgery Joint Task Force on Thoracic Surgical

Education.

47.     Dr. Dewey has received numerous awards and honors during his career.  These include: (i) a membership in the Alpha Omega Alpha Medical Honor Society at the Texas Tech University Health Sciences Center School of Medicine; (ii) being named Outstanding Student in Internal Medicine; and (iii) receiving the Francis C. Jackson Award for Excellence in Surgery while at Texas Tech.  In addition, he has been named 12 times as one of the "Best Doctors in Dallas" by D Magazine, and designated a "Texas Super Doctor" by Texas Monthly nine times.

48.     Dr. Dewey has authored, or co-authored, over 75 articles published in a variety of national and international medical journals and publications – including the New England Journal of Medicine, the Journal of Thoracic Cardiovascular Surgery, the Annals of Thoracic Surgery, and the European Journal of Cardiothoracic Surgery – as well as three chapters in well-known medical textbooks and treatises, such as *Cardiac Surgery in the Adult, Third Edition* and *Transcatheter Aortic Valve Implantation: Tips and Tricks to Avoid Failure*.  He has also made nearly 160 presentations at various meetings of medical professionals, including those held by the Society of Thoracic Surgeons, International Society for Minimally Invasive Cardiac Surgery, American College of Cardiology, and Society for Heart Valve Disease.  He has also presented over 30 abstracts, and been the Principal or Sub-Investigator for 30 studies, on various topics related to cardiothoracic devices and surgeries.

49.     In 2004, Dr. Dewey, along with Dr. Magee and other physicians, became a founding partner in Heart Hospital.  Dr. Dewey maintained active clinical staff at Heart Hospital for years.  In 2014, Dr. Dewey had his ownership interests involuntarily redeemed at the option of Heart Hospital on an adjusted capital basis, as a result of his failure to satisfy the ever-increasing number of required "patient contacts" at Heart Hospital.

16

50.     Through his experience as a founding physician-owner of Heart Hospital and active clinical staff member of Heart Hospital and Baylor Plano, Dr. Dewey has direct and independent knowledge of Defendants' practices for coordinating and enforcing policies between entities affiliated with Baylor Scott & White.  He also has knowledge of Defendants' use of policies to induce patient referrals.

51.     During the relevant time period, Dr. Dewey discussed with Dr. Magee his respective and collective knowledge regarding efforts by Defendants to induce patient referrals, all of which resulted in false billings to government healthcare programs and private insurers for patients referred to Defendants.

## V.     APPLICABLE STATUTES AND REGULATIONS

### A.     The Medicare Program – Title XVII of Social Security Act

52.     The Medicare Program was enacted in 1965 by Congress to pay for the costs of certain health services.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  Title XVIII of the Social Security Act; 42 U.S.C. §§ 426, 426A.  Part A of the Medicare Program authorizes payment for institutional care, including hospital care.  *See* 42 U.S.C. §§ 1395c-1395i-4.  Most hospitals, including Heart Hospital and Jack & Jane Hospital, derive a substantial portion of their revenue from the Medicare Program.

53.     Under the Medicare program, the Centers for Medicare and Medicaid Services ("CMS") makes payments after the services are rendered to hospitals for inpatient and outpatient services.  Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program.

54.     As detailed below, Heart Hospital and Jack & Jane Hospital, since at least 2004 and through today, have knowingly submitted, or caused to be submitted, claims both for specific

services provided to individual beneficiaries and for general and administrative costs incurred in treating Medicare beneficiaries.

55.      Heart Hospital and Jack & Jane Hospital, since 2004 and through the present, have participated in Medicare Part A.  To that end, they have, every year since 2004 and through the present, knowingly and periodically signed an application for participation in the Medicare program, known as CMS Form 855A, and submitted it to the United States.  Included in the CMS Form 855A is a "Certification Statement" that contains, *inter alia*, the following language:

> **I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider .... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law) and to the provider's compliance with all applicable conditions of participation in Medicare.**

56.      To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims, as well as processing the cost reports submitted by providers.  CMS also contracts with "carriers" to assist in administration of Medicare Part B.  Carriers are typically insurance companies, and are responsible for processing and paying Part B claims.  In November 2006, Medicare Administrative Contractors ("MACs") began replacing both carriers and fiscal intermediaries. *See* Fed. Reg. 67960, 68181.  In general, MACs act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. *See* 42 § C.F.R. 421.5(b).

57.      Following the discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64.  These hospitals submit patient-

18

specific claims for interim payments on a CMS Form UB-04 (formerly UB-92).

58.     As a prior condition to payment by Medicare, CMS requires hospitals to submit on an annual basis a form CMS-2552, more commonly known as the "Hospital Cost Report."  These reports constitute the final claim that a provider submits to the fiscal intermediary for items and services provided to Medicare beneficiaries.  After the conclusion of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20.  *See also* 42 C.F.R. § 405.l80(b)(l).  Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(t)(l).

59.     Heart Hospital and Jack & Jane Hospital were required to submit Hospital Cost Reports to their fiscal intermediaries, and have knowingly done so each year from the time of their opening in 2004 through the present.

60.     Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by the Defendants to ensure their accuracy and to preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made.

61.     Each Hospital Cost Report contains an express certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

62.     The Hospital Cost Report Certification is a preface to the cost report's certification, in which the following warning appears:

**MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.**

This advisory is followed by the actual certification language itself:

**CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)**

**I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations (emphasis added). (This is followed by: signature of facility's officer, title and date).**

63.     Defendants are required to be familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports. Thus, Heart Hospital, Jack & Jane Hospital, Baylor Plano, University, All Saints, BHCS, and BSWH are required to disclose all known errors and omissions in their claims for Medicare reimbursement (including their cost reports) to their fiscal intermediary.  42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports, stating, *inter alia*:

**Whoever ... having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or**

20

> **payment ... conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized ... shall in the case of such a ... concealment or failure ... be guilty of a felony.**

64.     Heart Hospital and Jack & Jane Hospital, each year since at least 2004 and through the present, have knowingly submitted Health Cost Reports that were signed by their respective employees, usually a hospital official, who attested, among other things, to the certification quoted above.  Doctors or other providers submit Medicare Part B claims to the carrier for payment.

**B.     The Medicaid Program – Title XVIII of the Social Security Act**

65.     Medicaid was created in 1965 under Title XIX of the Social Security Act.  Under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 *et seq*., the United States distributes funding to those Medicaid-participating states, which in turn provide certain medical services to the poor.  Medicaid regulations require participating states to designate a state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with regulations of the United States Department of Health and Human Services.  Once approved, the state is entitled quarterly reimbursement for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. § 1396b(a)(l).  This reimbursement is called "federal financial participation" ("FFP").  The Texas Health and Human Services Commission is the state agency responsible for administering the Texas State Medicaid Program.

66.     The amount of FFP in Medicaid spending by each state is calculated on a state-by-state basis each fiscal year in accordance with a formula established under Title XIX, depending on a variety of factors including such things as the relative wealth of the state and its people and the total amount and kinds of expected Medicaid expenditures that are needed or expected. For

example, for fiscal year 2012, the FFP for Texas was 58.22%.

67.     Each state's Medicaid program must cover hospital services, 42 U.S.C. § 1396a(l)(A), 42 US.C. § 1396d(a)(l)-(2), and each program uses a cost reporting method similar to that used under Medicare.

68.     Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state that requires the provider to agree to comply with all Federal and state Medicaid requirements, including the fraud and abuse provisions and the AKS and Stark Statute.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicaid patients.

### C.     The TRICARE/CHAMPUS Program – 10 U.S.C. § 1071-1106

69.     The United States also administers other health care programs, including the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), TRICARE, and the Federal Employee Health Benefit Program.

70.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

71.     In 1967 the Department of Defense established the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), a federal medical program funded by Congress. 10 U.S.C. § 1071.  CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel.

72.     In 1995, the Department of Defense established TRICARE, a managed health care program, which operates as a supplement to CHAMPUS.  *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE, both programs are frequently referred to collectively as

22

TRICARE/CHAMPUS, or just "TRICARE."  The purpose of the TRICARE program is to improve health care services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers."  32 C.F.R. § 199.17(a)(l).  The TRICARE Management Activity ("TMA") oversees this program.

73.    The TRICARE managed health care programs are created through contracts with managed care contractors in three geographic regions: North, South, and West.  The Defendants serve patients in the West TRICARE region.  Health services providers such as Heart Hospital and Jack & Jane Hospital, who are Medicare-certified providers, are also considered TRICARE authorized providers.

74.    Heart Hospital and Jack & Jane Hospital are each a TRICARE "Network Provider," which means they have entered into contracts with the West region's managed care contractor to provide services for an agreed reimbursement rate. 32 C.F.R. § 199.14(a).  They have, since at least 2004 and through the present, knowingly sought and obtained reimbursement from the TRICARE program for services they have provided to military retirees, and/or their eligible dependents, and/or active duty members of the armed forces, as well as federal employees, retirees, and survivors.

75.    In addition to individual patient costs, TRICARE reimburses hospitals for two types of costs based on the Medicare cost report: capital costs and direct medical education costs.  32 C.F.R. § 199.6.  A facility seeking reimbursement from TRICARE for these costs is required to submit a Request for Reimbursement form, in which the provider sets forth its number of TRICARE patient days and financial information which relates to these two cost areas, all of which is derived from the Medicare cost report for that facility.

76.    This Request for Reimbursement form requires that the provider expressly certify

that the information contained therein is "accurate and based upon the hospital's Medicare cost report." Upon receipt of a hospital's Request for Reimbursement and its financial data, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the facility.

77.     Heart Hospital and Jack & Jane Hospital, since 2004 and through the present, have knowingly submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports.

78.     Further, despite knowing that millions of dollars in payments from federal and state governments have been received in violation of the Stark Statute's prohibition on receipt of payment for services rendered pursuant to an improper financial arrangement, Defendants have failed to refund these payments as required by the Stark Statute. Under the False Claims Act, 31 U.S.C. § 3 729(a)(l)(G), this constitutes a knowing and improper avoidance of an obligation to transmit money to the United States.

## VI.     APPLICABLE FEDERAL STATUTES

### A.     The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b

79.     The AKS prohibits a party from giving or receiving "any remuneration," in any form, whether direct or indirect, in return for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal healthcare program." 42 U.S.C. §§ 1320a-7(b)(l)(A), 1320a-7(b)(2)(A).

80.     Proof of an explicit *quid pro quo* is not required to show a violation of the AKS.

81.     The term "any remuneration" encompasses anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. 42 U.S.C. 31320a-7b(b)(l). It includes both sums for

24

which no actual service was performed, and sums for which some service was performed.  The statute has been interpreted to cover any arrangement where even one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.

82.     Under the AKS, both criminal and civil penalties apply, including civil monetary penalties and the sanction of exclusion from federal health benefit programs.  The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization, poor medical judgment, and restrict competition, ultimately resulting in poor quality of care being delivered to patients.

83.     Compliance with the AKS is a *condition of payment* under Government healthcare programs, including the Medicare, Medicaid, and TRICARE programs, and that condition applies regardless of whether the kickback payor or recipient is submitting the claim to the Government. Claims that arise from a kickback scheme are per se false, and violate the False Claims Act, because they are the result of a kickback – no further express or implied false statement is required to render such infected or tainted claims false, and none can wash the claim clean.  42 U.S.C. § 1320a-7b(g).

84.     In addition to prohibiting payments designed to induce referrals, the AKS also prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Medicare, Medicaid, or TRICARE any claim for referrals that are induced by kickbacks. Importantly, the Patient Protection and Affordable Care Act of 2010 ("ACA") amended the AKS to expressly provide that a claim submitted for reimbursement to a federally-funded health care program for items or services provided as the result of a referral violating the AKS is deemed to be "false" under the FCA. 42 U.S.C. § 1320a-7b(g).

85.     The ACA also amended the AKS to expressly state that neither actual knowledge

of the AKS nor a specific intent to violate it is an element of a violation of the statute. 42 U.S.C. §

1320a-7b(h).  Prior to the passage of that amendment, the United States Court of Appeals for the

Fifth Circuit had stated that a violation of the AKS was knowing and willful when the defendant

had knowledge that the conduct in question was unlawful and was committed with the specific

intent to do something the law forbids, but the defendant need not have had knowledge of the

particular law allegedly violated. *United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998).

86.     In addition, Section 6402(a) of the ACA established section 1128J(d) in the Social

Security Act regarding reporting and returning Medicare, Medicaid, and TRICARE overpayments.

Section 1128J(a) requires a person who has received an overpayment to report and return the

overpayment by the later of (i) 60 days after the overpayment was identified or (ii) the date any

corresponding cost report is due.  The knowing and improper failure to return an overpayment

subjects the recipient to liability under the federal False Claims Act, 31 U.S.C. § 3730(a)(1)(G).

