## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MITCHELL J. MAGEE, M.D. and TODD M. DEWEY, M.D., | § § § § | |
| Plaintiffs, | § § | CASE NO. 4:16-CV-00717-ALM |
| v. | § § | **FILED UNDER SEAL** |
| TEXAS HEART HOSPITAL OF THE SOUTHWEST, L.L.P., *et al.*, | § § § § | |
| Defendants. | § | |

## RELATORS' MOTION FOR STATUTORY FEES
## AND COSTS UNDER 31 U.S.C. § 3730(d)(2)

## I.     Introduction

In the face of several significant challenges, Relators and their counsel prosecuted this case to the verge of trial and obtained a significant victory for the United States taxpayer and the hospital industry.  The challenges included the United States' decision not to intervene in the case, four exceptionally skilled and highly resourced law firms devoting no less than ███ attorneys to defend the case, and a set of facts never tested in any court—*i.e.*, the legality under the healthcare statutes of using patient contacts as an ownership requirement.  Faced with such obstacles, very few law firms who routinely practice in the Eastern District of Texas and Sherman, Texas, would have had the skills and resources to successfully prosecute the case.  The outcome was a settlement that included █████████ in repayments and █████████████████████████ ████████████████████████████████

In addition to representing a significant victory for the U.S. taxpayer, this was a case that the hospital industry and the patients it serves could not afford to lose, lest practices like these proliferate to the continued harm of patients and access to care.  One concrete indication of the contribution of Relators' counsel is ███████████████████████████ ████████████████████████████

Pursuant to the False Claims Act ("FCA"), Relators submit this claim for $10,034,038.00 in fees, $2,027,436.25 in expenses, and $126,559.97 in costs.  After applying billing judgment to reduce the hours claimed, the requested rates represent the use of counsels' current rates.  The current rates are appropriate because of the delay in payment, and because under the unique circumstances of this case the *Johnson* factors, analyzed below, overwhelmingly argue for the full and unreduced award of fees, expenses, and costs to fulfill the purposes of the FCA fee provision.

███████████████████████████████████████████

## II.    Legal Standard

The FCA provides for an award of reasonable attorneys' fees and costs to prevailing relators.  31 U.S.C. § 3730(d)(2):

> … Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

This provision should be applied with a view towards its goal of adequately incentivizing the exposure of fraud on the United States.  *E.g.*, *United States ex rel. Cook-Reska v. Cmty. Health Sys.*, 2014 U.S. Dist. LEXIS 154274, at *11, 2014 WL 5500710, at *3 (S.D. Tex. 2014); *see also United States ex rel. Tommasino v. Guida*, 2017 U.S. Dist. LEXIS 31402, at *5-6, 2017 WL 878587 (E.D.N.Y. 2017) ("If, however, a court were to substantially reduce a relator's attorneys' fees …, it would discourage attorneys from investing the time and resources necessary to bring a *qui tam* action, thereby undermining the purpose of the FCA").

In calculating attorneys' fees under the FCA, courts follow the lodestar model, which the Supreme Court has described as "the guiding light of our fee-shifting jurisprudence."  *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

The lodestar method is "the product of reasonable hours times a reasonable rate."  *City of Burlington*, 505 U.S. at 559-60.  The reasonableness of an attorney's rates is based upon market rate principles, and an hourly rate is reasonable if it is consistent with the prevailing market rates in the relevant community.  *Blum v Stenson*, 465 U.S. 886, 895 (1984). Under 31 U.S.C.A. § 3730(d)(4), the Relator is also entitled to reasonable expenses, including identifiable costs and out-of-pocket expenses associated with bringing and litigating the action.

"After calculating the lodestar, the Court may either: (1) accept the lodestar figure; or (2) decrease or enhance it based on the circumstances of the case, after considering the *Johnson* factors."  *Sanchez v. Maddies Mayhem, Inc.*, No. 4:19-CV-00574, No. 2020 U.S. Dist. LEXIS

148683, at \*19-20 (E.D. Tex. July 27, 2020) (Mazzant, J.) (citing *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 329 (5th Cir. 1995) (referring to *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).  However, the lodestar is presumed to be reasonable and should only be modified in exceptional cases.  *See Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993)*.*  And the Supreme Court has held that "[a]n adjustment for delay in payment is ... an appropriate factor in the determination of what constitutes a reasonable attorney's fee." *Missouri v. Jenkins*, 491 U.S. 274, 284, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989).

### III.  The Court Should Award $10,034,038.00 in Attorneys' Fees, $2,027,436.25 in Expenses, and $126,559.97 in Costs

#### A.  The Court Should Award Attorneys' Fees of $10,034,038.00

Relators request $10,034,038.00 in attorneys' fees.  Pursuant to the "lodestar" approach, Relators first demonstrate counsel's hours were reasonable and necessary, supported by the declaration of lead trial attorney Tom Melsheimer. Ex. A, Thomas M. Melsheimer Decl.  They then summarize reductions in hours made pursuant to the exercise of "billing judgment."  Next, they analyze the fees under the *Johnson* factors, which strongly support awarding the claimed fees.  Finally, they argue for using *current*, rather than historical rates, which is supported by Supreme Court precedent and justified by the circumstances of this case.

##### 1.  The Hours Expended Were Reasonable and Necessary

Attachment 1 to Mr. Melsheimer's declaration summarizes the hours expended by each Winston & Strawn attorney, paralegal, and litigation support specialist, along with their rates, years of experience, and total hours billed (but note that Attachment 1 includes numerous billers whose time was eliminated, as noted in the attachment). Ex. A, Melsheimer Decl., ¶ 5.  Attachment 2 to Mr. Melsheimer's declaration provides itemized fee statements.  The fee statements were created

contemporaneously with the work performed, and describe the time spent on each individual task (*i.e.*, multiple tasks are not combined into a single "block bill"). *Id.* ¶ 6.

Winston & Strawn started their representation of Relators in March 2018 after the United States' decision not to intervene in the case and the withdrawal of Relators' previous counsel. *Id.* ¶ 7.  At that point counsel significantly revised the complaint, adding claims against numerous additional defendants and claims based on the Stark Law that were not included in the original complaint. *Id.* ¶ 8.  The case was originally scheduled for trial in July 2020, but was continued to October 2020 at Defendants' request. *Id.* ¶ 9.  The case settled in principle on July 2, 2020, for a payment of ███████████████████████████████████████████████

███████████████████    *Id.* ¶ 10.

Winston & Strawn's work included the following necessary tasks:

- Drafted a 79-page complaint to meet Rule 9(b) standards, and amended the complaint two additional times based on evidence obtained during discovery, as permitted by the Court (Dkts. 31, 158, and 321);
- Took over 30 depositions;
- Reviewed over 75,000 documents, mostly produced by Defendants;
- Responded to 67 pages of motions to dismiss, denied in full (Dkt. 111);
- Responded to 97 pages of motions for summary judgment, denied in full (Dkt. 334);
- Drafted a motion for partial summary judgment on several defenses (Dkt. 176), granted in part (Dkt. 333);
- Drafted and responded to *Daubert* motions for 10 experts (five experts for each side) (five physicians, three lawyers, and two economists);
- Drafted and responded to numerous discovery requests;
- Drafted numerous discovery motions: motion to compel quality files (Dkt. 130, granted Dkt. 131); motion to compel due diligence documents (Dkt. 146, granted Dkt. 318); motion to compel production of redacted documents (Dkt. 336);
- Served subpoenas to obtain documents and/or written discovery responses from over a dozen third parties (*e.g.*, Relators served subpoenas on 11 physician-owned hospitals and Defendants subpoenaed an additional 30 hospitals);
- Conducted a court-ordered mediation;
- Began trial preparation for the October 2020 trial;
- Conducted numerous meet and confers and drafted multitudinous letters regarding various discovery disputes; and

- Prepared and filed this fee petition.[2]

Ex. A, Melsheimer Decl., ¶ 11.

