# EXHIBIT A
# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MITCHELL J. MAGEE, M.D. and TODD M. DEWEY, M.D., | § § § § | |
| Plaintiffs, | § § | CASE NO. 4:16-CV-00717-ALM |
| v. | § § § | |
| TEXAS HEART HOSPITAL OF THE SOUTHWEST, L.L.P., *et al.*, | § § § § | |
| Defendants. | § | |

**DECLARATION OF THOMAS MELSHEIMER IN SUPPORT OF RELATORS'**
<u>**MOTION FOR STATUTORY FEES AND COSTS**</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.:

***Introduction***

1. I am an attorney in good standing who has been licensed to practice law in the State of Texas since 1986. I am admitted to practice in the United States Court of Appeals for the Fifth and Federal Circuits, and the United States District Courts for the Eastern, Western, Northern, and Southern Districts of Texas.

2. I am the managing partner in the Dallas office of the law firm of Winston & Strawn LLP. Winston & Strawn is a 160-year old international law firm headquartered in Chicago, Illinois with nearly 1,000 attorneys across offices in Dallas, Houston, Los Angeles, New York, and Washington, D.C. The firm represents clients in litigation and transactional matters across the full spectrum of our client's needs in virtually every industry. I obtained a B.A. degree, *magna cum*

CONFIDENTIAL

*laude*, from the University of Notre Dame in 1983 and my J.D. from the University of Texas School of Law, with High Honors, in 1986.

3.      I am a Fellow of the American College of Trial Lawyers and the International Academy of Trial Lawyers, and a member of the American Board of Trial Advocates.

4.      I am a trial lawyer who represents companies and individuals in complex litigation, including False Claims Act ("FCA")/*qui tam* litigation.  Many of my cases are litigated in Texas federal district courts.  I have tried numerous cases within the Eastern District of Texas in particular over the past several decades.

5.      **Attachment 1** to this declaration summarizes the hours expended by each Winston & Strawn attorney, paralegal, and litigation support specialist, along with their rates, years of experience, and total hours billed, for which Relators are seeking reimbursement.

6.      **Attachment 2** to this declaration is a true and correct copy of Winston & Strawn's itemized fee statements for this matter for which Relators are seeking reimbursement.  The fee statements were created contemporaneously (*i.e.*, reasonably close in time) with the work performed, and describe the time spent on each individual task (*i.e.*, multiple tasks are never combined into a single "block bill").  Attorneys also reviewed the entries for privilege issues and clerical corrections, which were approved by the attorneys performing the work whenever possible, and if not possible (*e.g.*, in the case of a retiring attorney), by the attorney supervising the work and knowledgeable of the work performed.  The rates reflect the historical rate rather than the current rate.  Using the current rather than the historical rates result in total attorneys' fees of $10,034,038.00, an increase of $660,185.00 over the historical claimed rates, or approximately 6.5%.

CONFIDENTIAL

*Case Background*

7. Winston & Strawn started its representation of Relators in March 2018 after the United States' decision not to intervene in the case and the withdrawal of Relators' previous counsel.

8. At that point, Winston & Strawn counsel significantly revised the complaint, adding claims against numerous additional defendants and claims based on the Stark Law that were not included in the original complaint.

9. The case was originally scheduled for trial in July 2020, but was continued to October 2020 at Defendants' request.

10. The case settled in principle on July 2, 2020, ████████████████████████████████████████████████████████████

11. Tasks – Winston & Strawn's work included the following tasks that in my opinion were necessary to the successful prosecution of the case:

   a. Drafted a 79-page complaint to comply with Rule 9(b)'s standard, and amended the complaint two additional times based on evidence obtained during discovery, as permitted by the Court (Dkts. 31, 158, and 321);

   b. Took more than 30 depositions;

   c. Served subpoenas to obtain documents and/or written discovery responses from more than a dozen third parties (*e.g.*, Relators served subpoenas on 12 physician-owned hospitals and Defendants subpoenaed an additional 30 hospitals);

   d. Reviewed more than approximately 75,000 documents (based on my understanding from speaking with the attorney supervising these efforts), mostly documents produced by Defendants;

  e. Responded to 67 pages of motions to dismiss, denied in full (Dkt. 111);

  f. Responded to 97 pages of motions for summary judgment, denied in full (Dkt. 334);

  g. Drafted a motion for partial summary judgment (Dkt. 176), granted in part (Dkt. 333);

  h. Drafted and responded to *Daubert* motions for 10 experts (five experts for each side) (five physicians, three lawyers, and two economists);

  i. Drafted and responded to numerous discovery requests;

  j. Drafted numerous discovery motions: (motion to compel quality files (Dkt. 130, granted Dkt. 131); motion to compel due diligence documents (Dkt. 146, granted Dkt. 318); motion to compel production of redacted documents (Dkt. 336));

  k. Conducted a court-ordered mediation;

  l. Began trial preparation for October 2020 trial; and

  m. Prepared this fee petition.