87.     Violation of the statute constitutes a felony punishable by a maximum fine of

$25,000, imprisonment up to five years, or both.  Any party convicted under the AKA must be

excluded (*i.e.*, not allowed to bill for any services rendered) from Federal health care programs for

a term of at least five years.  42 U.S.C. § 1320a-7(a)(l).  Even without a conviction, if the Secretary

of HHS finds administratively that a provider has violated the AKS, the Secretary may exclude

that provider from the Federal health care programs for a discretionary period, and may impose

administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

88.     HHS has published safe harbor regulations that define practices that are not subject

to the AKS because such practices would not likely result in fraud or abuse.  42 C.F.R. § 1001.952.

However, the plaintiff need not prove as part of its affirmative case that any safe harbor does not

apply.  Once the plaintiff has demonstrated each element of a violation of the AKS, the burden

shifts to the defendant to establish that defendant's conduct at issue was protected by a safe harbor or exception.

89.     Such safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor. With regard to referrals from investors to a practice or entity such as Heart Hospital or Jack & Jane Hospital, the safe harbor requires that no more than 40% of the entity's gross revenue can come from such referrals, and the terms offered to investors must have no relation to expected volume of referrals or require that an investor make referrals to the entity. 42 C.F.R. § 1001.952(a)(2). Defendants' scheme fails both conditions. Indeed, in a Special Fraud Alert issued by the OIG in 1994, HHS warned that joint ventures such as Heart Hospital and Jack & Jane Hospital would violate the AKS if they serve to "lock up a stream of referrals from the physician investors and to compensate them indirectly for those referrals." OIG Special Fraud Alert on Joint Venture Arrangements, 59 Fed. Reg. 65373-74 (Dec. 19, 1994). The Alert specifically noted that one of the red flags marking such an entity as suspect under the AKS would include the joint venture choosing investors because they are in a position to make referrals. *Id.*

**B.     The Stark Statute, 42 U.S.C. § 1395nn**

90.     The portion of the Social Security Act commonly referred to as the "Stark Statute," 42 U.S.C. § 1395nn, prohibits hospitals from submitting claims to Medicare, Medicaid, or TRICARE for payment based on patient referrals from physicians who have an improper "financial relationship" with the hospital. *See* 42 U.S.C. § 1396b(s).

91.     The Stark Statute resulted from Congress's finding that financial relationships between referring physicians and their related entities can compromise their professional judgment and lead to overutilization of health care services. Academic studies have confirmed that physician

self-referral arrangements result in referring physicians using more of those providers' services than similarly situated physicians who did not have such relationships. The Stark Statute was designed specifically to reduce the loss suffered by the Medicare Program due to such improper overutilization of services.

92.     The Stark Statute provides:

(a) Prohibition of certain referrals
          (1) In general. Except as provided in subsection (b), if a physician (or an
          immediate family member of such physician) has a financial relationship
          with an entity specified in paragraph (2), then— (A) the physician may not
          make a referral to the entity for the furnishing of designated health services
          for which payment otherwise may be made under this subchapter, and (B)
          the entity may not present or cause to be presented a claim under this
          subchapter or bill to any individual, third party payor, or other entity for
          designated health services furnished pursuant to a referral prohibited under
          subparagraph (A). 42 U.S.C. § 1395nn(a)(1).

93.     Since 1995, the Stark Statute has defined the "designated health services" to which the billing prohibition applies to include: (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy; (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; (10) home health services, and (11) clinical laboratory services. *See* 42 U.S.C. § 1395nn(h)(6).

94.     Accordingly, providers may not bill Medicare, Medicaid, or TRICARE for designated health services resulting from a prohibited referral, and physicians may not refer patients to receive designated health services payable by Medicare, Medicaid, or TRICARE from entities with which the physician or an immediate family member has a financial relationship, unless an exception applies. Because payment is conditioned on compliance with the Stark Statute, no payment may be made by the Medicare, Medicaid, or TRICARE programs for designated health services provided in violation of 42 U.S.C. § 1395nn(a)(l). *See* 42 U.S.C. §§ 1395nn(g)(l);

1396b(s).

95.     Additionally, regulations require that any collected payments billed in violation of 42 U.S.C. § 1395nn(a)(l) must be refunded on a "timely basis," within at most 60 days.  *See* 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d); 42 C.F.R. § 1003.101.

96.     "Prohibited financial relationships" are broadly defined by the Stark Statute to include any ownership interest or "compensation" paid directly or indirectly to a referring physician, subject only to specifically identified exception.  42 U.S.C. § 1395nn(a)(2).

97.     Before 2010, CMS recognized a "whole hospital" exception to Stark that applied if the referring physician: (1) had a financial interest in the whole hospital, and not just a specific part; (2) was authorized to perform services at the hospital; and (3) was expected to actually perform the agreed upon services.  *See* 42 C.F.R. § 411.362.  The "whole hospital" exception to the Stark Statute was removed in 2010, but the Affordable Care Act allowed the exception to remain in effect for physician-owned hospitals that existed before March 23, 2010.  However, even if the exception would otherwise apply, it has always been a rule that *the hospital may not condition any physician-ownership interests on the physician making or influencing referrals to the hospital*. 42 C.F.R. § 411.362(b)(3)(ii)(B).  Thus, the exception does not apply to Defendants' scheme.

98.     The Stark Statute contains an exception for compensation for an employment relationship only if (1) the employment is for identifiable services, (2) the amount of remuneration under the employment relationship is consistent with the fair market value of the services and is not determined in a manner that takes into account the volume or value of any referrals by the referring physician, and (3) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer.  42 U.S.C. § 1395nn(e)(2).

99.     Compensation may be proper pursuant to a personal services arrangement between a hospital and a physician under the Stark Statute only if (1) the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement; (2) the arrangement covers all of the services to be provided by the physician to the entity; (3) the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the entity of the arrangement; (4) the term of the arrangement is for at least one year; (5) the compensation to be paid over the term of the arrangement is to be set in advance, does not exceed the fair market value for the services, is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless the agreement falls within the narrowly defined physician incentive plan); and (6) the services do not involve promoting any activity that violates state or Federal law.  42 U.S.C. § 1395nn(e)(3).

100.     Compensation in the form of "productivity bonuses" may also be proper in some circumstances where they are based on services personally performed by the physician.

101.     In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source, each of the following elements must be established: (1) there must be a written agreement, (2) the compensation must be consistent with fair market value, (3) the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and (4) the agreement cannot violate the AKS.

102.     Violations of the Stark Statute may subject the physician and the billing entity to exclusion from participation in federal health care programs, as well as financial penalties including (a) a civil money penalty of up to $15,000 for each service, and (b) an assessment of

three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited.  See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

103.    In sum, the Stark Statute prohibits hospitals and physicians from billing Medicare, Medicaid, or TRICARE for inpatient and outpatient hospital services resulting from a referral by a physician with whom the hospital has any financial relationship not falling within specifically identified exemptions. 42 U.S.C. § 1395nn.  Further, compliance with the Stark Statute is a condition for payment under Medicare, Medicaid, and TRICARE.  Neither Medicare, Medicaid, nor TRICARE may pay for any designated health services provided in violation of the Stark Statute. 42 U.S.C. § 1395nn(g)(l), 42 U.S.C. § 1396b(s).

### C.    The Federal False Claims Act, 31 U.S.C. §§ 3729(a) *et seq.*

104.    The FCA is the primary tool for combating fraud against the United States.  It provides incentives for individuals with knowledge of fraud against the United States to disclose the information, and for the private bar to commit legal resources to prosecuting fraud on the United States' behalf.  In fact, in 2009 and 2010, the FCA was amended to broaden coverage.

105.    From 1986 to 2009, the FCA prohibited, *inter alia*: (a) "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" as well as (b) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."   31 U.S.C. § 3729 (a)(l)-(2) (1986).  It also defined a "claim" as

> [A]ny request or demand, whether under a contract or othe1wise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(c) (1986).

31

106.    In 2009, the FCA, at 31 U.S.C. § 3729(a) (2009), was amended to provide, *inter alia*, that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to committee a violation of subparagraph (A), (B), . . . or (G) . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government*, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

107.    The FCA, at 31 U.S.C. § 3729(b) (2009), further provides, *inter alia*, that:

> For purposes of this section - (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) no proof of specific intent to defraud is required.

108.    The term "obligation" is defined to include "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (2009).

109.    Additionally, a "claim" is defined under 31 U.S.C. § 3729(b)(2)(A) (2009) as:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that - (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government - (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

110.    The FCA allows any person with information about a false or fraudulent claim to

bring an action and share in the recovery of a civil penalty between $5,500 and $11,000[4] for each false or fraudulent claim, plus three times the amount of damages sustained by the United States where the false statement would have a material effect on the United States' decision to pay the false or fraudulent claim.

111.    The element of materiality requires a showing that the alleged misrepresentation or omission had "a natural tendency to influence, or [was] capable of influencing, the payment or receipt of money or property."  42 U.S.C. § 3729(b)(4).  The Supreme Court in 2016 reaffirmed this standard, holding that a false certification of compliance "cannot be found [to be material to the Government's decision to pay a claim] where noncompliance is minor or insubstantial." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 2003 (2016). However, compliance with both the AKS and Stark Statute is material to the Government's decision to pay a claim, as evidenced by the enactment of the AKS and Stark Statute, as well as their various amendments, which demonstrate Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks and improper schemes. Thus, compliance with AKS and the Stark Statute is a material prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid, or TRICARE.

## VII.    DEFENDANTS CONSPIRED TO CREATE AND IMPLEMENT A MINIMUM CONTACTS REQUIREMENT INTENDED TO INDUCE REFERRALS IN VIOLATION OF AKS AND THE STARK STATUTE

### A.    The Patient Contacts Requirement Is Intended to Induce Referrals

112.    Heart Hospital and Jack & Jane Hospital were both initially formed in the early

---

[4] The Federal Civil Penalties Inflation Adjustment Act of 2015 was passed to require agencies to adjust the level of civil monetary penalties.  28 U.S.C. § 2461.  Since then, the Department of Justice has published adjusted penalties ranging from $10,957 to $21,916 for violations that occurred after November 2, 2015. Civil Monetary Penalties inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133.

2000s as limited partnerships between physicians, who collectively own 49.9% of each partnership, and Baylor Scott & White entities.  In particular, Baylor Plano owns 50.1% of Heart Hospital and University owns 50.1% of Jack & Jane Hospital.

113.    Jack & Jane Hospital was formed in 2002 for the purpose of creating a specialty hospital focusing on cardiac care, and primarily serving Medicare patients.  It operates a hospital physically adjacent to University in Dallas and a hospital physically adjacent to All Saints in Fort Worth.  As of April 2018, Jack & Jane Hospital is owned collectively by University and seventy-eight (78) physician-investors.  Individual physicians own between two (2) and forty (40) shares, while University owns 2,359 shares.