Several unique aspects of this case further support the reasonableness of the time expended. First, in a declined FCA case, Relators' counsel must prosecute the case without substantial assistance from the United States. The United States, however, remains the real party in interest and must approve of any resolution of the matter. It also retains the right to move to dismiss the case if it determines its continued prosecution is not in the best interests of the United States. As a result, Relators' counsel must also work closely with the DOJ, including providing frequent case updates and discussing case strategy. Ex. B, Baxter Decl., ¶ 6. This case was somewhat unique for declined cases in that the DOJ both closely monitored the case and played an integral role in settlement discussions, making Relators' communications with DOJ particularly vital to its progress and resolution. Ex. A, Melsheimer Decl., ¶ 12. Toward this end, Relators' counsel (i) drafted at least five formal memos summarizing key case evidence and strategic concerns, (ii) participated in numerous phone calls and written responses to requests for information, and (iii) prepared a formal PowerPoint presentation summarizing key evidence. *Id.* ¶ 13.

Second, Defendants' advice-of-counsel defense, which is rarely asserted in FCA cases, substantially added to the scope of required work. *Id.* ¶ 14. It resulted in Defendants producing thousands of additional documents related to the defense that would have otherwise been privileged. *Id.* Also, Relators deposed the five outside attorneys purportedly involved in providing oral or written advice, and the defense was a subject of numerous additional depositions. *Id.* It also resulted in hiring three lawyer experts (two by Defendants and one by Relators). *Id.* The

---

[2] *See Fontenot v. Louisiana Bd. of Elementary and Secondary Educ.*, 835 F.2d 117, 121 (5th Cir. 1988) (citing *Cruz v. Hauck*, 762 F.2d 1230, 1233 (5th Cir. 1985) ("It is settled that a prevailing plaintiff is entitled to attorney's fees for the effort entailed in litigating a fee claim and securing compensation.")); *Hensley v. Eckerhart*, 461 U.S. 424, 435-36 (1983).

defense also engendered numerous discovery disputes and correspondences between counsel concerning the scope of the waiver related to the defense and whether it applied to certain documents. *Id*. It also resulted in additional motion practice, including three motions to compel ((Dkt. 146, granted Dkt. 318); (Dkt 328, pending); and (Dkt. 336, pending)); and Relators' motion for partial summary judgment related to the defense (Dkt. 181).

Third, the scope of the case was greatly increased by the involvement of 10 defendants, including two distinct physician-owned hospitals (Texas Heart Hospital of the Southwest ("THH") and Baylor Scott & White Heart and Vascular Hospital), each with multiple related hospitals that participated in the conspiracy in disparate ways (Baylor Scott & White Medical Center - Plano, Baylor University Medical Center, Baylor Scott & White The Heart Hospital - McKinney, Baylor Scott & White The Heart Hospital - Denton, and Baylor Scott & White All Saints Medical Center), and system-level defendants involved in the conspiracy. The multiplicity of defendants resulted in additional documents, discovery requests, depositions, and motions practice. Ex. A, Melsheimer Decl., ¶ 15.

Fourth, Defendants marshalled unusually large and skillful legal resources and vigorously pursued their defense. Defendants were represented by four separate law firms, including two national firms, Reed Smith and Norton Rose Fulbright, in addition to several in-house Baylor Scott & White attorneys (not to mention the involvement of their insurance provider and of Defendants' non-litigation counsel, Hall Render and Hunton & Williams). Between the four law firms, ███ attorneys billed to the case. Ex. D, Summ. of Defs.' Counsel's Rates. The multiplicity of skillful attorneys aggressively pursuing every colorable defense required a corresponding commitment of time and resources. Defendants have refused to provide the total hours expended to defend the case. But if Defendants challenge the hours expended by Relators, Relators re-urge their request

for Defendants to disclose the hours they have expended.  *See, e.g.*, *United States ex rel. Abbott-Burdick v. Univ. Med. Assocs.*, No. 2:96-1676-12, 2002 WL 34236885, at \*21 and n.17 (D.S.C. May 23, 2002) (concluding that the hours expended by the defendant were "instructive" concerning the reasonableness of the time expended); *Wolfe v. Green*, No. 2:08-010232010, 2010 WL 3809857 (S.D.W. Va. Sept. 24, 2010) (noting that the time billed by Relators' counsel was reasonable "in comparison" to that billed by defense counsel); *see also Feld Motor Sports, Inc. v. Traxxas, LP*, No. 4:14-CV-543, 2016 WL 2758183, at \*7, n.10 (E.D. Tex. May 12, 2016) (comparing the number of attorneys by the claimant and respondent billing for trial work in resolving a fee request).

Fifth, this case involved a complex and highly technical area, even for FCA cases.  The central issue in the case was whether Defendants' patient-contacts requirement for physician owners was intended solely to promote quality of care, or whether one purpose was to generate business.  This required the exploration and understanding of not only complex medical issues, but also issues surrounding physician privileging and credentialing, and ownership issues.  Ex. A, Melsheimer Decl., ¶ 16.  This unusual complexity contributed to the necessity of significant resources.

Sixth, Relators themselves invested over 1,000 hours of their own time that will not be reimbursed by Defendants.  *Id.* ¶ 17.  Relators performed significant work on the case that would ordinarily be done by attorneys or paid experts and included in the statutory fee and expense claim, including the following:

- Relators worked to obtain the cooperation of numerous fact witnesses, including current THH owners Dr. Alistair Fyfe, Dr. Elizabeth Holper, Dr. Barron Hamman, and Dr. Eric Eichhorn, and former partner and Chief Medical Officer Dr. Bradley Leonard.  With each witness, Relators initiated the contact, interviewed them regarding their factual knowledge, and facilitated their testimony, including through several in-person meetings.

- Relators spent hundreds of hours reviewing, editing, and providing expert guidance on discovery requests, discovery responses, and briefs. In fact, Relators were themselves designated as expert witnesses under Federal Rule of Civil Procedure 26(a)(2)(C) concerning Defendants' patient-contacts requirement and its purported connection to quality of care.
- Lastly, Relators attended and assisted with the depositions of numerous fact and expert witnesses, consulting on technical and medical issues. Dr. Magee personally attended and contributed to over 20 depositions.

*Id.* ¶ 18. Relators' substantial contribution, in lieu of attorneys or paid experts, inures to the benefit of Defendants because that work is not included in this claim.

In summary, numerous factors made it reasonable and necessary for Relators' counsel to make a significant investment of time in this unusually complex and challenging case, as set out in Mr. Melsheimer's declaration and described in detail in the attached-contemporaneously created records.