12. In my experience, this case was somewhat unique for declined FCA cases in that the DOJ both closely monitored the case and played an integral role in settlement discussions, making Relators' communications with DOJ particularly vital to its progress and resolution.

13. Relators' counsel drafted at least five formal memos summarizing key case evidence and strategic concerns, participated in numerous phone calls and written responses to requests for information, and prepared a formal PowerPoint presentation summarizing key evidence.

14. **Advice-of-Counsel Defense** – Defendants' advice-of-counsel defense, which is (in my experience) rare in FCA cases, substantially added to the scope of required work. It resulted

CONFIDENTIAL

in Defendants producing thousands of additional documents related to the defense that would otherwise have been privileged.  Also, Relators deposed the five outside attorneys purportedly involved in providing oral or written advice, and it was a subject of numerous additional depositions.  Defendants' advice-of-counsel defense also resulted in hiring three lawyer experts (two by Defendants and one by Relators).  The defense also engendered numerous discovery disputes and correspondences between counsel concerning the scope of the waiver related to the defense and whether it applied to certain documents.

15. The multiplicity of defendants also resulted in additional documents, discovery requests, depositions, and motions practice.

***Subject Matter of the Case***

16. The complex and highly technical subject matter required exploration of and understanding of not only complex medical issues, but also issues surrounding physician privileging and credentialing, and ownership issues.

17. The Relators invested more than 1,000 hours of their own time that will not be reimbursed by Defendants.

18. Relators performed significant work on the case that would ordinarily be performed by attorneys or paid experts, including the following:

    a. Relators worked to obtain the cooperation of numerous fact witnesses, including current THH owners Dr. Alistair Fyfe, Dr. Elizabeth Holper, Dr. Barron Hamman, and Dr. Eric Eichhorn, and former partner and Chief Medical Officer Dr. Bradley Leonard.  For all witnesses, Relators initiated the contacts, interviewed them regarding their factual knowledge, and facilitated their testimony, including through several in-person meetings;

CONFIDENTIAL

      b.      Relators spent hundreds of hours reviewing, editing, and providing expert guidance on discovery requests, discovery responses, and briefs. In fact, Relators were designated as expert witnesses under F.R.C.P. 26(a)(2)(C) concerning Defendants' patient-contacts requirement and its purported connection to quality of care; and

      c.      Relators also attended and assisted with the depositions of numerous fact and expert witnesses, consulting on technical and medical issues. Dr. Magee personally attended and contributed to more than 20 depositions.

***Attorneys' Fees***

19.    ***Billing Judgment*** – Relators' counsel reviewed the bills to make appropriate reductions. In particular, counsel reduced or eliminated time, as summarized in **Attachment 3** to this declaration, "Summary of Billing Judgment Reductions." In this case, Winston & Strawn devoted **14,569.8** hours of time from 52 timekeepers (28 Winston & Strawn partners, associates, and practice attorneys), and another $2,153,996.22 in out-of-pocket expenses and costs. Even more time and out-of-pocket expenses would have been required to take the case through trial.

20.    Any non-working travel time was reduced by approximately 50%. Non-working travel time is typically billed to Winston & Strawn clients, but in some instances is reduced both at Winston & Strawn and in the industry.

21.    ***Billing Rates*** – Based on my knowledge and experience, the rates charged by the attorneys in this case are reasonable according to the prevailing Sherman market rate because the community of Sherman within the Eastern District of Texas includes some of the most sophisticated law firms and litigants in the country, commonly including attorneys from large firms with offices in Dallas such as Winston & Strawn, Reed Smith, and Norton Rose Fulbright. *See* **Attachment 1**. Firms typically do not differentiate between the rates they would charge for a

CONFIDENTIAL

matter in Sherman, and for a case in another venue in the Eastern District of Texas (such as Marshall or Tyler), nor for what they would charge for a case pending in the Northern District of Texas.

22. The rates are also the same rates Winston & Strawn attorneys typically charge for representing clients in similar litigation, including in the Eastern District of Texas and Sherman.