114.    Heart Hospital was formed in 2004, based on the same physician-ownership model as Jack & Jane Hospital, to create a specialty hospital focusing on cardiac care, and primarily serving Medicare patients.  Initially, Heart Hospital was founded by eighty-six physicians, including Relators, in partnership with Baylor Plano.  It began operation in the Baylor Plano facility, but in 2007, it moved into a newly-built facility adjacent to the current Baylor Plano campus.  As 2014, Heart Hospital was owned collectively by Baylor Plano and 138 cardiologists, cardiovascular surgeons and vascular surgeons.  In 2014, the value of each ownership unit was $33,000.  Below contains a table showing the owners of the Heart Hospital and their number of units owned as of January 30, 2014:

| Owner | Units Owned | % Owned |
|---|---|---|
| *Minority/Limited Ownership Entities* | | |
| 1 Abo-Auda, Wael | 14.0 | 0.1% |
| 2 Acuff, Tea | 67.0 | 0.7% |
| 3 Agarwal, Poonam | 19.0 | 0.2% |
| 4 Agrawal, Kanti | 81.0 | 0.9% |
| 5 Akbar, Saleem | 30.0 | 0.3% |
| 6 Aligeti, Venkata | 8.0 | 0.1% |
| 7 Allo, Simon | 11.0 | 0.1% |
| 8 Ammar, Richard | 25.0 | 0.3% |
| 9 Arora, Neeraj | 39.0 | 0.4% |
| 10 Bakshi, Sahil | 21.0 | 0.2% |
| 11 Beveridge, Thomas | 7.0 | 0.1% |
| 12 Blatt, Brian | 39.0 | 0.4% |
| 13 Boeher, James | 25.0 | 0.3% |
| 14 Bonilla, Mario | 11.0 | 0.1% |
| 15 Bowers, Bruce | 35.0 | 0.4% |
| 16 Bowman, Richard | 81.0 | 0.9% |
| 17 Brinkman, William | 29.0 | 0.3% |
| 18 Brown, David | 91.0 | 1.0% |
| 19 Cai, Tung | 39.0 | 0.4% |
| 20 Chappell, Vickie | 1.0 | 0.0% |
| 21 Chemmalakuzhy, Jacob | 11.0 | 0.1% |
| 22 Chodimella, Vidyasagar | 39.0 | 0.4% |
| 23 Cianci, Christopher | 5.0 | 0.1% |
| 24 Connaughton, Robert Connaughton | 7.0 | 0.1% |
| 25 Cruz, Carlos | 11.0 | 0.1% |
| 26 Cruz, Manuel | 28.0 | 0.3% |
| 27 Davis, David | 39.0 | 0.4% |
| 28 DeVille, J. Brian | 7.0 | 0.1% |
| 29 Dodla, Saritha | 11.0 | 0.1% |
| 30 Dunn, Toby | 21.0 | 0.2% |
| 31 Edgerton, James | 67.0 | 0.7% |
| 32 Edwards, David | 7.0 | 0.1% |
| 33 Eichhorn, Eric | 35.0 | 0.4% |
| 34 Engleman, David | 39.0 | 0.4% |
| 35 Fazio, Gary | 39.0 | 0.4% |
| 36 Fyfe, Alistair | 56.0 | 0.6% |
| 37 Gable, Dennis | 42.0 | 0.4% |
| 38 Gan, Luisa | 47.0 | 0.5% |
| 39 Gangasani, Aravind | 4.0 | 0.0% |
| 40 Gladden, Jeffrey | 70.0 | 0.7% |
| 41 Gopal, Ambrish | 25.0 | 0.3% |
| 42 Gopalakrishnan, Deepika | 81.0 | 0.9% |
| 43 Gordon, Bruce | 75.0 | 0.8% |
| 44 Graves, Max | 7.0 | 0.1% |
| 45 Gray, William Todd | 7.0 | 0.1% |
| 46 Grayburn, Paul | 19.0 | 0.2% |
| 47 Greenberg, Scott | 39.0 | 0.4% |
| 48 Grimsley, Bradley | 28.0 | 0.3% |
| 49 Gunukula, Srinivas | 81.0 | 0.9% |
| 50 Haddad, Marun | 56.0 | 0.6% |

| Owner | Units Owned | % Owned |
|---|---|---|
| Minority/Limited Ownership Entities | | |
| 51 Harrington, Katherine | 11.0 | 0.1% |
| 52 Harris , Ricky | 81.0 | 0.9% |
| 53 Hebeler, Robert | 35.0 | 0.4% |
| 54 Hecht, Phillip | 66.0 | 0.7% |
| 55 Ho, Trieu | 25.0 | 0.3% |
| 56 Hohmann, Stephen | 14.0 | 0.1% |
| 57 Hollowell, John | 21.0 | 0.2% |
| 58 Hurwitz, Jodie | 29.0 | 0.3% |
| 59 Hussain, Atif | 11.0 | 0.1% |
| 60 Hutcheson, Kelley | 11.0 | 0.1% |
| 61 Isaac, Michael | 28.0 | 0.3% |
| 62 Jacob, Abraham | 7.0 | 0.1% |
| 63 Jain, Vikas | 39.0 | 0.4% |
| 64 Jett, G. Kimble | 35.0 | 0.4% |
| 65 Kakish, Humam | 28.0 | 0.3% |
| 66 Kalidindi, Vishnu | 28.0 | 0.3% |
| 67 Kaplan, Jeffrey | 11.0 | 0.1% |
| 68 Karim, Asad | 14.0 | 0.1% |
| 69 Kazi, Farhana | 11.0 | 0.1% |
| 70 Kedora, John | 25.0 | 0.3% |
| 71 Kennard, Warret | 34.0 | 0.4% |
| 72 Kennedy, Patrick | 77.0 | 0.8% |
| 73 Khan, Akram Muhammad | 67.0 | 0.7% |
| 74 Khan, Hafiza | 15.0 | 0.2% |
| 75 Korlakunta, Hema | 11.0 | 0.1% |
| 76 Kosuri, Subbaraju | 39.0 | 0.4% |
| 77 Lankipalli, Ramarao S. | 35.0 | 0.4% |
| 78 Lawson, Randy | 81.0 | 0.9% |
| 79 Leonard, Bradley | 42.0 | 0.4% |
| 80 Liao, Robert | 25.0 | 0.3% |
| 81 Mack, Michael | 70.0 | 0.7% |
| 82 Maddukuri, Prasad | 25.0 | 0.3% |
| 83 Mallick, Saleem | 8.0 | 0.1% |
| 84 Marshall, Winston | 67.0 | 0.7% |
| 85 McKenzie, Marcus | 7.0 | 0.1% |
| 86 Meacham, Joseph | 25.0 | 0.3% |
| 87 Miller, Waenard | 81.0 | 0.9% |
| 88 Moncrief, Christian | 18.0 | 0.2% |
| 89 Moore, David | 60.0 | 0.6% |
| 90 Moore, Larry | 35.0 | 0.4% |
| 91 Morales, Philip | 24.0 | 0.3% |
| 92 Mottl, Steven | 11.0 | 0.1% |
| 93 Nair, Radhahkrishnan G. | 55.0 | 0.6% |
| 94 Nawaz, M. Zaim | 39.0 | 0.4% |
| 95 Parikh, Biren | 25.0 | 0.3% |
| 96 Park, Conrad | 81.0 | 0.9% |
| 97 Parr, Norvin | 56.0 | 0.6% |
| 98 Paturu, Prasad | 39.0 | 0.4% |
| 99 Pettijohn, Trent | 81.0 | 0.9% |
| 100 Phung, Neil | 20.0 | 0.2% |

| Owner | Units Owned | % Owned |
|---|---|---|
| *Minority/Limited Ownership Entities* | | |
| 101 Pillay, Prem S. | 14.0 | 0.1% |
| 102 Potluri, Srinivas | 39.0 | 0.4% |
| 103 Prewitt, David | 21.0 | 0.2% |
| 104 Proffitt, Trent | 14.0 | 0.1% |
| 105 Rawitscher, David | 56.0 | 0.6% |
| 106 Reddy, Srinivas Alla | 11.0 | 0.1% |
| 107 Rivera, Jose | 18.0 | 0.2% |
| 108 Rosenthal, J. Edward | 81.0 | 0.9% |
| 109 Roughneen, Patrick | 33.0 | 0.4% |
| 110 Ryan, William | 75.0 | 0.8% |
| 111 Shah, Manisha | 11.0 | 0.1% |
| 112 Samaan, Sarah | 35.0 | 0.4% |
| 113 Santos, Raul | 10.0 | 0.1% |
| 114 Scherer, David | 56.0 | 0.6% |
| 115 Schwartz, Brian G. | 8.0 | 0.1% |
| 116 Schwartz, David | 56.0 | 0.6% |
| 117 Shah, Dhiren | 53.0 | 0.6% |
| 118 Shalek, Marc | 56.0 | 0.6% |
| 119 Shapira, Adam | 29.0 | 0.3% |
| 120 Sheth, Mukesh | 10.0 | 0.1% |
| 121 Shutze, William | 46.0 | 0.5% |
| 122 Smith, Bertram | 28.0 | 0.3% |
| 123 Smith, Robert | 32.0 | 0.3% |
| 124 Solis, Rolando | 16.0 | 0.2% |
| 125 Stone, Sabrina | 2.0 | 0.0% |
| 126 Szerlip, Molly | 11.0 | 0.1% |
| 127 Theleman, Kevin | 39.0 | 0.4% |
| 128 Turner, Scott | 14.0 | 0.1% |
| 129 Varma, Jai | 8.0 | 0.1% |
| 130 Vasquez, Jay (Javier) | 14.0 | 0.1% |
| 131 Vrushab, Rajesh | 11.0 | 0.1% |
| 132 Wahid, Faisal | 46.0 | 0.5% |
| 133 Waller, Thomas | 56.0 | 0.6% |
| 134 Weiss, Marty | 25.0 | 0.3% |
| 135 Wilcott, Robert | 10.0 | 0.1% |
| 136 Woolbert, Samuel | 75.0 | 0.8% |
| 137 Wurzburg, Donald | 81.0 | 0.9% |
| 138 Yau, Franklin | 14.0 | 0.1% |
| Subtotal | 4,673.0 | 49.9% |
| *Control/Majority Ownership Entities* | | |
| BRMCP | 4,693.0 | 50.1% |
| **Total Ownership Units** | **9,366** | **100.0%** |

*As of June 30, 2014*

115.    Each claim submitted or caused to be submitted by one of the physicians-owners

since the beginning of the scheme in 2009 to the present constitutes a false claim.

116.    Medicare patients have consistently represented the majority of the patients at Heart Hospital and Jack & Jane Hospital.  According to Heart Hospital's 2014 valuation, Medicare patients represented 59.1% of Heart Hospital's revenue at the Plano location, and 68.4% of the gross revenue at the Denton location.  Below contains a chart of the payor mix at Heart Hospital's Plano location:

| Plano - Payor Mix (% Gross Charges) | FYE 2011 | FYE 2012 | FYE 2013 | FYE 2014 |
|---|---|---|---|---|
| Medicare | 53.6% | 55.1% | 60.1% | 59.1% |
| Medicaid | 1.5% | 1.5% | 1.0% | 1.0% |
| Managed Care/Commercial | 42.2% | 40.3% | 36.6% | 37.7% |
| Self Pay | 2.7% | 3.1% | 2.4% | 2.2% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

117.    Both Heart Hospital and Jack & Jane Hospital perform the gamut of cardiology and vascular surgical procedures that are covered by Medicare, Medicaid, and TRICARE, including Cardiac catheterizations, coronary interventions including stents, valvuloplasty, echocardiography, nuclear imaging or stress tests, aortic stent grafts, peripheral arterial interventions including stents, cardiac ablations, pacemaker and defibrillator (ICD) placement.  In addition, Heart Hospital also performs cardiac and thoracic surgical procedures including lung resections, coronary artery bypass, aortic and mitral valve repair and replacement, and left ventricular assist device placement.  Below contains a chart of the mix of procedures proved by Heart Hospital from 2011-2014:

| Case Volume | Plano | | | | Denton | Total | Plano | | | | Denton | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FYE 2011 | FYE 2012 | FYE 2013 | FYE 2014 | FYE 2014 | FYE 2014 | FYE 2011 | FYE 2012 | FYE 2013 | FYE 2014 | FYE 2014 | FYE 2014 |
| EP Studies | 879 | 925 | 1,151 | 1,208 | 43 | 1,251 | 6.1% | 5.1% | 5.0% | 4.2% | 2.1% | 4.1% |
| Pacemaker | 482 | 509 | 591 | 679 | 61 | 740 | 3.4% | 2.8% | 2.5% | 2.4% | 3.0% | 2.4% |
| ICD | 460 | 385 | 414 | 473 | 43 | 516 | 3.2% | 2.1% | 1.8% | 1.7% | 2.1% | 1.7% |
| Diagnostic Cath | 1,536 | 1,442 | 1,522 | 1,816 | 244 | 2,060 | 10.7% | 7.9% | 6.6% | 6.4% | 11.9% | 6.7% |
| Interventional Cath | 710 | 700 | 750 | 886 | 94 | 980 | 5.0% | 3.8% | 3.2% | 3.1% | 4.6% | 3.2% |
| CABG | 505 | 385 | 396 | 434 | 31 | 465 | 3.5% | 2.1% | 1.7% | 1.5% | 1.5% | 1.5% |
| Valve Surgery | 519 | 663 | 821 | 988 | 5 | 993 | 3.6% | 3.6% | 3.5% | 3.5% | 0.2% | 3.3% |
| Thoracic Surgery | 72 | 205 | 193 | 206 | 7 | 213 | 0.5% | 1.1% | 0.8% | 0.7% | 0.3% | 0.7% |
| Vascular Surgery | 1,181 | 1,067 | 1,145 | 1,198 | 133 | 1,331 | 8.3% | 5.9% | 4.9% | 4.2% | 6.5% | 4.4% |
| Cardiac | 3,520 | 5,465 | 8,582 | 10,296 | 332 | 10,628 | 24.6% | 30.1% | 37.0% | 36.1% | 16.2% | 34.8% |
| Vascular | 422 | 754 | 954 | 1,386 | 125 | 1,511 | 3.0% | 4.1% | 4.1% | 4.9% | 6.1% | 4.9% |
| Other | 4,012 | 5,686 | 6,696 | 8,937 | 926 | 9,863 | 28.1% | 31.3% | 28.8% | 31.4% | 45.3% | 32.3% |
| Totals | 14,298 | 18,186 | 23,215 | 28,507 | 2,044 | 30,551 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