## 2. Relators' Counsel Used Billing Judgment to Reduce the Claimed Hours

A party seeking attorneys' fees must prove that they exercised billing judgment, which "requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006).

In light of this requirement, Relators' counsel carefully reviewed the bills to make appropriate reductions under this standard. Ex. A, Melsheimer Decl., ¶ 19. In particular, counsel reduced or eliminated the following time, as detailed in Attachment 3 to Mr. Melsheimer's declaration, "Summary of Billing Judgment Reductions" and outlined below:

- Any time billed by timekeepers (including attorneys, paralegals, and non-attorney litigation specialists) that billed less than 25 hours was eliminated. This resulted in eliminating 90.4 hours and $42,880.50 for 20 total timekeepers. The time was eliminated based on the assumption that timekeepers new to a case might be less efficient than timekeepers billing a significant amount of time to the case, even though in the case of several attorneys whose time was eliminated, they were providing limited, specialized advice based on pre-existing expertise that did not require significant knowledge of the case. *See* Attach. 3, Pt. A ("Summary Timekeepers with Fewer Than 25 Hours"). As a result, Relators are billing for 28 attorneys, 10 of whom are document review attorneys that billed at $80 per hour,

and one supervising document review attorney that billed at $105 per hour.  Ex. A, Melsheimer Decl., ¶ 34.

- Any time billed by law clerks (*i.e.*, law students performing summer internships under attorney supervision) was eliminated.  This resulted in eliminating 52.4 additional hours and $28,296.00 for two timekeepers.  This time is typically billed to Winston & Strawn clients at the stated rates but was eliminated due to potential inefficiencies.  *See* Attach. 3, Pt. B ("Summary Law Clerk Time").

- Task entries were reviewed for potential inefficiencies, such as for tasks that could have potentially been performed by a paralegal rather than an attorney, or for which the time spent appeared potentially excessive for the task.  This resulted in reductions for 19.15 hours and $11,510.50 in 28 time entries.  *See* Attach. 3, Pt. C ("Reductions Based on Potential Inefficiencies").

- Any non-working travel time was reduced by approximately 50%.  Non-working travel time is typically billed to Winston & Strawn clients, but in some instances is reduced both by Winston & Strawn and in the industry.  Ex. A, Melsheimer Decl., ¶ 20.  Because the Court and most witnesses were located within North Texas, travel was minimal for this case.  This resulted in the reduction of 15.85 hours and $12,755.25 in 14 entries.  *See* Attach. 3, Pt. D ("Summary of Non-Working Travel Time Reductions").

- Time spent reviewing and preparing the fee statements for submission was eliminated.  This resulted in the reduction of 132.10 hours and $130,488.50 in 70 entries.  *See* Attach. 3, Pt. E ("Summary of Fee Preparation Reductions").

- Time spent negotiating with the Department of Justice regarding the Relators' Share award was eliminated.  This resulted in the reduction of 30.30 hours and $28,592.50 in 16 time entries.  Attach. 3, Pt. F ("Summary of Relator's Share Reductions").

In total, these billing judgment reductions resulted in the elimination of 340.20 hours of time, accounting for $254,523.25.  *See* Attach. 3, "Summary of Billing Judgment Reductions."

### 3.  The Rates Are Consistent with Those in the Community with Similar Qualifications and Experience

In determining the proper lodestar, courts typically consider "reasonable" hourly rates "according to the prevailing market rates in the relevant community."  *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). "Generally, the reasonable hourly rate for a particular community is established through affidavits of other attorneys practicing there."  *Id.*  However, "the district court is itself an expert in assessing

these matters." *Davis v. Bd. of Sch. Comm'rs of Mobile Cty.*, 526 F.2d 865, 868 (5th Cir. 1976) (citing *Weeks v. S. Bell Tel. & Tel. Co.*, 467 F.2d 95, 98 (5th Cir. 1972)).

In support of the reasonableness of Relators' counsels' rates, Relators submit the declarations of Tom Melsheimer, Sam Baxter, and Tom Gorham. Mr. Melsheimer is the managing partner of Winston & Strawn's Dallas office and the lead trial lawyer in this case. Ex. A, Melsheimer Decl., ¶ 2. Mr. Baxter is a principal in McKool Smith's Marshall and Dallas offices, with decades of experience litigating complex cases, including FCA cases, in the Eastern District of Texas. Ex. B, Baxter Decl., ¶ 2. Mr. Gorham is a partner at Gillam & Smith that has spent much of his career clerking with current or former Eastern District of Texas judges, practicing with a former Eastern District of Texas judge, or litigating complex cases in the Eastern District of Texas. Ex. C, Gorham Decl., ¶ 3. Each declarant has decades of experience with complex litigation in the Eastern District of Texas and extensive knowledge of the law firms and billing rates of lawyers representing clients in those cases, including in Sherman.

The rates charged by the attorneys in this case are reasonable under that standard since the community of Sherman within the Eastern District of Texas includes some of the most sophisticated law firms and litigants in the country, commonly including attorneys from large firms with offices in Dallas like Winston & Strawn, Reed Smith, and Norton Rose Fulbright. *See* Ex. A, Melsheimer Decl., ¶ 21; Ex. B., Baxter Decl., ¶ 12; Ex. C, Gorham Decl., ¶ 11. Firms typically do not differentiate between the rates they would charge for a matter in Sherman, and for a case in another venue in the Eastern District of Texas (such as Marshall or Tyler), nor for what they would charge for a case pending in the Northern District of Texas for that matter. Ex. A, Melsheimer Decl., ¶ 21. The Winston & Strawn rates are also the same rates these Winston & Strawn attorneys

-10-

typically charge for representing clients in similar litigation, which would be the same for complex cases in the Eastern District (including Sherman).  *See* Ex. A, Melsheimer Decl., ¶ 22.

Winston attempts to ensure that its billing rates remain competitive with those charged by its peer firms by regularly analyzing legal industry information provided by numerous independent sources, including, but not limited to, the annual Price Waterhouse & Coopers ("PwC") survey of legal rates (in which Winston participates but the results of which Winston is not permitted to make public).   Ex. A, Melsheimer Decl., ¶ 23.   Based on the information contained in these independent sources, including the 2020 PwC Survey, it is Winston's belief that its billing rates are comparable to those of other similarly situated law firms in this market.  *See also Nuvasive, Inc. v. Alphatec Holdings, Inc. et. al*., Case No. 3:18-cv-347-CAB-MDD, Docket 277 (S.D. Cal. 2020) (finding Winston's billing rates to be reasonable in the context of a patent infringement case); *see also* Ex. F, PwC 2020 Billing Rate & Associate Salary Survey (publicly available brochure listing standard billing rates, by median and certain quartiles, of equity partners at AmLaw 25 firms for the corporate, litigation, and real estate departments).

Mr. Baxter and Mr. Gorham also attach declarations stating that based on their experience and information, the rates charged by Winston & Strawn in this case are reasonable and within the range of prevailing rates charged by attorneys of similar experience and capabilities handling similar cases in the Sherman Division of the Eastern District of Texas.  Ex. B, Baxter Decl., ¶ 12; Ex. C, Gorham Decl., ¶¶ 9-11. ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████ Thus, abundant evidence supports

the reasonableness of the rates charged, as consistent with Winston & Strawn's peer firms for

complex cases that routinely practice in the Eastern District of Texas, including in Sherman.