23. Winston & Strawn attempts to ensure that its billing rates remain competitive with those charged by its peer firms by regularly analyzing legal industry information provided by numerous independent sources, including but not limited to, the annual Price Waterhouse & Coopers (PwC) survey of legal rates (in which Winston participates but the results of which Winston is not permitted to make public).

*Unique Case Features*

24. Several unique features of this case in my opinion justify the rates charged. First, the United States declined to intervene in the case, requiring a law firm that could marshal significant resources, including paying for significant out-of-pocket expenses. In my experience, it has been the historical practice of many small law firms and those that specialize in FCA lawsuits to withdraw after the United States declines to intervene.

25. In my experience, the investment Winston & Strawn made in this case, including particularly the out-of-pocket investment of more than $2 million, would not be possible for most firms. And in my experience, of the small universe of law firms that would have the resources and would be willing to represent relators, they likely would have comparable rates.

26. Another reason is that the chances of obtaining a successful result in a declined case is historically low in comparison to intervened cases. *See* DOJ Fraud Statistics – Overview, October 1, 1986 – September 30, 2019, available at https://www.justice.gov/opa/press-

CONFIDENTIAL

release/file/1233201/download.  A recent development making declined cases even more risky from the perspective of relators' counsel is the Department of Justice's 2018 memo, "Factors for Evaluating Dismissal Pursuant to 31 U.S.C. § 3730(c)(2)(A)," which has resulted in significant efforts by defense counsel to convince the DOJ to move to dismiss declined cases.

27. For example, Winston & Strawn recently invested millions of dollars in an FCA case that was dismissed pursuant to this memo seven years after its filing, having already survived two motions to dismiss. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916, 940 (E.D. Pa. 2019).

28. It is my understanding Defendants' counsel vigorously and repeatedly sought to have the United States move to dismiss this case based on the rationale in this memo.

29. Although frequent and effective communication with the DOJ is important in all FCA cases in my experience, it was particularly so in this case.

30. The alleged fraud in this case implicated complex issues including cardiology quality of care, physician credentialing and privileging practices, and hospital ownership issues. This made it even more important that counsel have deep experience with both the FCA and the healthcare statutes at issue.

**Baylor Scott & White's Legal Counsel**

31. Defendants' lead counsel was Jeff Layne of Reed Smith, who is in my opinion and based on my knowledge of his background an eminently experienced FCA lawyer based in Austin with unique subject matter expertise, having obtained a master's degree in public policy from Harvard University.

CONFIDENTIAL

32. Norton Rose Fulbright attorney Rodney Acker also served a central role in the case. I know Mr. Acker to be one of the most experienced and well-respected trial attorneys in Dallas, and he is currently the president-elect of the American College of Trial Lawyers.

33. ████████████████████████████████████████████████████████████████████████████████████████████████████████████ Based on market survey and other publicly available information, it is likely that Reed Smith and Norton Rose Fulbright's standard rates are similar to those claimed by Winston & Strawn in this case.

*Winston & Strawn's Reduced Billing Rates and Hours*

34. One unique feature of Winston & Strawn that significantly reduced its effective billing rates is an "in-house" team of full-time document review attorneys. In this case, these attorneys billed at the rate of $80 per hour and expended 1,599.80 hours. Our supervising document review attorney billed at $105 per hour.

35. In my experience, these tasks have historically often been performed by young associates that bill at a much higher rate (several times as high), or by outside vendors that must be paid a premium.

*Preclusion of Other Employment*

36. Each of the attorneys significantly involved in the case was precluded from other employment based on the acceptance of this case, including both work for hourly clients and work for FCA clients. I was personally involved in the decision to turn down multiple FCA cases because of our investment in this case. Every attorney that has significantly contributed to this

CONFIDENTIAL

case has done hourly work for clients during the course of this case, and was at least on occasion precluded from doing hourly work for those clients based on their involvement in this case.

***Amount Involved and the Results Obtained***

37. The settlement in principle included both the promise of a ███████████, which is a particularly significant settlement in a case in which the United States has declined to intervene. The settlement in principle also included ████████████████████████ ████████████████████████████ which from the perspective of Relators is also significantly important. If not for this outcome, it is likely the practice of using patient contacts to generate business could have proliferated throughout the country.

38. The DOJ attorneys have recommended that Relators receive a Relators' share award ████████████████████████████████████████ ████████████████████████████████████████

39. The United States ended up taking a primary role in negotiating a settlement of the case, and it is my understanding that it did so because of the importance of the case to CMS and the public interest.

***Experience, Reputation, and Ability of Winston & Strawn Attorneys***

40. The Winston & Strawn attorneys collectively have decades of experience trying complex cases, including in false claims and *qui tam* litigation.