118.    As a result of these services, Heart Hospital and Jack and Jane Hospital have received millions of dollars from Medicare, Medicaid, and TRICARE.   In fact, the average Medicare charges for patients admitted for surgery at Heart Hospital was over $190,000.  Likewise, the average charges for cardiovascular surgery patients at Jack & Jane Hospital was over $100,000.  Below contains a chart from the American Hospital Directory of the inpatient utilization statistics by medical service at Heart Hospital:

### Inpatient Utilization Statistics by Medical Service
Definitions

| | Number Medicare Inpatients | Average Length of Stay | Average Charges | Medicare Case Mix Index (CMI) |
|---|---|---|---|---|
| Cardiology | 563 | 4.14 | $31,219 | 1.1121 |
| Cardiovascular Surgery | 1,454 | 6.33 | $147,541 | 5.1342 |
| Medicine | 46 | 6.11 | $51,153 | 1.3286 |
| Neurology | 17 | 4.76 | $36,232 | 1.3713 |
| Orthopedic Surgery | 22 | 8.91 | $78,836 | 3.0191 |
| Pulmonology | 59 | 4.68 | $41,551 | 1.1755 |
| Surgery | 173 | 10.40 | $191,166 | 5.2572 |
| Urology | 24 | 4.50 | $30,086 | 1.2538 |
| Vascular Surgery | 269 | 2.74 | $42,698 | 2.0100 |
| Total | 2,641 | 5.70 | $107,944 | 3.7163 |

Below contains a chart from the American Hospital Directory of the inpatient utilization statistics by medical service at Jack & Jane Hospital:

**Inpatient Utilization Statistics by Medical Service**
Definitions

|  | Number Medicare Inpatients | Average Length of Stay | Average Charges | Medicare Case Mix Index (CMI) |
|---|---|---|---|---|
| Cardiology | 279 | 3.44 | $27,503 | 1.0991 |
| Cardiovascular Surgery | 485 | 3.77 | $101,199 | 4.2692 |
| Medicine | 13 | 4.54 | $22,004 | 1.0606 |
| Orthopedic Surgery | 47 | 8.15 | $58,411 | 3.3104 |
| Surgery | 29 | 6.21 | $82,329 | 3.6047 |
| Urology | 16 | 3.13 | $34,586 | 1.9620 |
| Vascular Surgery | 228 | 3.94 | $47,214 | 2.2512 |
| Total | 1,122 | 3.96 | $66,157 | 2.8807 |

119.     Jack & Jane Hospital and Heart Hospital operate similar physician-owned systems – each performs similar cardiovascular operations and, most importantly, each requires physician-owners to meet a minimum number of "patient contacts" per year.

120.     In 2010, Section 6001 of the Affordable Care Act was enacted to effectively ban new physician-owned hospitals and bar existing ones – such as Heart Hospital and Jack & Jane Hospital – from expanding, in an effort to address the mounting evidence that physician-owned specialty hospitals lead to overutilization of services.   Faced with this government-mandated limitation on the ability to generate additional revenue by adding beds, Defendants turned to another solution: further manipulating the "patient contacts" requirement to induce additional referrals and dominate the market.

121.     While requiring physicians to provide a reasonable number of patient services is not uncommon in the industry as a method to monitor physician competency, beginning in 2009, Heart Hospital and Jack & Jane Hospital began excessively increasing the quantity of required "patient contacts" and unreasonably narrowing the definition of "patient contacts" to only account for patient referrals. The "patient contacts" requirement at the Heart Hospital and Jack & Jane Hospital had significantly deviated from industry norms in ways intended to pressure physician-owners to refer additional patients.

122.     Since 2009 Relators have observed Defendants attempt to, and successfully, induce

40

patient referrals by deceptively exploiting the "patient contacts" requirement to induce referrals and capture market share.  As described below, Defendants changed the terms of the "patient contacts" requirement in various ways to count only patient referrals by physician-owners, and began requiring an increasing number of excessive "patient contacts" in order to pressure physician-owners to refer patients.  Further, Defendants have attempted to justify the "patient contacts" requirement as necessary to monitor quality of care, despite the fact that Defendants enforcement practices reveal their true intent.  Additionally, Defendants have used the "patient contacts" requirement to pressure high-performing physician-owners to leave their current practices and join as primary staff of Baylor Scott & White entities.  Finally, the scheme has caused meteoric growth for Heart Hospital and Jack & Jane Hospital, growing multiple times faster than the patient base and dominating the local market.

> 1.     *Heart Hospital and Jack & Jane Hospital Increase the Required Number of "Patient Contacts" and Narrow the Definition to Maximize Referrals*

123.     Heart Hospital and Jack & Jane Hospital require physician-owners to maintain a minimum number of "patient contacts" through their partnership agreement and medical staff bylaws.  The partnership agreements of Heart Hospital and Jack & Jane Hospital have, at least since 2009, required physician-owners to maintain active clinical staff membership in accordance with the medical staff bylaws.  The medical staff bylaws, in turn, require physicians to maintain a minimum number of "patient contacts."

124.     Specifically, since 2009, the partnership agreements of Heart Hospital and Jack & Jane Hospital include as "Physician Eligibility Requirements" for retaining physician partner units, that physician partners "continuously remain[ ] member[s] of the Active medical staff at the Hospital."  Additionally, the term "Active" is defined to mean "appointment to and continued membership on the active-clinical staff category of the medical staff of the Hospital."

41

125.    Moreover, both hospitals strongly incentivize physicians to maintain their eligibility for ownership.  Under the limited partnership agreements, Heart Hospital and Jack & Jane Hospital have the "right and option" to immediately redeem a physician-investor's units if the physician does not satisfy the Physician Eligibility Requirements.  Notably, while Jack & Jane Hospital has the option to redeem ineligible physicians' ownership for full market value, Heart Hospital has the option to redeem ownership at a price equal to the physician's adjusted capital account, which is considerably less than the full market value.

126.    In other words, if a physician-investor fails to maintain the minimum number of patient contacts, they may lose not only their limited partnership units and the value of those units, but also the lucrative income stream associated with those units.  In short, the number of "patient contacts" required to maintain active-clinical medical staff privileges is directly related to the remuneration received by the physician-investor from Heart Hospital and Jack & Jane Hospital. The amount of remuneration can be very lucrative, depending on the revenue of Heart Hospital or Jack & Jane at the time.   As of 2014, physician-investors in Heart Hospital were receiving payments of approximately $12,000 to $15,000 per interest unit on a semi-annual basis.  Moreover, no physician-owner held only one interest unit.   This remuneration constitutes a significant incentive.   Some individual physician-owners held over ninety (90) interest units, such as Dr. David Brown.

    i.    *Heart Hospital and Jack & Jane Hospital Excessively Increase the Required Number of "Patient Contacts"*

127.    As the definition of "patient contacts" became more aligned with patient referrals, Heart Hospital and Jack & Jane Hospital rapidly increased the required number of "patient contacts" in order to induce physician-owners to refer more patients.

128.    When Heart Hospital first began operations at Baylor Plano in 2004, the number of

patient contacts required to maintain active-clinical medical staff privileges was six (6) per year. In the ensuing years, the hospital's Medical Executive Committee and Board of Managers continued to increase the requirement, first to twelve (12).  By July 2011, reappointment to the active-clinical medical staff required twenty-four (24) patient contacts per year.  In July 2012, however, Heart Hospital's Medical Executive Committee and Board of Managers doubled that number to forty-eight (48) patient contacts per year, or at least eighty-four (84) over a two-year appointment period.  Thus, since 2004, the number of required patient contacts had gone up by eight-fold, without any justifiable basis tying the increase to quality control.[5]

129.    When Defendants realized that Heart Hospital began growing at a faster rate after increasing the number of "patient contacts" and tailoring the definition, they conspired to ensure that Jack & Jane Hospital would increase the required number of minimum patient contacts per year in lock step with Heart Hospital.  Soon after Heart Hospital increased its minimum patient contact requirement to twelve (12), Jack & Jane Hospital followed suit, raising its minimum patient contact requirement to twelve (12).  Likewise, when Heart Hospital raised the minimum number to twenty-four (24), Jack & Jane Hospital soon matched.  Eventually, both Heart Hospital and Jack & Jane Hospital have reached the current forty-eight (48) patient-contacts requirement, by no coincidence.

130.    The enormous increase from six (6) to forty-eight (48) required "patient contacts," which facially reflects an incentive to increase patient referrals, is especially troubling considering that Heart Hospital and Jack & Jane Hospital, along with their physician-owners, perform only a limited scope of specialized procedures.  Thus, the physician-owners are highly incentivized to

---

[5] As evidence that Heart Hospital enforces this policy, it regularly sent letters signed by the president, Mark Valentine, and the Chairman of the Medical Staff, Dr. David Brown, to Dr. Dewey and Dr. Magee in 2012 and 2013 stating that, if they did not meet the "patient contacts" requirement they would "**most likely be moved to courtesy staff**." (emphasis in original).

funnel a high percentage of their patients to the hospital they own, regardless of the interests and convenience of the patients and their loved-ones.  The scheme implicates the core concern of the AKS for overutilization of services.

> ii.   *The Minimum "Patient Contacts" Requirement Only Counts Patient Referrals*

131.   Heart Hospital and Jack & Jane Hospital changed the terms of the "patient contacts" requirement to better capture only high-revenue patient referrals, rather than any substantive patient encounters.  Initially, a "patient contact" included not only surgeries, but also any and all face-to-face encounters with a patient, including in-hospital history and physical examination, a consult, or encounter during required rounds at the hospital.  As of July 2011, however, Heart Hospital and Jack & Jane Hospital changed the definition to ensure that all "patient contacts" would be revenue generating by narrowing the definition to include only admissions.

132.   Most significantly, Heart Hospital and Jack & Jane Hospital essentially eliminated any distinction between "patient contacts" and "patient referrals" by mandating that "no patient admission will result in more than one (1) patient contact."  *See* Heart Hospital Medical Staff Rules and Regulations § 14.1.  Even if multiple consults are performed during the stay, additional procedures are performed as needed, or there are more than one "meaningful face to face encounter" with that patient, only one contact by one physician per admission applies to the "patient contacts" requirement.  Both hospitals also ceased to count patient contacts that occurred during rounds.

133.   First, the "patient contacts" requirement was amended to exclude "patient contacts" that occur at any other hospital, *even if the hospital is a related Baylor Scott & White Hospital or an adjacent facility*.  According to medical staff bylaws of each hospital, a "contact" was defined to require that it "occur in the Hospital," and not at any other hospital.  In line with this, the medical

staff rules and regulations define "patient contacts" as: (i) admissions, as long as the history and physical examination is performed *at the hospital*; (ii) inpatient and outpatient procedures performed *at the hospital*; (iii) surgeries performed *at the hospital*; (iv) or consultations that occur *at the hospital*.  Thus, despite the fact that Heart Hospital and Jack & Jane Hospital are both part of the Baylor Scott & White system, they do not even allow "patient contacts" at one of their hospitals to count towards the minimum required number of the other's, lest the revenue incentives be diluted.  For example, when Dr. Magee sought to have Heart Hospital count a patient procedure he performed at Univeristy, his request was summarily denied because the contact did not occur at Heart Hospital.  The hospitals share detailed information concerning the operations and practices of the entities, as described in detail below.  (*See infra* Part VII(c)).  It was this open coordination and collaboration that facilitated the schemes, and the hospitals had every opportunity to share quality of care metrics and information.  The only reason for not allowing contacts at one hospital to count for the other one is to maximize the impact of the referral scheme.

134.    The fact that "no patient admission will result in more than one (1) patient contact" shows the requirement is aimed at referrals.  The American Medical Association ("AMA") expressly states that clinical hospital "[p]rivileges should not be based on numbers of patients admitted to the facility." AMA Opinion 4.07 - Staff Privileges (June, 1994).  Yet, by limiting patient contacts to patient admissions, Heart Hospital and Jack & Jane Hospital are doing exactly that.  This overly narrow definition of patient contact requirement deviates from industry standards, as most hospitals allow basically any patient encounter to count as a contact.  Consultations and other non-procedure encounters give the hospital the chance to monitor competence (the purported reason for the requirement), regardless of whether the consultation is the reason for the patient's admittance.  For example, if a physician treats a patient with a procedure

that the same physician had previously admitted for an unrelated procedure, that should constitute a patient contact whereby the hospital can monitor the quality of the care provided.  Defendants, however, would not count the second treatment because the single "patient contact" had already counted for that admitting physician.  Further, counting only admissions multiplies the revenue-generating impact of the astronomically high minimum contact requirement.