"Where counsel requests compensation at his normal billing rate and that rate is shown to

be within the range of market rates for attorneys of similar skill and experience, the burden is on

the opposing party to show that a lower rate should be used." *Bank of N.Y. Mellon v. New Century

Loan Servicing, LLC*, 2019 U.S. Dist. LEXIS 166038, NO. 4:17-CV-00646, at *35 (E.D. Tex.)

(Mazzant, J.) (July 18, 2019) (citing *United States v. Cornerstone Wealth Corp., Inc.*, No. 3-98-

CV-0601-D, 2006 U.S. Dist. LEXIS 36077, 2006 WL 1524592, at *2 (N.D. Tex. Jun. 2, 2006).)

Thus, having established that Winston & Strawn's rates are within the range of market rates for

attorneys of similar skill and experience capable of prosecuting a complex FCA case in this Court,

the burden is on Defendants to show that a lower rate should be used.

Defendants will likely point out that although comparable to other large firms and other

elite firms with offices in Dallas that practice in Sherman (such as Norton Rose Fulbright, Reed

Smith, McKool Smith, and others), Winston & Strawn's rates are near the top of the market. But

several unique features of this case justify rates near the top of the market.

***First***, the United States declined to intervene in the case, requiring a law firm that could

marshal significant resources, including paying for significant out-of-pocket expenses. It has been

the historical practice of many small law firms and those that specialize in FCA lawsuits to

withdraw after the United States declines to intervene. Ex. A, Melsheimer Decl., ¶ 24; Ex. B,

Baxter Decl., ¶ 11. There are several reasons for this historical pattern. One is that many firms do

not have the financial or attorney resources to prosecute a case to the end without the United States' involvement.

In this case, Winston & Strawn devoted 14,569.80 hours of time (based on historical rates) from 52 timekeepers (28 Winston & Strawn partners, associates, and practice attorneys), and another $2,153,996.22 in out-of-pocket expenses and costs.  Ex. A, Melsheimer Decl., ¶ 19.  Even more time and out-of-pocket expenses would have been required to take the case through trial.  *Id.*  As described above, this investment was essential to effectively prosecuting the action under these circumstances.  *Supra* Part III(A)(1) (describing the necessary tasks in the case).  Such an investment would simply be impossible for most firms.  Ex. A, Melsheimer Decl., ¶ 25; Ex. B., Baxter Decl., ¶ 11.  And of the small universe of law firms that would have the resources and would be willing to represent relators, they would likely have comparable rates.  Ex. A, Melsheimer Decl., ¶ 25.

Further, the chances of obtaining a successful result in a declined case is historically low in comparison to intervened cases.[3]  Ex. A, Melsheimer Decl., ¶ 26.  Another recent development making declined cases even more risky is the Department of Justice's 2018 memo, "Factors for Evaluating Dismissal Pursuant to 31 U.S.C. § 3730(c)(2)(A)," which has resulted in significant efforts by defense counsel to convince the DOJ to move to dismiss declined cases, such as was the case in *United States ex rel. Health Choice Group, LLC. v. Bayer Corp., et al.*, No. 5:17-cv-126 (E.D. Tex.).  Ex. A, Melsheimer Decl., ¶¶ 26-27; Ex. B., Baxter Decl., ¶ 7; Ex. C, Gorham Decl., ¶ 6.  For example, Winston & Strawn recently invested millions of dollars in an FCA case that was dismissed pursuant to this memo.  Ex. A, Melsheimer Decl., ¶ 27.  That case was dismissed seven years after its filing, having already survived two motions to dismiss.  *Id*.  In the instant case,

---

[3] *See* DOJ Fraud Statistics – Overview, Oct. 1, 1986 – Sept. 30, 2019, *available at* https://www.justice.gov/opa/press-release/file/1233201/download.

Defendants' counsel vigorously and repeatedly sought to have the United States move to dismiss based on the rationale in this memo.  Ex. A, Melsheimer Decl., ¶ 28.  Although frequent and effective communication with the DOJ is important in all FCA cases, it was particularly so in this case.  Ex. A, Melsheimer Decl., ¶ 29; Ex. B., Baxter Decl., ¶ 6.

*Second*, the subject matter of this case was complex, even for a *qui tam* case, because the fraud implicated complex issues including cardiology quality of care, physician credentialing and privileging practices, and hospital ownership issues.  Ex. A, Melsheimer Decl., ¶ 30; Ex. B., Baxter Decl., ¶ 6.  Furthermore, both parties have agreed that the factual situation—the legality of conditioning ownership on patient contacts—has never before been decided by any court in the United States.  Def. THH's Mot. Summ. J. Reply, (Dkt. 211) at 2 █████████████████████

██████████████████████████████████████████████████████████████

████████.  This made it even more important that counsel have deep experience with both the FCA and the healthcare statutes at issue.  Ex. A, Melsheimer Decl., ¶ 30.  The complexity was increased by Defendants claiming an advice-of-counsel defense.  *Id.* ¶ 14.

The complexity of this case compares favorably with that of the fee petitioners in *Tech Pharm. Servs., LLC v. Alixa Rx LLC*, a complex trade secret case in Sherman in which this Court awarded the full requested rates up to $860 per hour.  *Tech Pharm. Servs., LLC v. Alixa Rx LLC*, 298 F. Supp. 3d 892, 907, 2017 U.S. Dist. LEXIS 211061, at *26-27, 2017 WL 6559260 ((E.D. Tex. Dec. 22, 2017) (the attorneys' fee award was decided three years ago).

*Third*, defense counsel was uniquely well-resourced, experienced, and skillful, requiring Relators' counsel with sufficient resources, experience, and skill.  As the largest healthcare provider based in Texas, Baylor Scott & White was able to hire a world-class team based in Austin, Dallas, and Sherman.  Lead counsel was Jeff Layne of Reed Smith, an eminently experienced FCA

-14-

lawyer based in Austin with unique subject matter expertise, having obtained a master's degree in public policy from Harvard University.  Ex. A, Melsheimer Decl., ¶ 31; Ex. B., Baxter Decl., ¶ 10. Reed Smith is a global law firm with over 1,500 attorneys, and is currently among the 25 largest law firms in the country, with FCA among its particular areas of expertise.[4]  Norton Rose Fulbright lead attorney Rodney Acker also served a central role in the case.  Ex. A, Melsheimer Decl., ¶ 32. Mr. Acker is one of the most experienced and well-respected trial attorneys in Dallas, and is currently the president-elect of the American College of Trial Lawyers.  *Id.*; Ex. B., Baxter Decl., ¶ 10.  Defense co-counsel Michael McColloch has over 30 years of experience as a criminal trial lawyer.[5]  Defense co-counsel Clyde Siebman has been trying cases in the Eastern District of Texas for decades, and is the founding president of the Eastern District of Texas Bench Bar Association.[6] These four firms devoted numerous additional well-credentialed, experienced, and highly competent partners and associates, as reflected in the rates that they provided.