41. I was lead counsel along with Natalie Arbaugh and Chad Walker in the most successful *qui tam* settlement in the history of the Texas Medicaid Fraud Prevention Statute in terms of the size of the recovery. The Winston & Strawn team has litigated numerous *qui tam* cases since that time.

CONFIDENTIAL

42. Based on my experience, there are numerous features of this case that would make it undesirable to most firms that represent whistleblowers, including the following:

    a. The United States declined to intervene during a period of increased risk of dismissal for these cases; and

    b. Defendants are the largest regional healthcare provider with immense legal resources.

*Award of Expenses*

43. A true and correct summary of the expenses the firm is claiming is provided in **Attachment 4** to this declaration. All expenses that could fall under office overhead have been excluded. The summary in **Attachment 4** is based on the detailed invoice of expenses included in **Attachment 2 ("Itemized Fee Statement")**.

44. Expert Witnesses Expenses – Each side retained five testifying experts. Relators' experts were economist Erica Bramer (supported by economic experts) ("BVA consulting"), two cardiology quality of care physician experts (one expert in general cardiology and one in cardiology surgery), one hospital credentialing physician expert, and one healthcare regulatory attorney expert.

45. In my opinion, the attorney expert was essential to rebutting Defendants' advice-of-counsel defense.

46. The Bramer/BVA consulting expenses were by far the highest among experts, in large part because of the volume of financial documents Ms. Bramer and her team were required to review and analyze. Ms. Bramer produced an 84-page report with 204 pages of exhibits, analyzing and describing the financial incentives created by and financial harm resulting from the patient-contacts requirement. Ms. Bramer also produced a supplemental 3-page report with 262

CONFIDENTIAL

pages of exhibits. Relators' counsel negotiated a 15% discount from BVA's normal rates due to the high volume of work, which reduction is reflected in the attached expense report. As demonstrated in the BVA expert report, the Medicare dollars at stake *prior to mandatory trebling and penalties* exceeded one-billion dollars. Although denying liability, Defendants' did not challenge Ms. Bramer's calculations based on Defendants' own claim data.

47. **Travel Expenses** – Travel and related miscellaneous expenses are those associated with attendance at depositions, court hearings, and meetings with experts. Travel expenses are limited because all deposition witnesses were located within driving distance close to Plaintiffs' counsels' offices, and expert travel expenses are limited.

48. **Courier Services** – Courier services are reasonable and are included only to the extent that they were used to transport documents for court conferences, depositions, pretrial hearings, and trial.

49. **Electronic Discovery Services** – In my experience, electronic discovery services were mandatory for a case of this size. There are more than 75,000 documents, including emails, and correspondence from Defendants and third parties. These expenses would ordinarily be provided by an outside vendor, but in this case were provided by internal Winston & Strawn resources, likely saving significant costs versus hiring an outside vendor.

50. Copying Costs – Copying costs have been included to the extent they include copies for document productions, depositions, hearings, and motions. Also included in this category are copying costs reimbursed to third parties in compliance with Plaintiff's subpoenas. Copies for inter-office use of documents have been eliminated from these expenses.

51. **Mediation Fees** – Mediation fees were incurred for court-ordered mediation and should be compensable.

CONFIDENTIAL

*Award of Costs*

52.     **Fees of the Clerk** – A true and correct summary of costs Relators are claiming is provided in **Attachment 5** of this declaration. The summary provided in **Attachment 5** is based on the detailed invoice of costs included in **Attachment 2 ("Itemized Fee Statement")**. This category includes filing fees and admission and *pro hac vice* fees paid directly to the clerk of this Court.

53.     **Fees for Service of Summons and Subpoenas** – These fees include service of process fees for subpoenas served on multiple third parties, including several third-party physician-owned hospitals. It was necessary to subpoena these hospitals to show that Defendants' patient-contacts requirement as a link of ownership differed from industry practices.

54.     It was also necessary to subpoena limited claims data from CMS, which was never obtained.

55.     **Fees for Printed or Electronically Recorded Transcripts** – These costs include the costs of transcripts of depositions and hearings.

56.     These costs were necessary as the transcripts of depositions were used by the experts in preparation of their reports and by Plaintiffs in gathering the necessary evidence for trial, as well as for impeachment at trial.

57.     The hearing transcripts were necessary in order for Plaintiff to ensure that the Court's directives were properly followed.

CONFIDENTIAL

58. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of September, 2020, in Dallas, Texas.

*[signature]*

_____
Thomas M. Melsheimer

CONFIDENTIAL