135.    In sum, the "patient contacts" requirement was manipulated to maximize the incentive to refer high-revenue generating procedures/surgeries and has become, in reality, a patient referral requirement because Heart Hospital and Jack & Jane Hospital now count only one "patient contact" per patient admission to that hospital.

> iii.    *Defendants' Current "Patient Contacts" Requirement is Far Outside Industry Standards*

136.    The forty-eight (48) patient contact requirement vastly exceeds industry standards for comparable hospitals, and Relators are unaware of any hospitals that have contact requirements even approaching these totals.  The following are examples of the minimum number of patient contacts for comparable hospitals and hospital systems in the United States:

a.  <u>Stanford Health Care, California</u>: Eleven (11) patient contacts per year, or otherwise regularly involved in Medical Staff functions.

b.  <u>HCA Medical City Dallas Hospital, Texas</u>: Six (6) patient contacts per year.

c.  <u>Banner Heart Hospital, Arizona</u>: Twenty-five (25) patient contacts per *two-year* appointment period.

d.  <u>Vanderbilt University Medical Center, Tennessee</u>: No designated minimum number of patient contacts.

e.  <u>Emory Johns Creek Hospital, Georgia</u>: Twenty-four (24) patient contacts per *two-year* appointment period.

f.  <u>Medical Center of Lewisville, Texas</u>: Twenty-four (24) patient contacts per *two-year* appointment period.

g. <u>Spectrum Health Hospitals, Michigan</u>: No minimum number of patient contacts.  Active privileges extended to those who "regularly admit patients to the Hospital and/or are regularly involved in the care and treatment of patients in the Hospital."

h. <u>Broward Health, Florida</u>: Eighteen (18) patient contacts per **two-year** reappointment period.

i. <u>Baylor University Medical Center (2015)</u>: Twelve (12) patient contacts per year for active staff privileges.[6]

j. <u>Texas Health Heart and Vascular Hospital Arlington</u>: Twelve (12) patient contacts per year for active staff privileges.

k. <u>Baylor Scott and White Hospital - Round Rock (2015)</u>: Twenty-Four (24) patient contacts per **two-year** reappointment period.[7]

137.    It also deviates from industry standards to so narrowly define "patient contacts" so as to maximize revenue.  For example, Spectrum Hospitals defines patient contacts more broadly as "any admission, consultation, procedure, response to emergency call, evaluation, treatment, or service performed in any facility operated by the Hospital or affiliate, including outpatient facilities."  Similarly, Broward Health broadly defines patient contacts as "[a]ny combination of admissions, emergency room encounters, rendering of inpatient or outpatient care as a designated attending, consultant, or surgeon or cross-covering physician, ambulatory or outpatient surgery cases, invasive procedures, evaluation for any such procedure which includes but is not limited to a written H&P or consultation."  By contrast, Heart Hospital and Jack & Jane Hospital only consider consultations, procedures, responses to emergency calls, emergency room encounters, evaluations, treatments, or services performed as qualifying contacts, if the patent's admission has not already resulted in a "patient contact" (*e.g.,* if it is a treatment subsequent to a procedure, the

---

[6] Notably, University required only one fourth of the number of "patient contacts" that Jack & Jane Hospital required, despite the fact that University was a nonprofit owner of Jack & Jane Hospital and operated a hospital directly adjacent to Jack & Jane Hospital.

[7] Baylor Scott and White Hospital - Round Rock is a nonprofit member of the Baylor Scott & White system.

treatment will not count). The narrow definition of "patient contacts" adopted by Heart Hospital and Jack & Jane Hospital powerfully shows that the requirement is intended to induce patient referrals, not to ensure quality care.

> 2. *Defendants' Implementation of the "Patient Contacts" Requirement Demonstrate It Is Intended to Induce Referrals, Not to Control Quality*

138.    Defendants claim that the increased number of required "patient contacts," and the narrowed scope of such contacts were necessary to "monitor the quality of care provided by the physicians" working at Heart Hospital and Jack & Jane Hospital. In addition to the sheer number of "patient contacts" required and its inexplicably narrow definition (discussed above), the following facts concerning Defendants' implementation of the requirement demonstrate its fraudulent intent.

139.    ***First***, the "patient contacts" requirement does not restrict purportedly "unqualified" physicians from practicing because physicians who do not meet the requirement have the same rights and privileges as those who do. If a physician-owner does not meet the requirement, Heart Hospital and Jack & Jane Hospital move the physician to courtesy staff. However, Defendants enforce no practical distinction between members of the courtesy staff, who need not meet the requirement, and members of the active-clinical medical staff, who must meet the requirement to qualify for ownership. A member of the courtesy staff can admit patients and perform any surgery, test, consultation, or other activity that a member of the active-clinical medical staff can perform. In addition, like physicians with active privileges, a courtesy staff member must perform rounds. If the patient contact requirement was meant to ensure quality, it should bar non-qualifying physicians from having any right to practice at the facility, not merely the right to gain or maintain an ownership interest.

140.    ***Second***, Heart Hospital and Jack & Jane Hospital refrain from enforcing the

"patient contacts" requirement against physicians who refer a high number of patients, regardless of the quality of care those physicians provide or the number of patients they treat.  Indeed, several physicians that Relators believe to have a reputation for providing poor quality of care have nevertheless been retained on the active-clinical medical staff, or otherwise permitted to retain their partnership units in Heart Hospital and Jack & Jane Hospital, because they make large numbers of patient referrals to the hospital.  Relators are unaware of any physician-investor at Heart Hospital or Jack & Jane Hospital whose privileges were revoked because of actual quality of care concerns, as opposed to failure to maintain the required number of "patient contacts."  In contrast, Relators have seen Defendants abstain from enforcing the policy against numerous physician-investors who provide a large number of referrals.

141.    For example, Dr. Waenard Miller was an initial investor in Heart Hospital, but has never treated or admitted a patient at the facility.  Heart Hospital allows him to retain his shares despite not meeting the qualifications for active-clinical medical staff because he is the co-founder of a comprehensive cardiologic diagnostic testing center and, therefore, can refer a large number of patients.  Additionally, Dr. Ron Underwood had no "patient contacts" at Heart Hospital, but was permitted to retain his limited partnership units because he was a good source of patient referrals.  Likewise, Dr. Tea Acuff has repeatedly failed to have the required minimum number of patient contacts, but has never even received a letter raising a concern about that fact.

142.    ***Third***, and in a similar vein, Defendants amended the medical staff rules and regulations to contain a "grandfather" policy that allows long-time physician-owners to maintain only six (6) patient contacts per year, which demonstrates that enforcement of the minimum patient contacts requirement does not relate to quality control.  Specifically, it states, "Effective January 26, 2009, any Member with a current appointment or qualified to an appointment but previously

49

was required to only have six (6) patient contacts per year in accordance with the Rules and Regulations at the time of such appointment, is grandfathered with respect to the patient contacts requirement of maintaining a minimum number of six (6) patient contacts per year during each appointment period."  There is no justification for this exception if the policy intends to monitor and ensure quality.  And more importantly, Heart Hospital and Jack & Jane Hospital implement this policy in an ad hoc way, only applying it when it benefits their revenue generation goals.  For example, for doctors who are members of the leadership or who refer a large volume of patients, whether they treat those patients or not, Heart Hospital and Jack & Jane Hospital apply the grandfathering policy.  Defendants will also apply the policy for aging doctors with slowing practices, provided they still refer the great majority of their patients to the physician-owned hospital.  For these owners, the policy has the desired effect of ensuring that the physicians refer the majority of their patients to the Defendant-hospital, so Defendants have no reason to enforce the contact requirement rigorously (as would be the case if it was intended to ensure quality).  In contrast, the hospitals will rigorously enforce the minimum against physician-owners that are actively referring a high number of patients to competitor hospitals.  For example, Heart Hospital did not apply the "grandfather" policy to Relators, who actively referred a significant number of patients to other facilities (for example, in Dr. Magee's case, he referred a significant number of patients to Medical City Dallas, Medical City Plano, and University, based on the patients' needs). Instead, Heart Hospital forced the revocation of Relators' interests despite the fact that they were founding members of Heart Hospital and maintained over six (6) "patient contacts" per year.

143.  *Fourth*, quality control cannot adequately explain why physicians who have their interests redeemed for failing to satisfy the "patient contacts" are immediately offered the opportunity to re-invest.  For example, at the very same meeting that leadership at Heart Hospital

redeemed Dr. Magee's interests for failing to meet the "patient contacts" requirement, Heart Hospital immediately offered Dr. Magee the option to buy back in to the system and "try again" to meet the requirement.  It would be nonsensical to consistently re-invite expelled physician-owners if the requirement was meant to ensure quality of care.  And of course Dr. Magee's stellar record provided no occasion for even a pre-textual expulsion based on quality.  In Relators' experience, the revocation of shares has consistently been based on a lack of referrals, not the quality of care provided or other hospital standards.

144.     *Fourth*, Defendants only invite cardiologists and surgeons to become limited partners (rather than other kinds of physicians) because their referrals are the most lucrative.  In particular, Defendants only offer partnership subscriptions to cardiologists, cardiac surgeons, thoracic surgeons, or vascular surgeons – *i.e.* specialists who could make referrals to the hospital. On the other hand, Defendants have not allowed anesthesiologists to be partners, despite their critical role to the operation of the cardio-surgical specialties, because anesthesiologists would not be a source of patient referrals.

145.     *Fifth*, in contrast with the stated goal of the "patient contacts" requirement to monitor "meaningful face to face contacts," Defendants do not even track "meaningful face to face contacts" – they track only one "patient contact" resulting from each patient admission. Approximately every six months, physicians receive a Physician Activity Summary and a Physician by Procedure report issued by the Baylor Health Care Enterprise System.  These reports list – by a physician's role as attending, consulting or surgeon – all of the procedures done by the physician for the time period of the report, the total number of patients seen, the total days those patients stayed at the hospital, the patients' average length of stay, the total charges billed to those patients, and the total days that the physician's patients were at the hospital.  Notably, neither the

physician activity summary nor the physician by procedure report includes a category for "meaningful face to face contacts."  Indeed, the only patient contacts that are tracked individually are revenue-generating "procedures."  If Defendants were truly concerned about their stated goal of monitoring "meaningful face to face contacts," they would both track this information and provide it to the physicians.

146.    Thus, Relators never received a "report card" or any other communication indicating any deficiency in quality of care.  In fact, neither Dr. Magee nor Dr. Dewey ever had a discussion with anyone at the hospital about their quality of care or competency, only their number of "patient contacts."  That is not surprising because both Relators' quality of care metrics were and are outstanding.  Dr. Magee is now the Director of Thoracic Surgical Oncology for HCA North Texas Division, as well as Director of the Minimally Invasive Surgery Institute for Lung and Esophagus at Medical City.  Dr. Dewey is the Surgical Director of Heart Transplant & Medical Assist Device Technologies at Medical City, as well as the National Medical Director for Cardiovascular Surgery for HCA.  Both participate in the STS National Database, which Heart Hospital subscribes to.  Further, Dr. Magee is a member of the STS Quality Measurements Taskforce that determines the quality metrics for the participants in the STS National Database. The notion that the removal of Relators as limited partners in Heart Hospital was due to the inability of the hospital to conduct a "meaningful peer review of the quality of care" they furnished patients is thus baseless.  The real reason for their removal was that Heart Hospital's leadership thought that they were not referring sufficient numbers of revenue-generating patients to the hospital.

147.    *Sixth*, Jack & Jane Hospital allows groups of physicians, such as the HeartPlace, to hold collective shares in Jack & Jane Hospital and designate individual physicians to satisfy the

"patient contacts" requirement while the rest can collect payments on those shares.  Allowing such group ownership belies the requirement's stated purpose to monitor each physician's quality of care.

148.    *Seventh*, Defendants limit individual physicians from owning shares in both Heart Hospital and Jack & Jane Hospital, lest the incentive to refer patients be reduced.  There is no justification for this policy based on monitoring quality of care, because the hospitals are affiliates of the Baylor Scott & White system, and regularly share detailed information concerning the operations and practices of the entities, as described in detail below.  (*See infra* Part VII(C)).  Like Defendants' other policies and practices, the only reason for not allowing joint ownership is to maximize the revenue impact of the referral scheme.[8]

149.    *Ninth*, despite the ever-increasing number of minimum patient contacts, Heart Hospital's quality of care has declined in notable ways – emphasizing the lack of connection between the minimum contacts policy and quality care.  For example, Heart Hospital was forced to have an emergency shareholder meeting in March 2018 to address recent failures on a procedure Heart Hospital regularly performs, which has resulted in Heart Hospital having a mortality rate nearly double the national average.