Although their rates and time expended are not dispositive, several courts have noted the relevance of the defendant's rates in an FCA fee request.  *See, e.g.*, *United States ex rel. Abbott-Burdick v. Univ. Med. Assocs.*, No. 2:96-1676-12, 2002 WL 34236885, at *21 and n.17 (D.S.C. May 23, 2002) (concluding that the rates charged by party opposing relators' fee request were "very relevant" to the Court's decision to approve the requested rates); *Wolfe v. Green*, No. 2:08-010232010, 2010 WL 3809857 (S.D.W. Va. Sept. 24, 2010) (noting that the time billed by relators' counsel was reasonable "in comparison" to that billed by defense counsel).

---

[4] *See* Reed Smith Health Care Government Investigations and Defense Page, https://www.reedsmith.com/en (last visited Sept. 20, 2020).
[5] *See* S. Michael McColloch PLLC Home Page, https://www.mccolloch-law.com/ (last visited Sept. 20, 2020).
[6] *See* Siebman, Forrest, Burg & Smith. LLP Clyde M. Siebman Page, https://siebman.com/attorneys/clyde-m-siebman/ (last visited Sept. 20, 2020).

As ordered by the Court, Defendants have produced their own counsels' rates, which are attached as Exhibit D.  Ex. D, Summ. of Defs.' Counsel's Rates.  Defendants provided rates for

███████, with each firm charging ████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████  ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████  Based on market survey and other publicly available information,

it is likely that Reed Smith and Norton Rose Fulbright's standard rates are similar to those claimed

by Winston & Strawn in this case.  Ex. A, Melsheimer Decl., ¶ 33; *see WPEM, LLC v. SOTI Inc.*,

No. 2:18-CV-00156-JRG, 2020 WL 555545, at *7 (E.D. Tex. Feb. 4, 2020) (finding that Norton

Rose Fulbright's discounted-partner hourly rates of $610-$900 were reasonable.); *see also* Fee

Hr'g Ex. 36, *WPEM, LLC v. SOTI Inc.*, No. 2:18-CV-00156-JRG, Docket No. 49-7 (Nov. 25,

2019) (Norton Rose Fulbright attorney far less experienced than Mr. Acker charging a standard

hourly rate of $705 per hour and a discounted rate of $610 per hour, which the court found to be

---

[7] ███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

reasonable); *id.*, Fee Hr'g Tr., Docket No. 51 at 66:20-69:3 (Norton Rose Fulbright partner testifying to the reasonableness of discounted-partner hourly rates $610-$900).  In any case, the purposes of the FCA should not be thwarted ████████████████████████

████████████████████

One unique feature of Winston & Strawn that significantly reduced its effective billing rates is an "in-house" team of full-time document review attorneys.  Ex. A, Melsheimer Decl., ¶ 34.  In this case, these attorneys billed at the rate of $80 per hour, and expended 1,599.80 hours.  *Id.*  These tasks have historically been performed by young associates that bill at a significantly higher rate, or by outside vendors that must be paid a premium.  Ex. A, Melsheimer Decl., ¶ 35.  This review strategy significantly reduced the overall effective rate of Winston & Strawn, even versus many peer law firms that do not have this capability.

In Defendants' August 25, 2020 letter rejecting Relators' claim for fees, Defendants cite a recent patent case in which a court in the Northern District of Texas reduced the fees for several Winston & Strawn attorneys between 15% and 35%.  *SAP Am., Inc. v. Investpic, LLC*, 2018 U.S. Dist. LEXIS 204805, at *15-18 (N.D. Tex. Dec. 4, 2018).  The Court in that case, however, recognized the unique policy considerations that govern the award of fees in a patent case found to be "exceptional":

> However, there must be some relation between the amount of the award and the extent of the conduct that made the case exceptional.  *Id.*  The district court should, to the extent possible, make findings of fact and explain the causal connection between the fee award and the activity that made the case exceptional.

*Id.* at *9.

Here, by contrast, the FCA requires application of the fee award provision in conjunction with its goal of encouraging the reporting of fraud.  *See, e.g.*, *United States ex rel. Tommasino v. Guida*, 2017 U.S. Dist. LEXIS 31402, *5-6, 2017 WL 878587 (E.D.N.Y. 2017) ("If, however, a

court were to substantially reduce a relator's attorneys' fees because the government settles for less than the amount expected by the relator, it would discourage attorneys from investing the time and resources necessary to bring a *qui tam* action, thereby undermining the purpose of the FCA"). As a practical matter, if firms have their customary fees significantly reduced in FCA cases, it will significantly dissuade them from taking those cases, particularly when they are complex and costly and against well-resourced defendants (that incidentally have the capability of committing the costliest frauds). And as described above, under the circumstances present here, it is reasonable and necessary to hire lawyers with the competence, experience, and resources of attorneys at the top of the market, many of whom likely practice at large firms. Additionally, the *SAP* court found that the movant had not adequately shown that top-of-market rates were justified for that case. *SAP Am., Inc. v. Investpic, LLC*, 2018 U.S. Dist. LEXIS 204805, at *6 (N.D. Tex. Dec. 4, 2018). By contrast, Relators have presented abundant evidence that top-of-market rates are necessary for prosecuting this case under the unique circumstances present. *See supra* Part III(A)(1).

### 4. The *Johnson* Factors Strongly Argue for Awarding the Full Requested Fees at Current Rates

After calculating the lodestar, the Court can consider adjusting it based on the factors enumerated in Johnson. For example, in *United States ex rel. Poulton v. Anesthesia Associate. of Burlington, Inc.*, 87 F. Supp. 2d 351, 359 (D. Vt. 2000) the court granted a 10% upward adjustment because it concluded several of the claims had a "high risk of not prevailing." Although Relators are not seeking an "upward adjustment" here, they are seeking the award of the full requested fees based on the *current* rates, which amounts to approximately a 6.5% increase over using the historical rates.

"[O]f the Johnson factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and

ability of counsel." *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998).  The Fifth Circuit has explained that "[t]he  most critical factor in determining an attorney's fee award is the 'degree of success obtained.'"  *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006) (quoting *Singer v. City of Waco, Tex.*, 324 F.3d 813, 829 (5th Cir. 2003)).   Finally, independent of the *Johnson* factors, the Supreme Court has held that "[a]n adjustment for delay in payment is ... an appropriate factor in the determination of what constitutes a reasonable attorney's fee."  *Missouri v. Jenkins*, 491 U.S. 274, 284, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989).

Here, all the *Johnson* factors support awarding the requested fees (and the application of current rates).  Additionally, several unique features of this case strongly argue for awarding the requested rates, including the following:

- The inherent risk required in a declined case asserting a novel fraud theory against the largest regional healthcare conglomeration represented by four eminently skilled and well-resourced law firms that committed █ attorneys to the case;
- The significant expense required by counsel in incurring over $2 million in out-of-pocket expenses and over $9 million in delayed attorneys' fees; and
- Obtaining a result of significant importance to the United States hospital industry and the public interest.

### a.   The *Johnson* factors strongly argue for awarding the requested fees

#### i.   the time and labor required

As described above, this case required a significant investment of time and legal resources. *See supra* Part III(A)(1).  Few firms could make such an investment, and the policy imperatives of the FCA argue for awarding the full requested rates.