> 3.    *Defendants Use the "Patient Contacts" Requirement to Pressure High Performers to Join Baylor and Dominate the Market*

150.    In addition to using the "patient contacts" requirement to induce physicians to refer additional patients, Defendants use the requirement as leverage to pressure high-performing, specialist surgeons to contract with Baylor Plano, University, All Saints, BHCS, BSWH, or BSW, and to perform the majority of their lucrative procedures at Defendants' hospitals.  Heart Hospital

---

[8] The only deviation from this policy was in the case of Paul Grayburn, who at one point owned shares in both Heart Hospital and Jack & Jane Hospital before he filed a lawsuit against BHVC in 2009.

and Jack & Jane Hospital thereby seek to consolidate the region's service providers to Baylor Scott & White entities and dominate the region's market share.

151.    It is much easier for physician-investors to meet the quota if they are employed by Baylor Plano, University, All Saints, BHCS, BSWH, or BSW compared to those that have contracts with other hospital systems.  To illustrate, patients brought into Heart Hospital or Jack & Jane Hospital through the emergency department or outpatient clinics operated by BHCS/BWSH are preferentially scheduled to surgeons contracted to Baylor Scott & White, further limiting access to "patient contacts" by those physician-investors that are not contracted to Baylor Plano, University, All Saints, BHCS, BSWH, or BSW.  Defendants use this advantage to pressure physicians to join the Baylor Scott & White system.  Once the physician-investors are also employees, they are even more likely to refer patients to the hospitals, thereby further increasing the financial benefit to Defendants of the scheme.

152.    For example, in early 2014, Mark Valentine ("Valentine"), Heart Hospital's President, and Dr. David Brown approached Relator Dr. Dewey and asked him to break his contract with HCA and come to work for Heart Hospital.  In doing so, they specifically mentioned that Dr. Dewey's "patient contacts" were below the forty-eight (48) per year.  They emphasized that working for BHCS would probably resolve the issue, but if he did not do so, they would take his limited partnership units away.  Dr. Dewey declined the invitation.  Subsequently, he was not reappointed to active-clinical medical staff, and his shares were involuntarily redeemed.

        *4.*    *Heart Hospital and Jack & Jane Hospital Have Grown Dramatically Because the Unlawful "Patient Contacts" Requirement has Successfully Induced Patient Referrals*

153.    Heart Hospital and Jack & Jane Hospital's meteoric growth and success demonstrates both the intent and effectiveness of the scheme.  In fact, Heart Hospital's growth has

been unprecedented – no other single hospital facility in the area has grown as quickly in terms of absolute volume and growth in cardiovascular procedures as Heart Hospital, let alone a specialty hospital with more limited offerings.  In light of the relatively much slower growth in the number of regional patients, Defendants' scheme has manifestly succeeded in consolidating patient treatment at Baylor Scott & White hospitals to the detriment of the patients in the area.

154.    In fact, Heart Hospital's explosive expansion outpaced population by over five (5) times the population growth in the area.  From 2011 to 2014, Heart Hospital grew by over 20% every year, despite the fact that population in the area only grew by less than 6% annually for that period.  A 2014 financial evaluation of the hospital depicts this point:

| | Plano | | | | Denton |
|---|---|---|---|---|---|
| **Total Center Volume:** | **FYE 2011** | **FYE 2012** | **FYE 2013** | **FYE 2014** | **FYE 2014** |
| Totals for Hospital | 14,298 | 18,186 | 23,215 | 28,507 | 2,044 |
| Growth | n/a | 27.2% | 27.7% | 22.8% | n/a |
| | | | | | |
| Average Cases per Week | 275.0 | 349.7 | 446.4 | 548.2 | 39.3 |
| Average Cases per Day | 39.2 | 49.8 | 63.6 | 78.1 | 5.6 |
| Days Worked per Year | 365 | 365 | 365 | 365 | 365 |
| | | | | | |
| *FFS Revenue only:* | | | | | |
| Average Gross Charge / Case | $28,195 | $23,981 | $23,189 | $22,494 | $16,971 |
| Average Net Revenue / Case | $11,551 | $9,492 | $8,918 | $8,376 | $6,178 |

| *Population Estimates* | 1990 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Collin County | 264,036 | 499,118 | 534,642 | 563,565 | 589,394 | 617,802 | 647,187 | 683,935 | 714,330 | 741,264 | 765,791 | 788,407 | 812,698 | 834,642 | 854,778 |
| *CAGR since 1990 | N/A | 6.6% | 6.6% | 6.5% | 6.4% | 6.3% | 6.2% | 6.1% | 6.0% | 5.9% | 5.8% | 5.6% | 5.5% | 5.4% | 5.2% |
| *CAGR since 2000 | N/A | N/A | 7.1% | 6.3% | 5.7% | 5.5% | 5.3% | 5.4% | 5.3% | 5.1% | 4.9% | 4.7% | 4.5% | 4.4% | 4.2% |

155.    To explain the source of referrals to the hospitals, most physician-owners have office-based practices and hospital-based practices.  When patients at one of these office or hospital locations need an elective procedure that would quality as a "contact," the physician-owners that work there have a powerful financial incentive to refer the patient to a Defendant hospital (even leaving aside the incentive to recommend unnecessary services).

156.    Notably, more often than not, Baylor Plano, University, and All Saints also end up

admitting those referred patients in order to perform collateral procedures not offered at Heart Hospital and Jack & Jane Hospital.  For example, Jack & Jane Hospital does not perform routine cardiac procedures and will regularly send Jack & Jane Hospital patients to the adjacent University facility or All Saints facility for those procedures before bringing them back.   Likewise, Defendants built a bridge between Heart Hospital and Baylor Plano to allow them to quickly transport patients between their facilities.  Thus, the other Defendant entities benefit financially from the referral scheme that they helped to plan and implement.

157.    In order to maximize this revenue-generating effect of referrals, Defendants strategically invite physicians that will increase their geographic reach.  As a consequence, most physician-owners have primary office and hospital practices in area codes different from the hospital in which they own shares.  As a result, the majority of patients treated by Heart Hospital and Jack & Jane Hospital do not reside in the same area code as their treating hospital.

158.    Defendants are using the "patient contacts" requirement to consolidate area patient treatment to the detriment of patient options and patient care.

**B.    Defendants Know the "Patient Contacts" Requirement Is an Illegal Attempt to Induce Patient Referrals**

159.    At different times, various physician-investors have objected to and demanded an explanation for the excessive and ever-increasing "patient contacts" requirements for active-clinical medical staff at Heart Hospital and Jack & Jane Hospital.  The concerns of these individuals have been ignored or dismissed, often with the statement that required number of contacts have been vetted and approved by Heart Hospital's attorney, R. Terry Heath.

160.    For example, at a meeting of the physician-investors, Dr. Eichhorn publicly asked Dr. Brown and Valentine to justify increasing the "patient contacts" requirement to forty-eight (48), noting that ***no other medical institution in the United States required such a high number***

*of contacts*.  He commented that the only plausible explanation was that the hospital was seeking to "make money off the backs of physicians."  Heart Hospital Board and executive leadership, including Mark Valentine, summarily rejected his concerns and questioned his loyalties.  Likewise, Dr. Baron Hammand has raised the issue at Jack & Jane Hospital on numerous times.  Dr. Brad Leonard, a physician-investor, Chief Medical Officer, and chair of the Cardiovascular Quality Committee of Heart Hospital, approached Dr. Brown and Valentine on multiple occasions to raise concerns about using the number of "patient contacts" as a quality of care measure, rather than more appropriate metrics.  In particular, Dr. Leonard noted that Heart Hospital was putting too much focus on the raw number of patient contacts, which is an arbitrary measure of quality of care and professional competency.  The leadership, including Mark Valentine at Heart Hospital and Nancy Vish at Jack & Jane Hospital, have ignored the concerns at every turn.

161.    Thus, Heart Hospital and Jack & Jane Hospital are well aware that their excessive "patient contacts" requirement is nothing more than a deliberate scheme to reward physician-investors for referring patients to the hospital by directly linking such referrals to the ability of those physicians to receive lucrative partnership income.

162.    Additionally, each defendant individually has knowledge of the scheme and furthered it through their participation in the system-level organization.  Defendants' ultimate domestic parent – BHCS, BSWH, and BSW at their respective dates of creation – operates the Baylor Cardiovascular Governance Council ("CV Governance Council") which is a committee composed of the leadership of various Baylor Scott & White entities.  The CV Governance Council includes the CEO of Heart Hospital, Mark Valentine, the CEO of Jack & Jane Hospital, Nancy Vish, and leaders at the BHCS, All Saints, and University levels, such as Dr. Kevin Wheelan, Dr. David Brown, and Michael Mack, the Committee Chair.  The purpose of the CV Governance

57

Council is, as BSWH put it in a June 2015 FAQ bulletin, to "optimize the safety and quality of cardiovascular care through the creation of minimum standards of clinical competence that apply across Baylor Scott & White Health (BSWH)."  In order to do this, the CV Governance Council meets periodically and executes plans to coordinate the operations of hospitals within the BHCS, BSWH, and BSW system.  As discussed below, through the CV Governance Council and meetings facilitated by BHCS, BSWH, and BSW for members of Defendants' leadership, each Defendant is aware of the scheme and its unlawful nature and furthered its planning and implementation.

163.     Defendants also know that the majority of the referred patients from this scheme have been provided services for which the hospital sought and received payment from federally-funded programs, such as Medicare, Medicaid, and TRICARE, and that its actions are, therefore, a violation of both the AKS and FCA.

**C.     Defendants Coordinated to Expand the Unlawful Scheme**

164.     Defendants have systematically coordinated and conspired to expand Defendants' market control and revenue through their agreement to implement the "patient contacts" requirement at the affiliated hospitals in the system.

165.     Pursuant to their agreement, Defendants furthered the conspiracy through actions of their shared leadership which has conspired and coordinated to further the scheme.  For example, Baylor Plano, University, and All Saints all share the same Board of Trustees composed of: Joel T. Allison; Walker G. Harman; Roy W. Lamkin; Thomas C. Leppert; Payl E. Madeley; George McClesky; J. Kent Newsom; Janie Pena; Gwyn Clarkson Shea; Donald H. Willis; and Frank Wilson.  In fact, Joel T. Allison is also a managing officer of Baylor Plano, BHCS, BSWH, and BSW.  The CEO of Jack & Jane Hospital, Nancy Vish, is also a president-level officer of University.  One of Heart Hospital's officers, Gary Brock, is also the executive vice president and

COO of BHCS, as well as a member of the board of directors of Jack & Jane Hospital.

166.    Additionally, Baylor Scott & White leadership at the system-level, including BHCS, BSWH, BSW, Heart Hospital, and Jack & Jane Hospital, have conspired to use the illegal "patient contacts" requirement to induce patient referrals by physician-owners of Heart Hospital and Jack & Jane Hospital, and have taken actions to further their conspiracy, through the CV Governance Council, which determines the required number of patient-contacts, has oversight authority over Heart Hospital and Jack & Jane Hospital, and has issued orders implementing "patient contacts" requirements to Baylor Scott & White hospitals.

167.    BHCS, BSWH, and BSW, through the CV Governance Council, have continually monitored the patient contacts requirement across the Baylor Scott & White system.  To illustrate this point, the CV Governance Council coordinated an effort in June 2015 to standardize the "patient contacts" requirement that will "apply across Baylor Scott & White Health."  After considering the issue "over a period of 12 months," the CV Governance Council decided to set a minimum requirement of forty-eight (48) annual patient "encounters" in order to maintain medical staff membership at any hospital in the Baylor Scott & White system.  Notably, however, the minimum requirement is not a real barrier to practicing at any Baylor Scott & White hospital because "physicians who . . . do not meet the 48 encounters per year requirement may maintain membership in the courtesy staff category with associated privileges in their specialty area" so long as the physician "maintain[s] membership in the active staff category at another hospital which can be outside BSWH."  Accordingly, BHCS, BSWH, and BSW, through the CV Governance Council, conspired and set a global forty-eight (48) "patient contacts" requirement for the hospitals operated by each Defendant – which had already been applied at Heart Hospital and Jack & Jane Hospital for years – that is not a requirement to practice at any hospital, and is only a

prerequisite to own shares of Heart Hospital and Jack & Jane Hospital.  The CV Governance Council's global forty-eight (48) "patient contacts" requirement throughout the Baylor Scott & White system indicates the efforts by BHCS, BSWH, and BSW to give the imprimatur of legitimacy to what they had found to be a lucrative scheme.