#### ii.   the novelty and difficulty of the issues in the case

In Defendants' summary judgment briefing, they concede that ███████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Further, as described above, the subject matter of the case was particularly complex, even for an FCA case.  *See supra* Part III(A)(3).  To

-19-

make matters more difficult, (i) Defendants raised a complex advice-of-counsel defense, and (ii) the United States declined to intervene in the case.  All of these make the case uniquely novel and difficult and support a multiplier.

### iii.   the skill requisite to perform the legal services properly

Numerous factors contributed to the skill required to competently prosecute this case (*see supra* Part III(A)-(B)), including the following: (i) the United States declined to intervene; (ii) Defense counsel was uniquely resourced and skilled and vigorously sought to have the case dismissed; (iii) the case involved a uniquely complex subject matter; and (iv) ten defendants were involved.

### iv.   the preclusion of other employment by the attorney due to acceptance of the case

As described in the attached declaration of Mr. Melsheimer, each of the attorneys significantly involved in the case was precluded from other employment based on the acceptance of this case.  Ex. A, Melsheimer Decl., ¶ 36.

### v.   the customary fee charged for similar services in the relevant community

Winston believes the hourly rates of the attorneys who performed this work are market rates for lawyers of their caliber and experience in the Eastern District of Texas legal market that includes Sherman.  *See supra* Part III(A)(3).

The declarations of Sam Baxter (Ex. B) and Tom Gorham (Ex. C), two attorneys with decades of experience with Eastern District of Texas litigation and FCA litigation, including in Sherman, confirm that Winston & Strawn's rates are consistent with the prevailing rates for attorneys of their caliber and experience in the Eastern District of Texas legal market that includes Sherman.

### vi.    time limitations imposed by the client or the circumstances

This factor is neutral.

### vii.    the amount involved and the results obtained

Relators brought this case seeking to recoup over a billion dollars in Medicare funds tainted by violations of the federal healthcare statutes. As demonstrated in the expert report of economist Erica Bramer, the Medicare dollars at stake *prior to mandatory trebling and penalties* exceeded one-billion dollars. Ex. A, Melsheimer Decl., ¶ 46. Although denying liability, Defendants did not challenge Ms. Bramer's calculations based on Defendants' own claim data. *Id*.

The results obtained included both a ███████████, which is a particularly significant settlement in a case in which the United States has declined to intervene. Ex. A, Melsheimer Decl., ¶ 37. And just as importantly, Baylor Scott & White ██████████ ███████████████████████████ If not for this outcome, it is likely the practice of using patient contacts to generate business could have proliferated throughout the country. *Id*. Thus, the case serves important public policy objectives underlying the healthcare statutes and the FCA itself.

The importance of the result is highlighted by ████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ██████████████████ *Id*. Additionally, the United States' interest in the case is supported by their filing of two opposed statements of interest, respectively, Defendants' motion to dismiss (Dkt. 97) and motion for summary judgment (Dkt. 274). In fact, the United States ended up taking a primary role in negotiating a settlement of the case, because of the importance of the case to CMS and the public interest. Ex. A, Melsheimer Decl., ¶ 39.

### viii.     the experience, reputation, and ability of the attorneys

As described in the attached declarations, the Winston & Strawn attorneys collectively have decades of experience trying complex cases, including in FCA and *qui tam* litigation.  Ex. A, Melsheimer Decl., ¶ 40.   Tom Melsheimer was lead counsel and Natalie Arbaugh and Chad Walker played leading roles in the most successful *qui tam* settlement in the history of the Texas Medicaid Fraud Prevention Statute, and the Winston team has litigated numerous *qui tam* cases since that time.   Ex. A, Melsheimer Decl., ¶ 41.   The relevant experience of Tom Melsheimer, Mark Werbner, and the other significantly involved attorneys are described in the attached declarations.   Ex. A, Melsheimer Decl., ¶¶ 40-41; Ex. B., Baxter Decl., ¶¶ 12-21; Ex. C, Gorham Decl., ¶ 12.

### ix.     the undesirability of the case

As described above (*supra* Part III(A)(1)), there are numerous features of this case that would make it undesirable to most firms that represent whistleblowers, including (i) the United States declined to intervene during a period of increased risk of dismissal for these cases and (ii) Defendants are the largest regional healthcare provider with immense legal resources.   Ex. A, Melsheimer Decl., ¶ 42.   Additionally, very few, if any, large firms with the resources to commit to a case such as this one can represent whistleblowers against large corporations for conflicts and business reasons, further making such cases undesirable and limiting the universe of firms that both have the resources and competence to handle the case and the ability to do so from a business or conflicts perspective.

### x.     awards in similar cases

The case with a fee award in this district bearing the most similarities is *United States ex rel. Joshua Harman v. Trinity Industries, Inc.  See generally United States ex rel. Harman v. Trinity Indus., Inc.*, 166 F. Supp. 3d 737 (E.D. Tex. 2015), *rev'd on other grounds*, 872 F.3d 645 (5th Cir.

2017).  In that case, the United States declined to intervene in an FCA action pending in Marshall, in which the relator alleged that the defendant was responsible for installing faulty guard rails on highways.  *Id.*  After finding $175,000,000 in single damages, the court awarded the full amount of attorneys' fees sought from about 60 billers from four separate law firms, with several attorneys surpassing $1,000 an hour and topping out at $1,150 an hour.  *See* Pl.'s Post Tr. Mot. to Enter J., *United States ex rel. Joshua Harman v. Trinity Indus., Inc.*, No. 2:12-CV-00089-JRG, Docket No. 623 (Jan. 7, 2015); *id.*, Ex. 5; Final J. at 2, *United States ex rel. Joshua Harman v. Trinity Indus., Inc., and Trinity Highway Products, LLC*, Civil Action No. 2:12-CV-00089-JRG, Docket No. 713 (Jan. 7, 2015) (awarding requested attorneys' fees in full).

The *Trinity Industries* case, like this case, involved competent and sophisticated law firms on both sides, at least hundreds of millions of dollars potentially at stake, and the United States declined to intervene.  (Dkt. 8.)  The fact that that case did not settle prior to trial and was overturned on appeal demonstrates the inherent riskiness of FCA cases.  This case compares favorably with the *Trinity Industries* case in that Relators were represented by a single law firm and significantly fewer billers, tending to create efficiencies that are not necessarily possible with the involvement of four law firms.  This Court has noted in an attorneys' fees opinion that the rates approved in *Trinity Industries* may reflect the fact that it was a complex *qui tam* case, which is certainly true of this case as well.  *Feld Motor Sports, Inc. v. Traxxas, LP*, No. 4:14-CV-543, 2016 WL 2758183, at *22, n.16 (E.D. Tex. May 12, 2016).

In Defendants' August 25, 2020 letter regarding attorneys' fees, they argue this case is inapplicable because the verdict was overturned on appeal.  Ex. E, Reed Smith's Attorneys' Fees Letter.  But the liability verdict was overturned on materiality grounds, and the Fifth Circuit did

not consider the attorneys' fees order, which remains the best analogy for this fee request.  *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 647 (5th Cir. 2017).