168.    The CV Governance Council has also monitored the "patient contacts" requirement for years and approved the increased number of forty-eight (48) "patient contacts" requirement despite the fact that the required number of "patient contacts" were far-outliers compared to other Baylor Scott & White-affiliates, often two to four times higher than any other hospital.  Indeed, for several years, Heart Hospital and Jack & Jane Hospital had required "patient contacts" numbers that dwarfed even adjacent Baylor Scott & White facilities.

169.    In addition, the presidents and CEOs of Heart Hospital, Jack & Jane Hospital, Baylor Plano, University, and All Saints have regular meetings facilitated and attended by BHCS, BSWH, and BSW leadership to discuss profitability of the hospitals and the system.  These meetings are organized to maximize revenue across the Baylor Scott & White system by, among other things, determining what services should not be provided by Heart Hospital so that they can be provided by Baylor Plano and what services should not be provided by Jack & Jane Hospital so that they can be provided at either University or All Saints.  This process allows Defendants to maximize the revenue that they will receive from the unlawful patient referrals made by physician-owners of Heart Hospital and Jack & Jane Hospital.

170.    The coordinated increases in minimum-patient-contacts between Heart Hospital and Jack & Jane Hospital resulted from this system-level administration and leadership that coordinates practices amongst Baylor Scott & White hospitals.  Additionally, the CEO of Heart Hospital, Mark Valentine, and the CEO of Jack & Jane Hospital, Nancy Vish, regularly meet,

which is an opportunity to coordinate their efforts to use the "patient contacts" requirement to induce patient referrals to their respective hospitals, as indicated by the coordinated policy changes and number of minimum contact increases between Heart Hospital and Jack & Jane Hospital.

171.    Defendants have conspired together in order to use Heart Hospital and Jack & Jane Hospital as vehicles to remunerate physicians for patient referrals.  Accordingly, Defendants conspire together to coordinate, plan, monitor, and enforce the scheme that is implemented at Heart Hospital and Jack & Jane Hospital.

172.    As a result, each and every claim that was billed to a Government healthcare program, including Medicare, Medicaid, and/or TRICARE for a healthcare service performed on a patient referred to Heart Hospital or Jack & Jane Hospital by a physician with an ownership interest in that hospital, violates the federal FCA.

173.    Relators allege upon information and belief that Defendants have not reported to federal healthcare programs that the services performed on patients referred by physician-owners should not have been covered by Medicare, Medicaid, or TRICARE.  In addition, Relators believe, and therefore aver, that Defendants have not repaid Government healthcare programs for reimbursements for services which were fraudulently obtained through their elaborate scheme.

174.    Defendants Heart Hospital and Jack & Jane Hospital, through their concerted efforts with Baylor Plano, University, All Saints, BHCS, BSWH, and BSW to carry out Heart Hospital and Jack & Jane Hospital's fraudulent schemes to bill Government healthcare programs for false claims for healthcare services, conspired to defraud the federal government by getting false or fraudulent claims (including those related to unnecessary services, as well as those claims related to referrals tainted by violations of the federal AKS and Stark Statute) allowed or paid by the government in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

175.     As conspirators, Heart Hospital, Jack & Jane Hospital, Baylor Plano, University, All Saints, BHCS, BSWH, and BSW are jointly and severally liable for all damages arising out of their scheme. *See, e.g. Miller v. Holzmann*, 563 F. Supp. 2d. 54, 113 (D.D.C. 2008); *Kelso v. Fed. Crop Ins. Corp.*, 724 F. Supp. 448, 453 (E.D. Tex. 1988).

### 1.  Baylor Plano Furthered the Scheme

176.     Based on information and knowledge from Relators' interactions with Baylor Plano and active staff membership with Baylor Plano, as well as Dr. Magee's experience on the Board, Baylor Plano has conspired with Heart Hospital to induce patient referrals from physician-investors of Heart Hospital through Baylor Plano's participation at leadership meetings to discuss implementation of the "patient contacts" requirement at the BHCS, BSWH, and BSW level. Baylor Plano has provided personnel and services support to Heart Hospital to enable Heart Hospital to enact the unlawful scheme.  Through shared leadership with the other Defendants, and representation on the CV Governance Council, Baylor Plano has taken actions to implement and further the scheme.

### 2.     University Furthered the Scheme

177.     Based on information and knowledge from Relators' interactions with University and active staff membership with University, and Relators' contacts with knowledgeable physician-owners of Jack & Jane Hospital, University has conspired with Jack & Jane Hospital to induce patient referrals from physician-investors of Jack & Jane Hospital through University's participation at leadership meetings to discuss implementation of the "patient contacts" requirement at the BHCS, BSWH, and BSW level.  University has provided personnel and services support to Jack & Jane Hospital to enable Jack & Jane Hospital to enact the unlawful scheme. Through shared leadership with the other Defendants, and representation on the CV Governance

Council, University has taken actions to implement and further the scheme.  University has, at all relevant times, known that the scheme is unlawful, as evidenced by the fact that University required only twelve (12) "patient contacts" for years, despite knowing through system-level leadership meetings, shared leadership with Jack & Jane Hospital, and representation on the CV Governance Council, that Jack & Jane Hospital and Heart Hospital had raised and maintained a forty-eight (48) "patient contacts" requirement.

### 3. *All Saints Furthered the Scheme*

178.    Based on information and knowledge from Relators' interactions with All Saints, and Relators' contacts with knowledgeable physician-owners of Jack & Jane Hospital, All Saints has conspired with Jack & Jane Hospital to induce patient referrals from physician-investors of Jack & Jane Hospital through All Saints' participation at leadership meetings to discuss implementation of the "patient contacts" requirement at the BHCS, BSWH, and BSW level.  All Saints has provided personnel and services support to Jack & Jane Hospital to enable Jack & Jane Hospital to enact the unlawful scheme.  Through shared leadership with the other Defendants, and representation on the CV Governance Council, All Saints has taken actions to implement and further the scheme.

### 4. *BHCS Furthered the Scheme*

179.    Based on information and knowledge from Relators' interactions with BHCS, Relators' participation in BHCS leadership meetings, and Relators' contacts with knowledgeable physician-owners of Jack & Jane Hospital, BHCS has conspired with Heart Hospital and Jack & Jane Hospital to induce patient referrals from physician-investors through BHCS's organizing and facilitating meetings amongst the leadership of Heart Hospital, Jack & Jane Hospital, Baylor Plano, University, and All Saints to discuss implementation of the "patient contacts" requirement.  Through shared leadership with the other Defendants, and organization and empowerment of the

BHCS's CV Governance Council, BHCS has taken actions to further the scheme by monitoring, devising, and implementing the coordinated "patient contacts" requirement in a way intended to induce the maximum amount of patient referrals from physician-owners of Heart Hospital and Jack & Jane Hospital.

### 5.    *BSWH Furthered the Scheme*

*180.*    Based on information and knowledge from Relators' interactions with BSWH, Relators' participation in BSWH leadership meetings, and Relators' contacts with knowledgeable physician-owners of Jack & Jane Hospital, BSWH has conspired with Heart Hospital and Jack & Jane Hospital to induce patient referrals from physician-investors through BHCS's organizing and facilitating meetings amongst the leadership of Heart Hospital, Jack & Jane Hospital, Baylor Plano, University, and All Saints to discuss implementation of the "patient contacts" requirement. Through shared leadership with the other Defendants, and organization and empowerment of the BSWH's CV Governance Council, BSWH has taken actions to further the scheme by monitoring, devising, and implementing the coordinated "patient contacts" requirement in a way intended to induce the maximum amount of patient referrals from physician-owners of Heart Hospital and Jack & Jane Hospital.

### 6.    *BSW Furthered the Scheme*

181.    Based on information and knowledge from Relators' interactions with BSW, Relators' participation in BSW leadership meetings, and Relators' contacts with knowledgeable physician-owners of Jack & Jane Hospital, BSW has conspired with Heart Hospital and Jack & Jane Hospital to induce patient referrals from physician-investors through BHCS's organizing and facilitating meetings amongst the leadership of Heart Hospital, Jack & Jane Hospital, Baylor Plano, University, and All Saints to discuss implementation of the "patient contacts" requirement.

Through shared leadership with the other Defendants, and organization and empowerment of the BSW's CV Governance Council, BSW has taken actions to further the scheme by monitoring, devising, and implementing the coordinated "patient contacts" requirement in a way intended to induce the maximum amount of patient referrals from physician-owners of Heart Hospital and Jack & Jane Hospital.

### D.      Defendants' Actions Violate the AKS and Stark Statute

182.    From at least 2009 to the present, Defendants have acted in concert to bill federal health care programs through Heart Hospital and Jack & Jane Hospital, despite operating a physician-ownership system to incentivize patient referrals in violation of the AKS and Stark Statute.

183.    Furthermore, on information and belief, each year from at least 2009 to the present, Heart Hospital and Jack & Jane Hospital filed Form 855 and Cost Reports acknowledging compliance with, *inter alia*, the AKS and the Stark Statute.  Heart Hospital and Jack & Jane Hospital made similar representations when submitting claims for payment.

#### 1.      *Defendants Have Violated the AKS*

184.    Beginning by at least April 2009 and continuing through today, Defendants have knowingly implemented an illegal physician-ownership scheme for the purpose of providing remuneration to physician-investors in Heart Hospital and Jack & Jane Hospital in order to induce, or in return for, referrals of services to beneficiaries of federally-funded health care programs in violation of the AKS.  The induced referrals have enriched all Defendants.  Moreover, Heart Hospital and Jack & Jane Hospital have implemented the illegal remuneration scheme through decisions of their executive leadership and their Boards.  Baylor Plano and University exercised their control as the majority owners of Heart Hospital and Jack & Jane Hospital, respectively, in

order to implement the scheme to induce patient referrals.   Baylor Plano, University, and All Saints used their affiliation with and physical proximity to Heart Hospital and Jack & Jane Hospital in order to support and further the scheme to induce patient referrals.   For each relevant period, BHCS, BSWH, and BSWH, exercised their authority as the ultimate domestic parent of Heart Hospital and Jack & Jane Hospital in order to implement the illegal remuneration scheme, and further the scheme by facilitating its coordination amongst all Defendants.

185.   No potential AKS "safe harbor" insulates Defendants' scheme.  The investment interests safe harbor does not apply in a situation where ownership is conditioned on the requirement that a physician "make referrals to, be in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity."   *See* 42 C.F.R. § 1001.952(a)(2)(iv).  The safe harbor also states that "no more than 40 percent of the entity's gross [annual] revenue . . . may come from referrals or business otherwise generated from investors." 42 C.F.R. § 1001.952(a)(2)(vi).  Additionally, every applicable safe harbor prohibits a physician's remuneration from taking into account or relating to the volume or value of patient referrals from that physician, as is the case with Defendants' scheme.  *See, e.g.,* 42 C.F.R. § 1001.952(a)(2)(iii), (d)(5), (n)(6), (r)(1)(i).  Defendants' deliberate and knowing scheme to require unduly large and ever increasing numbers of revenue-generating "patient contacts" as a condition of maintaining a lucrative investment interest in Heart Hospital and Jack & Jane Hospital is not protected by any "safe harbors" under the regulations governing the AKS.