As described above, the requested rates are also comparable to those awarded by this Court in *Tech Pharmacy Services, LLC*, a complex case also involving Winston & Strawn, in which the Court found that rates up to $860 were "reasonable and necessary" in light of "the nature of [that] case."  298 F. Supp. 3d at 907.  In so doing, the Court noted the rates were consistent both with cited surveys and the Court's own experience.  *See also Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 2018 U.S. Dist. LEXIS 56478, at *19, 2018 WL 1602460 (E.D. Tex. Apr. 3, 2018) (approving rates up to $1,100 an hour, which were "prima facie reasonable" because they were uncontested).[8]

### 5.   The Court Should Use Current Rates to Account for a Delay in Payment

Courts have compensated for delay in payment by awarding attorneys' fees based on current rates and other enhancements in appropriate cases.  *See Islamic Ctr. v. Starkville*, 876 F.2d 465, 472-73, 1989 U.S. App. LEXIS 9432, at *24-26 (5th Cir. 1989) (noting that "the courts of appeals have repeatedly upheld the propriety of delay enhancements"); *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 773 (5th Cir. 1996) (finding that a district court may compensate for delay by granting a lodestar based on current rates); *Hopwood v. State of Texas*, 236 F.3d 256, 281 n.107 (5th Cir. 2000) (approving district court's use of current rates to compensate for delay in payment where attorneys submitted current hourly rates in addition to historical rates); *James v. City of Dallas*, No. 3:98-CV-0436-R, 2005 WL 954999, at *3 (N.D. Tex. Apr. 25, 2005) (awarding attorneys' fee based on current rates to account for delay in payment).

---

[8] Another factor, consideration of whether a fee is contingent or billable, was a *Johnson* factor but has been expressly disallowed by the Supreme Court.  *City of Burlington v. Dague*, 505 U.S. 557, 567 (1992).

Because of the unique circumstances of this case, including the fact that the *Johnson* factors overwhelmingly argue for an upward adjustment, it would be appropriate for the Court to use the current rates here.  Using the current rather than the historical rates would result in total attorneys' fees of $10,034,038.00, an increase of $660,185.00 over the historical claimed rates, or approximately 6.5%.  Ex. A, Melsheimer Decl., ¶ 6.

**B.    The Court Should Award Expenses of $2,027,436.25**

Relators request $2,027,436.25 in expenses.  The FCA provides that a court may award a relator "reasonable expenses" in addition to costs and attorneys' fees.  *United States ex. rel. Becker v. Tools & Metals, Inc*., 2013 WL 1293818, at *10-14 (N.D. Tex. Mar. 31, 2013) (affirming magistrate's award of e-discovery expenses and the costs of housing electronic information); *United States ex. rel. Rigsby v. State Farm Fire and Cas. Co*., 2014 WL 691500, at *7-8 (S.D. Miss. Feb. 21, 2014) (awarding expenses that included expert retention fees, deposition costs, and attorney travel expenses).  Due to the provision in the FCA providing for the awarding of "reasonable expenses," expenses which are not recoverable as taxable costs "are shifted to the losing party ... where a statute provides for the shifting of attorneys' fees, as long as those costs are identifiable, out-of-pocket expenses as opposed to non-recoverable routine office overhead." *Rigsby*, 2014 WL 691500, at *7-8 (internal citations omitted).

Here, all expenses that could fall under office overhead have been excluded.  Ex. A, Melsheimer Decl., ¶ 43.  All that are left are those costs which courts in the Fifth Circuit have allowed under this provision of the FCA.  Here, Plaintiffs are entitled to be reimbursed for expenses associated with experts, traveling and related miscellaneous expenses, courier services, electronic discovery services, legal research, copying costs, focus group exercises, mediation fees, and business center fees.

Plaintiffs' expenses are summarized in Attachment 4 ("Summary of Expenses") to Mr. Melsheimer's declaration, and a detailed invoice for expenses are provided in Attachment 2 ("Itemized Fee Statement").  Generally, Plaintiffs' expenses include the following:

**Expert expenses** are by far the largest expenditure (~$1.8 million out of ~$2 million) and have been included in compliance with the law in the Fifth Circuit, which recognizes such costs as compensable under the FCA.  *See United States ex. rel. Garibaldi v. Orleans Parish School Bd.*, 46 F. Supp. 2d 546, 567 (E.D. La. 1999), *judgment vacated on other grounds*, 244 F.3d 486; *judgment reentered*, 2003 WL 22174241 (E.D. La. Sept. 18, 2003); *see also United States ex rel. Abbott-Burdick v. Univ. Med. Assocs.*, 2002 U.S. Dist. LEXIS 26986, *77-78 (4th Cir. 2002). (noting that the FCA "was created to embolden citizen enforcement of important federal policies, namely: (1) the enhancement of the government's ability to recover losses resulting from fraud, and (2) to encourage individuals who know of government fraud to come forward with that information.… The failure to award the full complement of attorneys' fees and expenses under the Act would inhibit the application of these policies.").

Each side retained five testifying experts. Ex. A, Melsheimer Decl., ¶ 44.  Relators' experts were economist Erica Bramer (supported by economic experts) ("BVA consulting"), two cardiology quality of care physician experts (one expert in general cardiology and one in cardiology surgery), one hospital credentialing physician expert, and one healthcare regulatory attorney expert.  *Id*.  The physician experts were essential for rebutting Defendants' argument that the sole purpose of the contacts requirement was quality.  The attorney expert was essential to rebutting Defendants' advice-of-counsel defense.  *Id.* ¶ 45.  Finally, Ms. Bramer and BVA consulting were essential to showing the financial incentives created by Defendants' patient-contacts requirement, as well as to analyze voluminous claims data produced by Defendants.

The Bramer/BVA consulting expenses were by far the highest among experts, in large part because of the volume of financial documents Ms. Bramer and her team were required to review and analyze. *Id.* ¶ 46. Ms. Bramer produced an 84-page report with 204 pages of exhibits, analyzing and describing the financial incentives created by and financial harm resulting from the patient-contacts requirement, and a supplemental three-page report with 262 pages of exhibits. *Id.* Relators' counsel negotiated a 15% discount from BVA consulting's normal rates due to the high volume of work, which reduction is reflected in the attached expense report. *Id.*

**Travel and related miscellaneous expenses** are those associated with attendance at depositions, court hearings, and meetings with experts. *Id.* ¶ 47. Travel expenses are limited because all deposition witnesses were located within driving distance and close to Plaintiffs' counsel's office, and expert travel expenses are limited. *Id.*

**Courier services** are reasonable and are included only to the extent that they were used to transport documents for court conferences, depositions, pretrial hearings, and trial. *Id.* ¶ 48.

**Electronic discovery services** were mandatory for a case of this size. *Id* ¶ 49. There are over 75,000 documents, including emails, and correspondence from the Defendants and third parties. These expenses would ordinarily be provided by an outside vendor, but in this case were provided by internal Winston & Strawn resources, likely saving significant costs versus hiring an outside vendor. *Id.*

**Legal research** has been found by Fifth Circuit courts to be compensable under statutes allowing attorneys' fees and expenses. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 334-35 (W.D. Tex. 2007) (allowing legal research fees to services like Westlaw and Lexis to be compensable") (internal citations omitted); *Channell v. Eichelberger*, 2008 WL 4683419, at *3 (N.D. Miss. Oct. 22, 2008) (awarding legal research costs as a component of attorneys' fees).