186.   The United States would not have paid Defendants' claims had it known that the Medicare, Medicaid, and TRICARE claims were not properly payable, submitted in violation of the AKS, and the result of unlawful physician referrals.  Additionally, the Department of Justice aggressively pursues improper financial relationships between hospitals and physicians that violate

the Stark Statute, and has settled numerous such cases for millions of dollars.[9]

### 2.     *Defendants Have Violated the Stark Statute*

187.     Beginning at the latest April 2009 and continuing through today, Defendants have conspired to knowingly implement an illegal physician-ownership scheme through which physician-owners have a financial relationship with, and refer patients to, Heart Hospital and Jack & Jane Hospital in violation of the Stark Statute.  The illegal financial relationship has enriched all Defendants.  Moreover, Heart Hospital and Jack & Jane Hospital have implemented the illegal financial relationship through decisions of their executive leadership and their Boards.  Baylor Plano and University exercised their control as the majority owners of Heart Hospital and Jack & Jane Hospital, respectively, to implement the illegal financial relationship.     Baylor Plano, University, and All Saints used their affiliation with and physical proximity to Heart Hospital and Jack & Jane Hospital to support and further the illegal financial relationship.   For each relevant

---

[9] *See, e.g.,* U.S. Dept. of Justice, New  York Hospital Operator Agrees to Pay $4 Million to Settle Alleged False Claims Act Violations Arising from Improper Payments to Physicians (Sept. 13, 2017), https://www.justice.gov/opa/pr/new-york-hospital-operator-agrees-pay-4-million-settle-alleged-false-claims-act-violations ("This recovery should help to deter other health care providers from entering into improper financial relationships with physicians that can taint the physicians' medical judgment, to the detriment of patients and taxpayers"); U.S. Dept. of Justice, Florida Hospital System Agrees to Pay the Government $85 Million to Settle Allegations of I proper Financial Relationships with Referring Physicians (Mar. 11, 2014), https://www.justice.gov/opa/pr/florida-hospital-system-agrees-pay-government-85-million-settle-allegations-improper (commenting that "financial arrangements that compensate physicians for referrals encourage physicians to make decisions based on financial gain rather than patient needs"); U.S. Dept. of Justice, Radiation Therapy Company Agrees to Pay Up to $11.5 Million to Settle Allegations of False Claims and Kickbacks (Mar. 29, 2018), https://www.justice.gov/opa/pr/radiation-therapy-company-agrees-pay-115-million-settle-allegations-false-claims-and (FCA settlement based on an AKS violation where a radiation therapy company falsely certified compliance despite entering into an improper financial relationship with referring physicians); U.S. Dept. of Justice, Pennsylvania Hospital and Cardiology Group Agree to Pay $20.75 Million to Settle Allegations of Kickbacks and Improper Financial Relationships (Mar. 7, 2018), https://www.justice.gov/opa/pr/pennsylvania-hospital-and-cardiology-group-agree-pay-2075-million-settle-allegations (FCA settlement for submitting claims in violation of the AKS and Stark Statute, "The Department of Justice is committed to preventing illegal financial relationships that undermine the integrity of our public health programs.").

period, BHCS, BSWH, and BSWH, exercised their authority as the ultimate domestic parent of Heart Hospital and Jack & Jane Hospital to implement the illegal financial relationship, and further the scheme by facilitating its coordination amongst all Defendants.

188.    A portion of the compensation paid to physician-owners of Heart Hospital and Jack & Jane Hospital is tied directly to the volume of business that they refer to the Defendants' hospitals, and therefore creates improper financial relationships between Defendants and their referring physicians.  All services billed as a result of referrals from such physician-owners are thus improper and non-reimbursable under the AKS and Stark Statute.

189.    No exception to the Stark Statute protects Defendants.  While the "whole hospital" exception to the Stark Statute creates a safe harbor for certain physician-owned hospitals that existed before the 2010 amendment to the Stark Statute, to qualify for the exception, a hospital must "[n]ot condition any physician ownership or investment interests either directly or indirectly on the physician owner or investor making or influencing referrals to the hospital or otherwise generating business for the hospital."  42 C.F.R. § 411.362(b)(3)(ii)(B).  Because Defendants' scheme conditions ownership on making or influencing referrals to the hospital, the safe harbor does not apply.  Indeed, every potential exception to the Stark Statute prohibits a physician-owned hospital from conditioning ownership on an investor's ability to refer patients or otherwise inducing patient referrals.

190.    The United States would not have paid Defendants' claims had it known that the Medicare, Medicaid, and TRICARE claims were not properly payable, submitted in violation of the Stark Statute, and the result of unlawful physician referrals.  In fact, the United States is prohibited by statute from paying claims made in violation of the Stark Statute.  42 U.S.C. § 1395nn (g)(1).  Additionally, the Department of Justice aggressively pursues improper financial

relationships between hospitals and physicians that violate the Stark Statute, and has settled

numerous such cases for millions of dollars.[10]

## VIII.  <u>CLAIMS</u>

### <u>COUNT I</u>

**Federal False Claims Act**
**31 U.S.C.A. §§ 3729(a)(1)(A) & (C) (2009)**
**31 U.S.C. § 3729(a)(1) & (3) (1986)**

191.    Relators re-allege and incorporate the allegations in all previous paragraphs as if

fully set forth herein.

192.    This claim is for treble damages and penalties under the False Claims Act, 31,

U.S.C. § 3729, *et seq.*

193.    Before the effective date of the 2009 FCA amendments, by and through the acts

described above, Defendants have knowingly presented or caused to be presented, false or

fraudulent claims to the United States for payment or approval in violation of 31 U.S.C. §§ 3729

(a)(1) & (3) (1986).  Defendants also conspired to do the same with respect to the misconduct

---

[10] *See, e.g.,* U.S. Dept. of Justice, South Carolina Hospital to Pay $17 Million to Resolve False Claims Act and Stark Law Allegations, (July 29, 2016), https://www.justice.gov/opa/pr/south-carolina-hospital-pay-17-million-resolve-false-claims-act-and-stark-law-allegations ("This case demonstrates the United States' commitment to ensuring that doctors who refer Medicare beneficiaries to hospitals for procedures, tests and other health services do so only because they believe the service is in the patient's best interest, and not because the physician stands to gain financially from the referral"); U.S. Dept. of Justice, Ohio-Based Health System Pays United States $10 Million to Settle False Claims Act Allegations (Mar. 31, 2015), https://www.justice.gov/opa/pr/ohio-based-health-system-pays-united-states-10-million-settle-false-claims-act-allegations (FCA settlement for claims submitted in violation of the Stark Statute and AKS based on improper management agreements between a health system and two physicians groups); U.S. Dept. of Justice, Florida Hospital System Agrees to Pay the Government $85 Million to Settle Allegations of Improper Financial Relationships with Referring Physicians (Mar. 11, 2014), https://www.justice.gov/opa/pr/florida-hospital-system-agrees-pay-government-85-million-settle-allegations-improper (FCA settlement for Medicare claims falsely certifying compliance with Stark Statute despite improperly paying incentives to oncologists based on the value of prescriptions and services provided).

alleged herein.

194.    After the effective date of the 2009 FCA amendments, by virtue of the acts described above, Defendants have knowingly presented or caused to be presented, false or fraudulent claims to the United States for payment or approval in violation of 31 U.S.C. §§ 3729(a)(l)(A), 3729 (a)(l)(B), and 42 U.S.C. § 1320a-7b(g).  Defendants have also conspired to do the same with respect to the misconduct alleged herein.

195.    Defendants have received overpayments by United States healthcare programs for illegally-induced and/or medically unnecessary healthcare services that must be returned.

196.    Defendants failed to report their submission of false claims for healthcare services to federal and state government healthcare programs or CMS, and Defendants also failed to return payments received from government healthcare programs based upon false claims or records.

197.    Defendants were not entitled to receive payments from government healthcare programs based on claims that were false because: they violated the federal AKS and Stark Statute; they contained false certifications of medical necessity; and/or they contained false certification and/or representations of compliance with federal statutes and regulations, including the federal AKS and Stark Statute.

198.    The United States, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.  Defendants' misrepresentations and omissions have a natural tendency to influence, and did influence, the United States to pay and Defendants to receive money based on the false claims.  If the United States had known of Defendants' illegal conduct, it would not have paid the resulting false claims.

199.    The United States has been damaged by reason of Defendants' acts, and continues

to be damaged, in a substantial amount to be determined at trial.

200.    By virtue of the false records or false statements knowingly caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

## COUNT II

### False Claims Act
### 31 U.S.C.A. §§ 3729(a)(1)(B)-(C) (2009)
### 31 U.S.C. § 3729(a)(2)-(3) (1986)

201.    Relators re-allege and incorporate the allegations in all previous paragraphs as if fully set forth herein.

202.    This claim is for treble damages and penalties under the False Claims Act, 31, U.S.C. § 3729, *et seq.*

203.    Before the effective date of the 2009 FCA amendments, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the United States in violation of 31 U.S.C. §§ 3729(a)(2)-(3) (1986), presented or caused to be presented, false or fraudulent claims to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(2) (1986).  Defendants also conspired to do the same with respect to the misconduct alleged herein.

204.    After the effective date of the 2009 FCA amendments, by virtue of the acts described above, Defendants have knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the United States in violation of 31 U.S.C. §3729(a)(l)(B), presented or caused to be presented, false or fraudulent claims to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(l)(B).

Defendants have also conspired to do the same with respect to the misconduct alleged herein.

205.   Defendants have received overpayments by United States healthcare programs for illegally-induced and/or medically unnecessary healthcare services that must be returned.

206.   Defendants failed to report their submission of false claims for healthcare services to federal and state government healthcare programs or CMS, and Defendants also failed to return payments received from government healthcare programs based upon false claims or records.

207.   Defendants were not entitled to receive payments from government healthcare programs based on claims that were false because: they violated the federal AKS and Stark Statute; they contained false certifications of medical necessity; and/or they contained false certification and/or representations of compliance with federal statutes and regulations, including the federal AKS and Stark Statute.

208.   The United States, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.  Defendants' misrepresentations and omissions have a natural tendency to influence, and did influence, the United States to pay and Defendants to receive money based on the false claims.  If the United States had known of Defendants' illegal conduct, it would not have paid the resulting false claims.

209.   The United States has been damaged by reason of Defendants' acts, and continues to be damaged, in a substantial amount to be determined at trial.

210.   By virtue of the false records or false statements knowingly caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

## COUNT III

**False Claims Act**
**31 U.S.C.A. §§ 3729(a)(1)(G) (2009)**

211.    Relators re-allege and incorporate the allegations in all previous paragraphs as if fully set forth herein.

212.    This claim is for treble damages and penalties under the False Claims Act, 31, U.S.C. § 3729, *et seq*.

213.    By virtue of the acts described above, Defendants have knowingly concealed and improperly avoided an obligation to pay money to the United States, including specifically Defendants' obligation to report and repay past overpayments of Medicare, Medicaid, and TRICARE claims, for which Defendants knew refunds were properly due and owed to the United States.  Defendants also conspired to do the same with respect to the misconduct alleged herein.

214.    Defendants have received overpayments by United States healthcare programs for illegally-induced and/or medically unnecessary healthcare services that must be returned.

215.    Defendants failed to report their submission of false claims for healthcare services to federal and state government healthcare programs or CMS, and Defendants also failed to return payments received from government healthcare programs based upon false claims or records.

216.    Defendants were not entitled to receive payments from government healthcare programs based on claims that were false because: they violated the federal AKS and Stark Statute; they contained false certifications of medical necessity; and/or they contained false certifications and/or representations of compliance with federal statutes and regulations, including the federal AKS and Stark Statute.

217.    The United States, unaware of the concealment by Defendants, did not make demand for or collected the overpayments due from Defendants.  Defendants' misrepresentations

73

and omissions have a natural tendency to influence, and did influence, the United States not to demand or collect the overpayments due from Defendants.  If the United States had been aware of Defendants' unlawful conduct, it would have demanded and/or collected those overpayments.

218.    The United States has been damaged by reason of Defendants' acts, and continues to be damaged, in a substantial amount to be determined at trial.

219.    By virtue of Defendants' knowing concealment and improper avoidance of their obligations to repay overpayments, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.[11]

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, the United States requests that judgment be entered in its favor and against Defendants as follows:

a.    Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

b.    this Court enter judgment against Defendants in an amount to be determined at trial equal to three times the amount of the United States' damages, plus a civil penalty of not less than $5,500 and not more than $11,000[12] for each payment made and retained in violation of 31 U.S.C. § 3729;

c.    Plaintiffs be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

d.    Plaintiffs be awarded all costs in this action, including attorneys' fees and expenses;

---

[11] The Federal Civil Penalties Inflation Adjustment Act of 2015 was passed to require agencies to adjust the level of civil monetary penalties.  28 U.S.C. § 2461.  Since then, the Department of Justice has published adjusted penalties ranging from $10,957 to $21,916 for violations that occurred after November 2, 2015. Civil Monetary Penalties inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133.

[12] Note that civil penalties range from $10,957 to $21,916 for violations that occurred after November 2, 2015. Civil Monetary Penalties Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133.

and

e.      such further relief as is proper.

## X.      <u>PRAYER FOR JURY TRIAL</u>

Relators pray for a jury trial in this action.


Dated:  June 18, 2018

Respectfully submitted,

*/s/ M. Brett Johnson*
Thomas M. Melsheimer
Texas Bar No. 13922550
tmelsheimer@winston.com
M. Brett Johnson
TX Bar No. 00790975
mbjohnson@winston.com
Chad B. Walker
TX Bar No. 24056484
cbwalker@winston.com
Hayden L. Duffy
TX Bar No. 24097975
hduffy@winston.com
Lane M. Webster
TX Bar No. 24089042
lwebster@winston.com
Winston & Strawn, LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201
Phone: 214-453-6500
Fax:  214-453-6400


*Counsel for Relator-Plaintiffs, Mitchell J. Magee,*
*M.D. and Todd M. Dewey, M.D.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of June, 2018, a copy of the foregoing document was filed electronically and served on each Defendant by hand delivery.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.


*/s/ M. Brett Johnson*
M. Brett Johnson