**Copying costs** have been included to the extent they include copies for document productions, depositions, hearings, and motions.  Also included in this category are copying costs reimbursed to third parties in compliance with Plaintiffs' subpoenas.  Ex. A, Melsheimer Decl., ¶ 50.  Copies for inter-office use of documents have been eliminated from these expenses.  *Id.* These costs are reasonable and should be reimbursed.

**Focus group exercise** costs are included as commonly awarded by courts as a "more economical, alternative to a mock trial."  *Wolfe v. Green*, 2010 U.S. Dist. LEXIS 102623, at *29-30, 2010 WL 3809857 (S.D.W. Va. Sept. 24, 2010); *see also Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 540 (S.D.N.Y. 2008) ("It is entirely proper, however, to bill a client for a mock trial exercise devoted to the case at hand.... Consequently, no reduction shall be made for time spent on the mock trial."); *Finkelstein v. Bergna*, 804 F. Supp. 1235, 1239, 1258-59 (N.D. Cal. 1992) (allowing fees and costs associated with one mock trial and focus group, including employment of high-caliber attorney to act as mock opposing counsel).

**Mediation fees** were incurred for court-ordered mediation and should be compensable. Ex. A, Melsheimer Decl., ¶ 51.

**Business center fees** were incurred.  The business center provides proofreading and other document preparation services that might otherwise need to be performed by paralegals or attorneys, and are billed out at only $80-$105 per hour.  These expenses have been excluded.

### C.    Relators Are Entitled to Costs of $126,559.97

Relators request $126,559.97 in costs.  In addition to the collection of attorneys' fees and expenses, the FCA provides that Relators may recover costs.  31 U.S.C. § 3730; *United States ex. rel. Rigsby v. State Farm Fire and Cas. Co.*, 2014 WL 691500, at *7-8 (S.D. Miss. Feb. 21, 2014); *Thompson v. Quorum Health Resources*, LLC, 2010 WL 20144542 (W.D. Ky. May 21, 2010). This provision has generally been construed to award costs in accordance with 28 U.S.C. § 1920,

including (1) docket and court fees; (2) fees and disbursements for printing and witnesses; and (3) fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case.

Costs related to the taking of depositions are allowed under section 1920(2) "if the materials were necessarily obtained for use in the case. *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 536 (5th Cir. 1999). A "deposition need not be introduced into evidence at trial in order to be 'necessarily obtained for use in the case.'" *Fogleman v. ARAMCO*, 920 F.2d 278, 285 (5th Cir. 1991); *Embotelladora Agral Regiomontana, S.A. de C.V. v. Sharp Capital, Inc.*, 952 F. Supp. 415, 419 (N.D. Tex. 1997). Deposition costs are generally allowed if the taking of the deposition is shown to have been reasonably necessary in light of facts known to counsel at the time it was taken. *Copper Liquor v. Adolph Coors Co.*, 684 F.2d 1087, 1099 (5th Cir. 1982).

All of Relators' costs are summarized in Attachment 5 ("Bill of Costs") to Mr. Melsheimer's Declaration, and a detailed invoice for costs are provided in Attachment 2 ("Itemized Fee Statement") to Mr. Melsheimer's declaration. Generally, Relators' costs include the following:

1. **Fees of the Clerk**. As summarized in Attachment 5, this category includes filing fees, admission, and *pro hac vice* fees paid directly to the clerk of this Court. Ex. A, Melsheimer Decl., ¶ 52.

2. **Fees for Service of Summons and Subpoenas**. These fees include service of process fees for subpoenas served on third parties, including several third-party physician-owned hospitals. Ex. A, Melsheimer Decl., ¶ 53-54. It was necessary to subpoena these hospitals to show that Defendants' patient-contacts requirement as a condition of ownership differed from industry practices. *Id*.

-29-

3. **Fees for Printed or Electronically Recorded Transcripts**.  These costs include the costs of transcripts of depositions and hearings, and the costs were necessary as the transcripts of depositions were used by the experts in preparation of their reports and by Plaintiffs in gathering the necessary evidence to bring to trial, as well as for impeachment at trial.  *Id.* ¶¶ 55-56. Deposition expenses for transcripts and videos have been allowed by Fifth Circuit courts under the FCA for expenses associated with depositions which were "necessarily obtained for use in the case." *West Wind Africa Line v. Corpus Christi Marine Servs.*, 834 F.2d 1232, 1237-38 (5th Cir. 1988).  The hearing transcripts were necessary for Plaintiff to ensure the Court's directives were properly followed. *Id.* ¶ 57.

IV.    **Conclusion**

This is a case of great importance and major challenges.  As a result, the Congressional purpose underlying the FCA and its fees and costs provision—providing sufficiently robust incentives to disclose fraud—are best served by awarding the full requested fees, expenses, and costs.   As a result, Relators request $10,034,038.00 in fees, $126,559.97 in costs, and $2,027,436.25 in expenses.  In the alternative, Relators request $9,373,853 in fees, should the court award historical rather than current rates.

Dated:  September 29, 2020

Respectfully submitted,

*/s/  Chad B. Walker*
THOMAS M. MELSHEIMER (TX Bar No. 13922550)
M. BRETT JOHNSON (TX Bar No. 00790975)
CHAD B. WALKER (TX Bar No. 24056484)
REX A. MANN (TX Bar No. 24075509)
MARK S. WERBNER (TX Bar No. 21179700)
DION J. ROBBINS (TX Bar No. 24114011)
WINSTON & STRAWN LLP
2121 N. Pearl Street,
Suite 900
Dallas, TX 75201
Phone: (214) 453-6500

-30-

Fax: (214) 453-6400
tmelsheimer@winston.com
mbjohnson@winston.com
cbwalker@winston.com
rmann@winston.com
mwerbner@winston.com
drobbins@winston.com
*Counsel for Relators,*
*Mitchell J. Magee, M.D. and Todd M. Dewey, M.D.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  Therefore, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by mail on September 29, 2020.  Further, pursuant to Local Rule CV-5(c), all counsel of record will be promptly served via e-mail on September 29, 2020.


*/s/ Chad B. Walker*


## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

Pursuant to Local Rule CV-5(a)(7), the undersigned certifies that the foregoing document and exhibits thereto should be filed under seal because they contain materials designated as confidential under the Amended Order Governing Proceedings (Dkt. 72) and Agreed Protective Order (Dkt. 106).


*/s/ Chad B. Walker*

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that counsel has complied with the meet and confer requirement in Local Rule CV-7(h), and this motion is opposed.  On July 31, 2020, counsel for Relators provided defense counsel a letter regarding Winston & Strawn's statutory claim for attorneys' fees and costs under 31 U.S.C. § 3130(d)(2), along with an invoice detailing the fees and costs.  On August 17, 2020, counsel for Defendants stated their preliminary position via email that (1) Winston's hourly rates are in excess of prevailing rates, and (2) Winston listed an excessive number of time keepers. On August 25, 2020, Defendants rejected Relators' statutory claim for fees.

*/s/ Chad B. Walker*